**In re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION.**

**Mark Newby, et al., Plaintiffs**

**v.**

**Enron Corporation, et al., Defendants.**

**Connecticut Resources Recovery Authority, Plaintiff,**

**v.**

**Murtha Cullina, LLP, et al., Defendants.**

**Connecticut Resources Recovery Authority, Plaintiff,**

**v.**

**Kenneth L. Lay, et al., Defendants.**

**Connecticut Resources Recovery Authority, Plaintiff,**

**v.**

**Kenneth L. Lay, et al., Defendants.**

**MDL No. 1446.**
**Civil Action Nos. H–01–3624, H–03–1580, H–03–1579, H–03–1558.**

United States District Court,
S.D. Texas,
Houston Division.

Feb. 16, 2005.

---

*MEMORANDUM AND ORDER*

MELINDA HARMON, District Judge.

**ROADMAP**

I. Factual Background and H–03–1580 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .751

**750**

II. Pending Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .757
 A. H–03–1580 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .757
 B. H–03–1579 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .757
 C. H–03–1558 . . . : . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .758

III. Motions in H–03–1580 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .760
 A. CRRA's Motion to Remand and/or Abstain or to Strike, Dismiss or Sever
 and Remand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .760
 B. Court's Ruling on Key Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .761
 1. "Related To" Bankruptcy Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . .761
 2. Well Pleaded Complaint Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .763
 3. CRRA's Motion to Abstain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .764
 4. CRRA's Motion to Strike, Dismiss or Sever and Remand
 Apportionment Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .765

IV. Motions in H–03–1558 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .774
 A. CRRA's Motion to Remand or Abstain or to Strike, Dismiss or Sever . . . . . . . .774
 B. CRRA's Motion to Stay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .775
 C. CRRA's Petition for Certification of Interlocutory Appeal . . . . . . . . . . . . . . . . .775
 D. Credit Agencies' Motion for Leave to File Motions to Dismiss or For Stay
 of Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .776
 E. CRRA's Motion to Consolidate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .777
 F. CRRA's Motion to file Sur–Reply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .777
 G. Defendant Andrews & Kurth LLP's Motion to Dismiss . . . . . . . . . . . . . . . . . . .777
 1. Allegations in the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .777
 2. The Arguments and Court's Comments . . . . . . . . . . . . . . . . . . . . . . . . . . .778
 3. Court's Rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .788
 a. Personal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .788
 b. Applicable State Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .790
 c. Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .797
 d. CUTPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .799
 e. Aiding and Abetting Negligent and/or Fraudulent
 Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .801
 (1.) General Challenges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .801
 (2.) The Elements of a § 876(b) in Connecticut . . . . . . . . . . . . . . . . .804
 (a.) Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .804
 (b.) Substantial Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . .805
 H. Credit Rating Agencies' Motions to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . .808
 1. Negligent Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .809
 a. Rating Agencies' Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .809
 b. Court's Ruling on Negligent Misrepresentation Claim . . . . . . . . . . . . . .815
 (1.) First Amendment Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . .817
 (2.) Duty of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .826
 2. CUTPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .827
 a. Rating Agencies' Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .827
 b. Court's Ruling on CUTPA claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . .830
 (1.) Professional Negligence Exemption . . . . . . . . . . . . . . . . . . . . . . . .830
 (2.) Unfair Practice that Violates CUTPA: The Cigarette Rule . . . . .833

V. Summary of Rulings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .835
 A. H–03–1580 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .835
 B. H–03–1558 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .835
 C. H–03–1579 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .836

Plaintiff Connecticut Resources Recovery Authority ("CRRA") filed the three, above referenced, related actions in Connecticut state court, each of which was removed and ultimately transferred to this Court by the Judicial Panel on Multidis-

trict Litigation for pretrial consolidation with MDL 1446. All three are brought by Richard Blumenthal, Attorney General of the State of Connecticut, on behalf of CRRA, a Connecticut State agency created and controlled by statute, to recover public money lost or damages for injury allegedly suffered by CRRA when Enron Corporation ("Enron") and its subsidiary, Enron Power Marketing, Inc., stopped payments to CRRA in breach of an agreement known as the "Enron Transaction" and filed for chapter 11 bankruptcy protection on December 2, 2001.

The suits in part arise out of the same nucleus of facts regarding purportedly *ultra vires* contractual agreements comprising the Enron Transaction, executed in December 2000 by CRRA, Connecticut Light & Power ("CL & P"), and Enron. CRRA on the one hand, in H–03–1558 and H–03–1579, claims that the Enron Transaction was part of the same fraudulent pyramid scheme that has been asserted in *Newby* and in many of the MDL 1446 actions (involving lawyers, accountants, investment banks, etc.) to misrepresent Enron's financial condition and to lure and defraud investors and businesses. Simultaneously CRRA maintains that its claims in H–03–1580 against three law firms for their role in advising CRRA and structuring the Enron Transaction are separate and unrelated to Enron's financial collapse, even though a substantial portion of its damages resulted when Enron filed for bankruptcy and stopped payments owed to CRRA under the Enron Transaction agreements.[1] Because some of the pending motions in the three suits are interrelated, the Court addresses the motions in all three actions in this memorandum order.

## I. Factual Background and H–03–1580

A malpractice suit, now designated H–03–1580, *Connecticut Resources Recovery Authority v. Murtha Cullina, LLP, et al.,* was originally filed in the Superior Court for the Judicial District of Hartford, Connecticut under docket number CV 02 0818783 S, then transferred to the Waterbury Complex Litigation Docket under number (X06) CV 02 0174569 S, from which it was removed by some of the subsequently added Third-party Apportionment Complaint Defendants to the United States District Court of the District of Connecticut, before being transferred to the undersigned judge by the Judicial Panel on Multidistrict Litigation.

The causes of action asserted under Connecticut state law in the original Complaint, filed on August 7, 2002, are breach of a legal services agreement, negligence, and indemnification against CRRA's outside counsel, Murtha Cullina, L.L.P. ("Murtha") and Hawkins, Delafield and Wood ("Hawkins, Delafield"). Ex. A to #1. On November 26, 2002, Defendant Leboeuf, Lamb, Greene & McCrae ("Leboeuf"), which served as outside counsel for Enron during the Enron Transaction and whose opinion letters were allegedly relied upon by CRRA in consummating the Enron Transaction, was added in an Amended Complaint, the governing pleading here. Part of Ex. C to #1. The causes of action asserted against Leboeuf are negligent misrepresentation, fraudulent misrepresentation, and violation of the Connecticut Unfair Trade Practices Act

---

1. CRRA argues that while liability in its suits H–02–1579 and H–03–1558 against Lay, *et al.* arises out of Enron's financial crash, this malpractice suit, H–03–1580, alleges that three law firms drafted, developed and caused CRRA to enter into the Enron Transaction and to lend $220 million to Enron when the Defendant law firms knew or should have known that such a transaction was illegal and beyond CRRA's statutory authority. Thus CRRA insists that even if Enron had not gone into bankruptcy, CRRA would still be entitled to recover damages.

("CUTPA"), Connecticut General Statutes ("C.G.S.") § 42–110a, *et seq.* Since H–03–1580 focuses most narrowly on the nature of CRRA's business relationship to the three law firms, and to non-party Enron, in the Enron Transaction, the seed which ultimately gave rise to the all three suits, the Court begins with it to provide factual background.

CRRA alleges the following background facts. H–03–1580 was brought by the Attorney General of the State of Connecticut, on behalf of CRRA, "a public instrumentality and political subdivision of the state of Connecticut pursuant to Conn. Gen.Stat. § 22a–257 *et seq.* (the Solid Waste Management Services Act)," which manages, recycles, and disposes of solid waste for most of Connecticut's towns. Under waste management services contracts, 169 Connecticut towns paid CRRA's operating expenses and provided at least minimum amounts of waste and recyclables for disposal, while CRRA operated facilities to burn solid waste and convert the resulting waste heat into steam or electricity, which CRRA then sold under energy purchase agreements, and used the funds generated to defray garbage hauling fees charged by CRRA to the member towns.

The towns are divided into, and financially guarantee, four regional "projects" that are financially independent of CRRA. Original Complaint at 1–3, Ex. A to Notice of Removal (instrument # 1). The project involved in this dispute is the Mid–Connecticut Project. A statutorily created state agency, CRRA is authorized by C.G.S. § 22a–269 to issue tax-exempt bonds to construct, operate and maintain the Projects; the bonds are secured by contracts that CRRA entered into with the member towns, which provide the waste and recyclables and pay CRRA's operating expenses, and by other CRRA assets. The statute limits CRRA's authority by allowing it to make only secured loans specifically for the acquisition, construction or reconstruction of waste management projects, and to make only safe, conservative investments in government securities. It may also only make loans of "funds not needed for immediate use" to municipal or regional waste management authorities to establish waste management projects. *Id.* at 7. Internal procedures allow CRRA to make loans to private entities "only as part of comprehensive financial agreements related to solid waste facility financings," and such loans must be approved by CRRA's Board of Directors or those to whom or to which such authority has been delegated by the Board of Directors.

For years CRRA used money derived from the sale of bonds to construct and maintain several "trash-to-energy" plants to burn solid waste from member towns to create steam, which it then sold to CL & P for conversion into electricity. CRRA then used the proceeds from the sale of the electric or steam energy and the per-ton garbage hauling ("tipping") fees charged to member towns to pay for CRRA's operating expenses and the principal and interest payments on its bonds.

In 1985, before deregulation, CRRA and CL & P entered into a long-term energy purchase agreement ("the 1985 EPA"), which was to govern until May 2012 and under which CRRA would sell to CL & P the steam from the plant generated by the burning of the solid waste in the Mid–Connecticut Project for conversion into electricity at a set rate of 8.5 cents per kilowatt hour of the electricity that was produced. This price was above the prevailing price in the New England regional wholesale electricity market.

In the wake of energy deregulation in 1998, the Connecticut Deregulation Act (P.A. 98–28) required utilities like CL & P to focus on distribution and transmission of electricity and to divest themselves of

power generation facilities. Thus these utilities sought to divest themselves of purchasing contracts like the 1985 EPA by means of buyouts, buydowns, or restructuring of their contracts, including a number that CL & P had with CRRA. To compensate the energy suppliers, like CRRA, for the loss of above-market price under the 1985 EPA, the utilities would make an up-front lump-sum payment to the suppliers in the buydowns. After obtaining the necessary approval, CL & P issued state-tax-exempt Rate Reduction Bonds, provided for by the Connecticut General Assembly in the Deregulation Act, to produce the capital necessary to effectuate the buydowns. Subsequently, CL & P and CRRA entered into a memorandum of understanding, pursuant to which CL & P would pay up front approximately $280 million to CRRA to eliminate or reduce CL & P's 1985 EPA obligation to purchase steam from CRRA until May 2012 at an above-market valuation. Moreover, as another part of the Enron Transaction, CL & P agreed to buy all the power generated by the newly sold facility, known as South Meadow, in Hartford, Connecticut, but at a lower price than it was obligated to pay before.

According to the amended complaint in the main case, Murtha Cullina, CRRA's long-time counsel, in a purported conflict of interest, represented CRRA in these negotiations, while its lobbying arm simultaneously worked for Enron to open governmental work and business opportunities, in particular approval of a publicly funded fuel cell project, in Connecticut that would involve CRRA. In December 2002 Enron became involved in the Mid–Connecticut Project buydown, i.e., the allegedly illegal and statutorily unauthorized Enron Transaction, comprised of five main contracts and two agreements dated December 22 and December 28, 2000, which replaced the 1985 EPA between CRRA and CL & P. Of the $280 million received from sale of the Rate Reduction Bonds, CRRA took $60 million, of which it used $10 million to buy the electricity-generating facilities, the land on which they sat, and the equipment owned by CL & P, $27 million to clean up the environmental contamination at the site, and $23 million for its own needs. CRRA instructed CL & P to provide the remaining $220 million directly to Enron and structured the repayment of this unsecured "loan" in two separate monthly payments, one of $2.2 million and the other $175,000, by Enron to CRRA over an eleven-and-one-half-year period (for a total of $294.8 million with interest). CRRA purportedly did not receive any collateral, surety bond, or risk-management interest to secure the deal with Enron outside of a contractual guarantee by Enron to repay Enron's obligations. Thus the complaints in these three actions contend that what was in actuality an illegal loan of $220 million by CRRA to Enron was disguised, camouflaged and/or manipulated by the law firms, which drafted the documents, so that it would instead appear on Enron's financial books as an energy transaction, creating a big cash infusion for the company. Murtha Cullina and Hawkins, Delafield purportedly set up the unsecured loan for CRRA, and Leboeuf acted as Enron's counsel on the transaction, which CRRA contends was illegal, *ultra vires,* and void *ab initio* because CRRA did not have the statutory authority to lend the $220 million to Enron. CRRA maintains that in actuality Enron's role in the Enron Transaction was limited to that of borrower obligated to repay the $220 million loan to CRRA with interest; Enron never had custody or control of the steam or electricity, never generated either type of energy, assumed none of the actual risk, which at all times was borne by CRRA, and made no profit on the energy transfer, nor did it handle

its own billing or payment for power delivered to CL & P by CRRA.[2] Moreover, according to the amended complaint, in a December 28, 2000 memorandum, Hawkins, Delafield predicted that CRRA was "almost certain to" receive $26.4 million per year, whether or not CRRA produced any energy in that contract year.

Enron's monthly payments to CRRA began in April 2001 and were to end in 2012; Enron made the payments only until it and Enron Power Marketing, Inc. ("EPMI"), a subsidiary of Enron, filed for protection under the bankruptcy laws on December 2, 2001.

In addition, the complaint asserts that Murtha Cullina and Hawkins, Delafield secretly developed a plan to divert monies from the financially independent Mid–Connecticut Project into CRRA's own accounts to fund a new and risky venture in alternative energy technologies. On the advice of Murtha Cullina and Hawkins, Delafield, which allegedly did not inform the towns of the Enron Transaction nor disclose the risk involved nor obtain the member

**2.** In an effort to distinguish its Adversary Proceeding complaint in the Enron bankruptcy proceedings from its legal malpractice action against lawyers for erroneous advice on business dealings and the Apportionment Complaint, both of which CRRA insists do not involve Enron or the Enron bankruptcy estate, CRRA explains its theory in the Adversary Proceeding as follows:

Because the loan was void *ab initio*, Enron received no title or only bare legal title, leaving CRRA with beneficial ownership of the funds. Under applicable state and federal bankruptcy law, CRRA has claimed that Enron is holding the loan proceeds in a constructive trust for the benefit of CRRA and has an enforceable duty to return those funds to CRRA. CRRA's claim is that as the true owner of the property, it is not a creditor and its claim exists outside the bankruptcy estate. *See Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.)*, 874 F.2d 88, 93 (2d Cir. 1989) ("A constructive trust ... confers on the true owner of the property an equitable interest in the property superior to that of a trustee."). Property in which the debtor has no property interest, as CRRA alleges to be the case with the $220 million loan, is not part of the debtor's estate because the Bankruptcy Code expressly excludes from the estate property in which the debtor has only a legal and not an equitable interest. *See* 11 U.S.C. § 541(d).

CRRA's memorandum of law in support of its motion for remand or abstention, # 73 at 25. CRRA argues that "while both actions involve the same illegal $220 million loan to Enron, the legal requirements for recovery from the law firms under state law and from Enron under a constructive trust are completely different. Additionally, with different defendants in state court (the law firms) and in the bankruptcy court (Enron), CRRA's state law legal malpractice action will have no effect on the Enron bankruptcy case." *Id.* at 16. It further contends that the Apportionment Complaint is not "related to" the Enron bankruptcy estate and is not related legally or factually to the adversary proceeding because (1) its potential claims are "merely speculative and hypothetical"; and (2) it seeks damages from numerous parties other than Enron who allegedly helped Enron conceal its financial condition; and (3) if its theory that Enron holds the loan proceeds in a constructive trust for CRRA is successful, the loan will be judicially declared illegal and void *ab initio* and the money given to Enron would never have been part of the Enron estate. *Id.*

According to the memorandum in opposition to the remand (# 107 at 9, n. 8) filed by Hawkins, Delafield, in an order dated June 23, 2003 (Ex. L to # 108), after reconsideration and reargument of the matter, Judge Gonzalez dismissed the constructive trust complaint in the Adversary Proceeding with prejudice, concluding there was no basis to impose a constructive trust because there was no allegation that CRRA had custody or ownership of the funds and thus it could not show that its property was in the hands of the wrongdoer, i.e., traceable. Nevertheless CRRA remains in the bankruptcy proceeding as an unsecured creditor of Enron with a proof of claim for $220 million.

Furthermore, This Court finds that restricting the standard of "any conceivable effect" to what would follow if CRRA won its adversary proceeding would be erroneous.

towns' approval, while the $2.2 million monthly payment went to the Mid–Connecticut Project, the $175,000 monthly payment went into a new CRRA Non–Project Ventures Fund for use outside the Mid–Connecticut Project.

The complaint charges that the Enron Transaction, involving CRRA, CL & P, and Enron, developed and documented by Murtha Cullina and Hawkins, Delafield, was an illegal contract not only outside the scope of CRRA's statutory authority, but also in violation of CRRA's internal procedures, and that it threatened the financial stability of the Mid–Connecticut project.[3] The complaint further alleges that Murtha Cullina and Hawkins, Delafield failed to advise CRRA to retain financial advisors to examine the merits of the transaction as well as to warn of any risks involved in doing business with Enron.

Moreover under the tax arbitrage laws non-profit, tax-exempt entities like CRRA are not allowed to profit from their tax-exempt status and may not use capital raised by issuing tax-exempt bonds to make net profits on financial investments, but must rebate any such profits to the IRS. The complaint states that CRRA was paying its Mid–Connecticut bond holders about 5 and 1/2% from bond proceeds on any earnings, while Enron was paying CRRA 7%. Thus CRRA should have been paying the difference back to the IRS, as well as the diverted $175,000 monthly payment. However Murtha Cullina and Hawkins, Delafield drafted the contract to make it appear that the monthly payment

in the Enron Transaction was an ongoing energy sale not covered by the arbitrage laws. Hawkins, Delafield also reassured the Board of Directors that the Enron Transaction had no federal tax arbitrage implications and issued an erroneous opinion that CRRA was authorized to enter into the transaction and did not need bondholder consent. Murtha Cullina's and Hawkins, Delafield's advice and guidance in the Enron Transaction, undisclosed to the towns or to the bondholders and bond trustee, allegedly endangered the tax-exempt status of CRRA's bonds, created a substantial risk of higher operating costs for the Mid–Connecticut Project and of tipping fees for the towns, threatened the Project's ability to repay its bondholders, and menaced the Project's financial stability.

Procedurally, the malpractice suit against CRRA's and Enron's attorneys was significantly modified when, according to CRRA, on December 12, 2002, Hawkins, Delafield became an "Apportionment Plaintiff" by impleading forty-eight Third–Party Defendants, including former Enron executives and directors, and Arthur Andersen LLP along with a number of partners in that accounting, auditing and consulting firm, by filing what Connecticut calls an "Apportionment Complaint" for potential liability for a proportionate share of the damages sought by CRRA under Connecticut General Statutes ("C.G.S.") §§ 52–102(b) and 52–572(h), as amended by Public Act ("P.A.") 99–69. Apportionment Complaint, Ex. B to the Notice of Removal (# 1).[4] CRRA asserts that nearly all the Third–Party Defendants to H–

---

3. The $220 million loan to Enron represented 44% of the Mid–Connecticut Project's assets and 85% of the Project's equity. Moreover, the Mid–Connecticut Project is "by far the largest part of CRRA" and in 2001 the Mid–Connecticut Project constituted 75% of CRRA's complete asset base. Complaint at 19–20, ¶ 45.

4. Although CRRA characterizes this as a "third-party complaint" and represents that

the Defendants were "impleaded," Hawkins, Delafield insists such is not the case. Federal Rule of Civil Procedure 14(a) permits a claim against "a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." In contrast, an apportionment complaint under Connecticut law seeks only an apportionment of fault or responsibility, if there is any, among multiple defendants.

03–1580 had already been sued in state court by CRRA in a separate action alleging fraud, intentional torts, and violation of the CUTPA, based on Enron's purported concealment of its financial instability and fraudulent business dealings from CRRA. That case has since been removed and transferred to this Court by the Multidistrict Litigation Judicial Panel, and is now pending before the undersigned judge as H–03–1558. The parties frequently refer to the pleading in H–03–1558 as the "global complaint"[5] and the suit as the "global action" or "global suit." In essence, H–03–1558 alleges virtually the same kind of fraudulent scheme attacked by Lead Plaintiff in *Newby* in complaining that Defendants fraudulently helped Enron hide its financial instability and fraudulent business deals from the public, including CRRA, and precipitated Enron's financial collapse and CRRA's loss of $220 million that it had lent to Enron. The Third–Party Apportionment Complaint in H–03–1580 is modeled upon and repeatedly references the global complaint, according to CRRA.

Procedurally as well as substantively distinguishable from the other two suits,

the legal malpractice suit, H–03–1580, was removed to federal district court not by the Defendant law firms, but by some of the Third–Party "Apportionment Defendants" under C.G.S. § 52–102b(a).[6] The Apportionment Defendants[7] argue that federal jurisdiction exists over the whole suit under 28 U.S.C. §§ 1334(b) and 1452 and Bankruptcy Rule 9027 because the third-party complaint is "related to" Enron's bankruptcy proceeding, pending before Judge Arthur Gonzalez in the United States Bankruptcy Court for the Southern District of New York, *In re Enron Corp.*, No. 01–16034. Specifically Apportionment Defendants maintain that the Apportionment Complaint is "related to" the Enron bankruptcy proceedings because (1) the factual and legal issues in this case relate to those in Adversary Proceeding No. 02–02727 between CRRA and Enron before Bankruptcy Judge Arthur Gonzalez and (2) that if Apportionment Plaintiff Hawkins, Delafield prevails against some of the Third–Party Defendants, Enron may owe contribution or indemnity to some of the Apportionment Defendants for costs of litigating this suit, which would reduce the amount in the bankruptcy estate.[8]

---

**5.** *See* footnote 25 of this memorandum and order.

**6.** Ex. B to Notice of Removal (instrument # 1).

**7.** The Apportionment Defendants are (1) Enron officers and directors Kenneth L. Lay, Jeffrey K. Skilling, Andrew S. Fastow, Richard A. Causey, Richard B. Buy, James V. Derrick, Jr., Jeffrey McMahon, Joseph W. Sutton, Lawrence Greg Whalley, Ben F. Glisan, Ken L. Harrison, Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Wendy L. Gramm, Robert K. Gatwick, John Mendelson, Jerome J. Meyer, Paulo V. Ferraz Pereira, John A. Urquhart, John Wakeham, Charles E. Walker, Charles A. LeMaistre, Joe H. Foy, Frank Savage, Bruce G. Willison, Herbert S. Winokur, Jr., and Rebecca Mark–Jusbasche; (2) Enron accountants Arthur Andersen, LLP, Joseph F. Berardino, David B.

Duncan, Debra A. Cash, David Stephen Goddard, Jr., Gary B. Goolsby, Michael M. Lowther, Benjamin S. Neuhausen, Michael C. Odom, John E. Stewart, Michael L. Bennett, William E. Swanson, Richard D. Willard, Gregory W. Hale, John E. Sorrells, and Danny D. Rudloff; and (3) utilities CL & P, Northeast Utilities Service Company, and Northeast Utilities.

The removing Defendants were Belfer, Blake, Chan, John H. Duncan, Foy, Gramm, Gatwick, LeMaistre, Meyer, Savage, Wakeham, Walker, Winokur, and Willison. A separate consent to the removal (# 3) was filed by the Andersen Defendants except for Michael M. Lowther, Michael C. Odom, Michael L. Bennett, and William E. Swanson.

**8.** Removing Defendants also state, for purposes of Bankruptcy Rule 9027, that this is a non-core proceeding and they do not consent

## II. Pending Motions

### A. H–03–1580

Pending before the Court in H–03–1580, initially alleging malpractice against Defendants Murtha Cullina and Hawkins, Delafield under Connecticut state law, arising out of legal services provided to CRRA relating to the Enron Transaction involving CRRA, CL & P, and Enron Corporation ("Enron"), are *inter alia* the following motions:

(1) Apportionment Defendants Frank Savage and Herbert S. Winokur, Jr.'s motion (filed prior to transfer of the suit to this district) to consolidate H–03–1580 with what is now H–03–1558, *Connecticut Resources Recovery Authority v. Kenneth L. Lay, et al.*, also pending before the undersigned judge as part of the civil Enron litigation, MDL 1446 (instrument # 15);

(2) Plaintiff CRRA's motion to remand (to the Superior Court for the Judicial District of Waterbury, Connecticut) and/or abstain (# 72) [or alternatively to strike, dismiss or sever the third-party complaint pursuant to Rule 14(a) of the Federal Rules of Civil Procedure and remand the underlying malpractice action against the three law firm defendants pursuant to 28 U.S.C. § 1447(c) or 1334(c)(1) or 1334(c)(2)];

(3) CRRA's motion to stay the Apportionment Complaint (# 94);

(4) Apportionment Defendant Joseph W. Sutton's motion to dismiss under Fed. Rule Civ. P. 12(b)(2) for lack of personal jurisdiction (# 61); and

(5) Apportionment Defendant Rebecca Mark–Jusbasche's motion to dismiss under Fed. Rule Civ. P. 12(b)(2) for lack of personal jurisdiction (# 62).[9]

### B. H–03–1579

H–03–1579, *Connecticut Resources Recover Authority v. Lay, et al.*, was removed from the Connecticut Superior Court for the Judicial District of Hartford to the United States District Court for the District of Connecticut on "related to" bankruptcy jurisdiction, based on claims in Adversary Proceeding No. 02–02727, *The Connecticut Resources Recovery Authority v. Enron*, and then transferred to the undersigned judge by the Judicial Panel for Multidistrict Litigation for consolidation in MDL 1446. Pending before the Court in H–03–1579 is CRRA's motion to stay adjudication of any motions to transfer (instrument # 36 in H–03–1579; # 119 in H–03–1558) until CRRA files, and a court resolves, a motion to remand that will determine whether the court has subject matter jurisdiction. CRRA has filed such motions to remand in H–03–1558 (# 121), H–03–1579 (# 39, a duplicate of the one in H–03–1558), and in H–03–1580 (# 72). This Court will rule on these motions to remand in this memorandum and order, mooting the motions to stay adjudication in each case.

In H–03–1579, CRRA seeks to recover from various Enron officers and directors ("the Enron Defendants"[10]), Arthur An-

---

to entry of final orders or judgment by any bankruptcy court.

9. The judge previously presiding over these actions stayed the response dates to # 61 and 62 until thirty days after resolution of the motion to remand so they are not ripe for adjudication on the merits.

10. The Enron Defendants are Kenneth L. Lay, Jeffrey K. Skilling, Andrew S. Fastow, Richard A. Causey, Richard B. Buy, James V. Derrick, Jr., Jeffrey Mahon, Joseph W. Sutton, Lawrence Greg Whalley, Ben F. Glisan, Ken L. Harrison, Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Wendy L. Gramm, Robert K. Gatwick, John Mendelson, Jerome J. Meyer, Paulo V. Ferraz Pereira, John A. Urquhart, John Wakeham, Charles E. Walker, Charles A. LeMaistre, Joe H. Foy, Frank Savage, Bruce G. Willison, Herbert S. Winokur, Jr., and Rebecca Mark–Jusbasche.

dersen, LLP and some of its accountants ("the Andersen Defendants"[11]), Enron's lawyers, i.e., the law firms of Vinson & Elkins, LLP, and Kirkland & Ellis, four Enron bankers,[12] and three credit rating agencies[13] $200 million in public funds allegedly owed to CRRA by Enron and EPMI at the time they filed for Chapter 11 bankruptcy protection. The causes of action asserted under Connecticut state law are (1) fraudulent misrepresentation against the Enron Defendants and the Anderson Defendants; (2) negligent misrepresentation against the Enron Defendants, the Andersen Defendants, and the Credit Rating Agency Defendants; (3) aiding and abetting fraudulent and negligent misrepresentation against the Enron Defendants, the Andersen Defendants, Vinson & Elkins, Kirkland & Ellis, and the Banking Defendants; (4) negligence against the Andersen Defendants; and (5) violations of the Connecticut Unfair Trading Practices Act ("CUTPA"), C.G.S. § 42–110a, *et seq.* against all Defendants. Motions pertaining to this action have been filed in either of the other two cases, so the Court will address them under those cases.

## C. H–03–1558

CRRA in H–03–1558, also removed from the Connecticut Superior Court for the Judicial District of Hartford to the United States District Court for the District of Connecticut, and then transferred here by the Judicial Panel for Multidistrict Litigation for consolidation with MDL 1446, sues the same Defendants that are charged in H–03–1579 and asserts "related to" bankruptcy jurisdiction because Enron may owe contribution and/or indemnity to some of the Defendants and because the claims are related to the Adversary Proceeding between CRRA and Enron in Judge Gonzalez's court.

The asserted causes of action under Connecticut state law are as follows: fraudulent misrepresentation against the Enron and Andersen Defendants; negligent misrepresentation against the Enron Defendants, the Andersen Defendants, and the Credit Agency Defendants; aiding and abetting fraudulent and negligent misrepresentation against the Enron Defendants, the Andersen Defendants, Vinson & Elkins, Kirkland & Ellis, J.P. Morgan Chase, Citigroup, Inc., Merrill Lynch, and Barclays Capital, Inc.; negligence against the

11. The Andersen Defendants are Arthur Andersen, LLP, Joseph F. Berardino, David B. Duncan, Debra A. Cash, David Stephen Goddard, Jr., Gary B. Goolsby, Michael M. Lowther, Benjamin S. Neuhausen, Michael C. Odom, John E. Stewart, Michael L. Bennett, William E. Swanson, Richard D. Willard, Gregory W. Hale, John E. Sorrells, and Danny D. Rudloff.

12. The "Bank Defendants" consist of J.P. Morgan Chase & Co., Citigroup, Inc., Merrill Lynch & Co., and Barclays Capital Inc.

13. The Credit Rating Agency Defendants are identified as Standard & Poor's Rating Services, Moody's Corporation, and Fitch, Inc. Maintaining that they have been sued under the wrong names, Standard & Poor's represents that its correct name is Standard & Poor's Credit Market Services, while Moody's

states that its correct name is Moody's Investor Service, Inc.

Steven L. Schwarcz, in, *Private Ordering of Public Markets: The Rating Agency Paradox,* 2002 U. Ill. L.Rev. 1, 6 (2002), describes the role of rating agencies:

A rating is an assessment of the likelihood of timely payment on securities. Thus, only the creditworthiness of an investment, not its economic desirability to investors, is rated. Pure equity securities therefore are not rated because they have neither a specified maturity date nor a contractually fixed principal amount. Because rating agencies make their rating determinations based primarily on information provided by the issuer of securities, a rating is no more reliable than that information. Ratings thus do not cover the risk of fraud. [footnotes omitted]

Andersen Defendants; and engaging in unfair trade practices in violation of CUTPA, C.G.S. § 42–110a *et seq.*, in a scheme to misstate or conceal material information about Enron's financial condition, against all Defendants. Since the transfer of the action here, a first amended complaint (# 247) and a second amended complaint (# 306) have been filed by CRRA.

Pending in H–03–1558 are the following ripe motions:

(1) CRRA's motion to stay adjudication of any motions to transfer until motion for remand is resolved (# 119), joined by the Arthur Andersen Defendants (# 141);

(2) CRRA's motion to remand and/or abstain, or alternatively to strike, to dismiss or to sever the third-party complaint pursuant to Rule 14(a) of the Federal Rules of Civil Procedure and then remand the underlying action against the three law firm defendants (# 121);

(3) CRRA's petition for certification of interlocutory appeal (# 224) of an order by the Honorable Warren W. Eginton,[14] United States District Court for the District of Connecticut,[15] denying CRRA's motion to remand;

(4) Credit Agency Defendants' motion for leave to file motions to dismiss and for a stay of discovery (# 237), in other words for relief from this Court's scheduling order (# 1561 in *Newby*) staying the filing of amended pleadings and/or responsive pleadings in coordinated cases until the Court resolves the class certification motions in *Newby* and *Tittle;*

(5) CRRA's motion to consolidate H–03–1558 with H–03–1579 (# 246);

(6) Defendant Andrews & Kurth L.L.P.'s motion to dismiss (# 254)[16];

(7) Defendant S & P's motion to dismiss (# 256);

(8) Defendant Fitch Inc.'s motion to dismiss First Amended Complaint (# 259);

(9) Defendant Moody's Corporation's motion to dismiss First Amended Complaint (# 262); and

(10) Plaintiff's motion to file sur-reply (# 321) to Andrews & Kurth L.L.P.'s reply.

The Court retroactively grants Credit Agency Defendants' motion for leave to file motions to dismiss (part of # 237), since the motions to dismiss have already been submitted and answered. In addition the Court grants Plaintiff's motion to file sur-reply (# 321) to Andrews & Kurth L.L.P.'s reply (surreply submitted as # 322). These parties' motions to dismiss have been fully briefed, and thus the Court will resolve them.

When the motions to dismiss were filed, the governing complaint to which they were directed was the First Amended

**14.** Instrument # 203, denying # 60.

**15.** Instrument # 60. Judge Eginton's is now published: *Connecticut Resources Recovery Authority v. Lay,* 292 B.R. 464 (D.Conn.2003). Judge Eginton concluded that (1) relying on *In re WorldCom, Inc. Sec. Litig.,* 293 B.R. 308 (S.D.N.Y.2003), *order issued* No. 02 CIV. 3288(DLC) 2003 WL 685099 (S.D.N.Y. Mar. 3, 2003), the court had "related to" bankruptcy jurisdiction over the suit because the $220 million at issue would "assuredly affect the bankruptcy estate; (2) the unanimity rule does not apply to removal under § 1452 if the court has jurisdiction under § 1334(b); (3)

CRRA failed to meet its burden of showing the suit could be timely adjudicated in state court for mandatory abstention; and (4) judicial economy and efficiency warrant denial of the request for permissive abstention."

**16.** Also pending, but with response dates extended until 30 days after resolution of the motion to remand, are the following: Defendant Joseph W. Sutton's motion to dismiss (# 125) for lack of personal jurisdiction; and Defendant Rebecca Mark–Jusbasche's motion to dismiss (# 158) for lack of personal jurisdiction;

Complaint (# 247), filed on December 23, 2003. On March 29, 2004, apparently without leave of court, Plaintiff filed a Second Amended Complaint (# 306), which merely added new parties.

The Court now addresses the ripe motions, case by case, with subject matter jurisdiction issues to be resolved first, i.e., whether this Court has "related to" bankruptcy subject-matter jurisdiction over any of these three suits.

### III. MOTIONS IN H–03–1580

**A. CRRA's Motion to Remand [pursuant to 28 U.S.C. § 1447(c)] and/or Alternatively to Abstain [pursuant to 28 U.S.C. § 1334(c) (1) ], or Alternatively to Strike, to Dismiss or to Sever the Third–Party Complaint pursuant to Fed. R. of Civil P. 14(a) and Remand pursuant to 28 U.S.C. § 1447(c), or to Abstain under § 1334(c)(1) (permissive abstention) or under § 1334(c)(2) (mandatory abstention).**

██ A removing Defendant bears the burden of establishing federal jurisdiction. *B., Inc. v. Miller Brewing Co.,* 663 F.2d 545, 549 (5th Cir.1981).

In its motion to remand in H–03–1580, CRRA emphasizes that (1) not only the complaint, but also the third-party complaint are based solely on Connecticut state law; (2) only 23 out of 48 third-party Apportionment Defendants removed or consented to removal of the suit, while the named Defendants did not, and one or more of the named Defendants oppose the removal; and (3) the third-party apportionment complaint is (a) impermissible under the Connecticut state law for apportionment and must be stricken or dismissed and (b) not related to the bankruptcy and contains no federal issues; and (4) even if the third-party complaint were permissible under Connecticut law and did relate to the Enron bankruptcy action, nevertheless the malpractice action contains no federal issues, and the removal is defective because not all main-suit Defendants and Apportionment Defendants consented to it. Alternatively, CRRA argues that if the Court finds the removal proper, this action satisfies all the criteria for mandatory abstention pursuant to 28 U.S.C. § 1334(c)(1) and for discretionary abstention under 28 U.S.C. § 1334(c)(2).

In opposition, the removing Apportionment Defendants argue that because the law firms may lose the malpractice case and Hawkins, Delafield may win on its Apportionment Complaint, the third-party complaint is "related to" Enron's bankruptcy proceeding based on potential claims of contribution or indemnification claims against Enron (and its insurers), which, if successful, might diminish the debtor's estate. CRRA objects that the legal malpractice claim against three law firms does not involve Enron.[17]

---

**17.** Indeed CRRA maintains in its Notification to the Court of the CRRA's Pending Motion for Remand or Abstention (# 95) at 4,

... [T]he law firm defendants' liability in the instant legal malpractice case has nothing to do with Enron's financial collapse. This legal malpractice case is premised on allegations that the defendant law firms drafted, developed, and caused CRRA to enter into a transaction (a $220 million loan by CRRA to Enron) that the law firms knew or should have known was illegal and beyond the limited statutory authority of CRRA, a quasi-public state agency. This

loan would have been illegal, and CRRA would have been entitled to recover any damages caused by this legal malpractice, even if Enron had remained solvent, or even if CRRA had loaned the money to a party other than Enron.

Obviously, the Apportionment Plaintiff disagrees, moreover the CRRA's other two suits, in particular H–03–1558, the "global complaint" asserting *inter alia*, a number of intentional torts, against the participants in the Enron fraud scheme allege or imply the inclusion of the Enron Transaction as part of the larger scam.

CRRA argues that removal petitions, like all complaints asserting federal jurisdiction, are subject to the well-pleaded complaint rule and that removing Defendants bear the burden to show that the basis of the removal appears on the face of the third-party complaint; removal is not permissible where the basis for federal jurisdiction first appears in a defendant's answer, defense, or counterclaim. Insisting that the removal is improper, CRRA describes the third-party complaint as "a classic example of a non-federal complaint, since petitioners are unable to assert any ground for federal jurisdiction, except one arising from a speculative defense/counterclaim that petitioners claim they may be able to raise later."

Moreover, argues CRRA, the "rule of unanimity" requires that all co-defendants join in or consent to removal, but fewer than half have done so here. Furthermore, regarding Defendants' claim that the Apportionment Complaint is "related to" the bankruptcy proceeding, the factual circumstances underlying the two are completely unrelated: CRRA contends that its complaint in the Adversary Proceeding against Enron in the bankruptcy court is based on the illegality of the CRRA–Enron loan as *ultra vires* and beyond CRRA's statutory authority, while the Third–Party Apportionment Complaint here sues Enron executives, directors and others who aided Enron in concealing its true financial condition.

Additionally CRRA insists that Apportionment Defendants' two grounds for asserting related-to bankruptcy jurisdiction, i.e., that the third-party complaint is related to the Adversary Proceeding CRRA filed against Enron in the bankruptcy court and that if Apportionment Defendants are found liable, they will assert indemnification and contribution claims against Enron and could conceivably affect the bankruptcy estate, are wrong. With respect to the first, CRRA characterizes the Adversary complaint as "based on the illegality of the CRRA–Enron loan in that it was *ultra vires* and beyond CRRA's statutory authority" in contrast to the third party complaint against former Enron executives and accountants who helped conceal Enron's actual financial condition. With respect to the second ground regarding potential diminishment of the bankruptcy estate, CRRA responds that the case does not involve Enron but only advice given to CRRA by three law firms and that the indemnification claim "at some point in the future is so speculative and far removed from the action at bar that it cannot establish a basis for removal."

## B. Court's Ruling on Key Issues

### 1. "Related To" Bankruptcy Jurisdiction

■ The Court hereby incorporates the conclusions of law in it earlier memoranda and orders in MDL 1446 cases regarding "related to" bankruptcy jurisdiction, in particular two entered in *Newby* as instruments # 1661 and # 1714 concluding that "related to" bankruptcy jurisdiction in this massive multidistrict litigation exists over third-party Defendants' claims for contribution and indemnity against Enron insurers with a reasonable basis (as directors and officers of Enron, some of Apportionment Defendants are insured by and have contractual rights to indemnity under approximately $450 million of insurance policies that have been declared part of the Enron estate) because they have a conceivable effect on the debtor's estate.

Title 28 U.S.C. § 1452 provides that "a party may remove"; in comparison to the general removal statute, 28, U.S.C. § 1441, section (a) of which allows removal only "by the defendant or the defendants," [18] Section 1452 "is arguably broad enough to

---

**18.** Section 1441(c) does not restrict its application to "defendants," but states, "Whenever

a separate and independent claim or cause of

encompass actions removed under § 1452 by debtor and non-debtor third-party defendants and by either type of third-party plaintiffs, who are generally defendants in the primary action that resulted in assertion of third-party claims." Thomas B. Bennett, *Removal, Remand, And Abstention Relate to Bankruptcies; Yet Another Litigation Quagmire!*, 27 Cumb. L.Rev. 1037, 1052–53 (1996–97). Moreover, even under § 1441(c), the Fifth Circuit has recognized the right of a third-party defendant to remove when the third-party claim sets forth a separate and independent controversy, such as the claim for indemnification here. *Carl Heck Engineers Inc. v. Lafourche Parish Police Jury*, 622 F.2d 133, 135–36 (5th Cir.1980)(concluding that indemnity claims are separate and independent because "[s]uch actions can be and often are brought in a separate suit from that filed by the original plaintiff in the main claim.").[19]

In # 1714 and # 2143 this Court previously rejected some of CRRA's legal conclusions and arguments and does again here. This Court has ruled that unanimity is not required for such removals under § 1452, that the debtor need not be a named defendant, and that under the facts alleged there is a "unity of identity" of the debtor and Third–Party Apportionment

Defendants based on the same nucleus of wrongdoing in mutual participation in a scheme to hide Enron's actual financial status while personally enriching themselves. In this massive multidistrict litigation, claims vastly outstrip assets available for recovery, and should Plaintiffs prevail and trigger the indemnification claims, liability would have an enormous impact on the bankruptcy estate.

Thus the Court agrees with Judge Eginton and concludes that, if the Apportionment Complaint is cognizable under Connecticut law, there is "related to" bankruptcy jurisdiction over H–03–1580 based on the Apportionment Complaint and that the Apportionment Defendants have properly removed the entire action to federal court. The Court also finds that the alleged wrongdoing of the Apportionment Defendants here is inextricably intertwined both factually and legally with the alleged wrongdoing of Enron and its co-conspirators, as well as that of Murtha Cullina, Hawkins, Delafield, and Leboeuf in the malpractice complaint. CRRA is a creditor in the bankruptcy for the same money damages arising out of the same Enron Transaction, although brought under a constructive trust theory that was subsequently rejected by Bankruptcy Judge Gonzalez.[20] Moreover, in H–03–

---

action within the jurisdiction conferred by section 1331 of this title, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed...."

There is a division among the courts whether a third-party defendant may remove under § 1441, with a majority disagreeing with the Fifth Circuit's view. *See, e.g., Thomas v. Shelton*, 740 F.2d 478, 488 (7th Cir.1984); *Lewis v. Windsor Door Co.*, 926 F.2d 729, 731 (8th Cir.1991). For a listing of decisions on both sides of the issue *see generally Johns v. United States*, Nos. Civ. A. 96–1058 and 97–213, 1997 WL 543092, *2 (E.D.La. Sept. 2, 1997); *Mignogna v. Sair Aviation, Inc.*, 679 F.Supp. 184, 187–91 (N.D.N.Y.1988).

Because of this statutory silence as to who may remove, as discussed in the text, the courts have split over the issue of third-party removals.

**19.** Since *Carl Heck* was decided, Congress amended § 1441(c) in 1990 to expressly exclude claims based solely on diversity jurisdiction, which was the basis for the removal in *Carl Heck. See, e.g., Gracia v. Irvine*, Civ. A. No. 4–91–442–E, 1992 WL 150093, *1–2 (N.D. Tex. June 10, 1992). Here, in contrast, jurisdiction is not predicated on diversity, but on "related to" bankruptcy jurisdiction.

**20.** This Court has also relied on *In re WorldCom, Inc. Sec. Litig.* for its rulings on "related to" bankruptcy jurisdiction in # 1714 and

1580 CRRA has alleged facts suggesting complicity between Murtha Cullina, Enron, and by inference, Defendants in H–03–1558 and the Adversary Proceeding.

## 2. Well Pleaded Complaint Rule

CRRA argues that the removal here was impermissible because it was based on a claimed federal defense or counterclaim to the claims on the face of CRRA's complaint. In arguing for the applicability of the well-pleaded complaint rule to challenge removal of this suit from Connecticut state court, CRRA is confusing two different jurisdictional statutes, both providing original jurisdiction for federal district court.

■ First, 28 U.S.C. § 1331, the general federal question statute, recites, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." With respect to the "arising under" language, for purposes of removal "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); *Franchise Tax Board v. Construction Laborers Vacation Trust for Southern California*, 463 U.S. 1, 8–12, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Thus a plaintiff is the master of his complaint, which he may choose to bring solely under state law to avoid federal jurisdiction, and, except where there is complete preemption by federal law, a case may not be removed if the federal question does not appear on the face of the complaint, but is only raised in a defense to the petition. *Id.; Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–67, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). (Cases grounded in state law may still "arise under" federal law if vindication of the state-law-created right must turn on a construction of federal law, but such is not relevant in this suit." *Franchise Tax*, 463 U.S. at 8–9, 103 S.Ct. 2841.) Here it is undisputed that the malpractice complaint and the Apportionment Complaint assert only Connecticut state-law claims.

■ In contrast, for "related to" bankruptcy removal jurisdiction under 28 U.S.C. § 1452, the court has jurisdiction if it satisfies 28 U.S.C. § 1334. Section 1334 provides,

(a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all civil proceedings arising under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

"Cases arising under title 11" pursuant to § 1334(a) are actions begun by the filing of a bankruptcy petition under 11 U.S.C. § 301–303 in federal district court or bankruptcy court. *In re Wood*, 825 F.2d 90, 92 (5th Cir.1987). The instant suit is not such a case, for the debtor is not a party and the complaints do not seek relief under Title 11 of the Bankruptcy Code. Section 1334(b), however, provides for original jurisdiction not only of proceedings "arising under" title 11, but also actions "related to cases under title 11," even if they are otherwise not subject to federal jurisdiction. An action is "related to bankruptcy" if the outcome of the proceeding could

agrees with part of Judge Eginton's conclusions, i.e., that he and this Court have "related to" bankruptcy jurisdiction over this suit.

conceivably have any effect on the estate being administered in bankruptcy. *Id.* at 93.

■ The well-pleaded complaint rule is not applicable in "related to" bankruptcy removal cases. *American National Red Cross v. S.G.,* 505 U.S. 247, 258, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992)("The 'well-pleaded complaint' rule applies only to statutory 'arising under' cases."), *citing Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 494, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).

### 3. CRRA's Motion to Abstain

CRRA's motion to abstain either under the mandatory-provision, § 1334(c)(2) or under the a permissive provision, § 1334(c)(1), is also denied.

■ In determining whether a district court is required under § 1334(c)(2) to abstain from hearing a proceeding based on state law that is before the court on "related to" bankruptcy-jurisdiction, the court must consider the following factors: (1) whether the abstention motion was "timely" filed; (2) whether the action consists of state law claims; (3) whether the action is "related to" a bankruptcy proceeding (i.e., "non-core" matters), in contrast to "arising under" the Bankruptcy Code or "arising in" a case (i.e., "core matters" under the Bankruptcy Code); (4) whether jurisdiction rests solely on § 1334; (5) whether there is an action "commenced" in state court; and (6) whether the action can be "timely adjudicated" in state court. *In re Southmark Corp.,* 163 F.3d 925, 928 (5th Cir.1999), *cert. denied,* 527 U.S. 1004, 119 S.Ct. 2339, 144 L.Ed.2d 236 (1999); *Matter of Gober,* 100 F.3d 1195, 1206 (5th Cir. 1996); *In re River Center Holdings, LLC,* 288 B.R. 59, 66 (Bkrtcy.S.D.N.Y.2003); *Renaissance Cosmetics, Inc. v. Development Specialists, Inc.,* 277 B.R. 5, 12 (S.D.N.Y. 2002). It is undisputed that the motion was timely filed in this suit. Furthermore

the action asserts only state-law claims. The Court has determined that the Apportionment Complaint is "related to" the Enron bankruptcy and thus the only factors still at issue here are (5) and (6).

■ Clearly dispositive of the abstention question here is factor (5) under Second Circuit law, which diverges from Fifth Circuit law. Under the law of lower courts in the Second Circuit, mandatory abstention does not apply to a removed action where no parallel court proceeding exists because of the removal of the case; under Fifth Circuit law mandatory abstention may apply to cases removed under § 1452. *Renaissance Cosmetics,* 277 B.R. at 12–13 & nn.4–6; *River Center,* 288 B.R. at 66–67; *In re Southmark,* 163 F.3d at 929. Because the Enron bankruptcy proceedings were filed in the bankruptcy court for the Southern District of New York, this Court's "related to" bankruptcy jurisdiction derives from that court and this Court has concluded that Second Circuit law should apply to MDL 1446 cases here based on such jurisdiction.

Regarding factor (6), with the Apportionment Complaint (discussed below), the Court further finds that CRRA has not met its burden in demonstrating that this action could be timely adjudicated in a Connecticut state court given the complexity of the Enron-related litigation and given CRRA's claims in the bankruptcy proceeding.

■ As for permissive remand in the interests of justice, comity, or respect for state law under 28 U.S.C. § 1334(c)(1), or equitable remand under § 1452(b), courts have broad discretion. *Gober,* 100 F.3d at 1206–07. Among the factors considered are

(1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law pre-

dominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (6) the existence of the right to a jury trial; and (7) prejudice to the involuntarily removed defendants.

*In re NTL Inc.*, 295 B.R. 706, 719 (Bkrtcy. S.D.N.Y.2003), *quoting Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.*, 130 B.R. 405, 407 (S.D.N.Y.1991). Two other central factors are "the duplicative and uneconomical use of judicial resources" and the "lessened possibility of inconsistent results." *NTL*, 295 B.R. at 719. Both are well served by this Court's retention of jurisdiction here. The civil actions in this court and the proceedings in Judge Gonzalez's bankruptcy court substantially overlap in parties and issues, and the judges have coordinated proceedings so there is no material obstacle to efficient administration of the debtor's estate and coordinated discovery provides efficient and equitable access for all. Although the suit is grounded solely in state law, the facts and the issues overlap with those in the federal claims cases and discovery for both federal and state claims will coincide. Here the desirability of dealing with civil actions related to the collapse of the debtor in a single forum, recognized by the Judicial Panel on Multidistrict Litigation, weighs heavily against permissive abstention. *See, e.g., In re Global Crossing Ltd. Sec. Litig.*, 311 B.R. 345, 349 (S.D.N.Y. 2003). As Judge Cote has noted in *In re WorldCom Inc. Sec. Litig.*, 293 B.R. 308, 333–34 (S.D.N.Y.2003),

> . . . [I]t is beyond cavil that judicial economy and efficiency are best served by exercising the jurisdiction that so clearly exists. The MDL panel has consolidated scores of cases before this Court to promote the expeditious and efficient resolution of the claims arising from the collapse of WorldCom. The

litigation is proceeding apace. . . . With the consolidation of the litigation in one court, the motion practice and discovery process can be managed to protect the rights of all parties and to preserve, to the extent possible, the maximum amount of assets for recovery by plaintiffs with meritorious claims. . . . In contrast, if this Court were to abstain pursuant to Section 1334(c)(1) and remand the litigation originally filed in state court, motion practice and discovery would proceed separately in many jurisdictions. The litigation that would ensue in the various fora would be entirely duplicative and wasteful. It would eat into the funds available to pay the alleged victims identified in this litigation. . . . A remand would encourage a race for assets, a race that may deprive many victims of the alleged fraud of their fair share of any recovery.

Moreover, while state law governs both the malpractice and the apportionment complaints, there are no unique or unsettled issues of state law that warrant abstention on comity grounds. *In re WorldCom*, 293 B.R. at 333. Thus the Court denies the motion to abstain.

### 4. CRRA's Motion to Strike, Dismiss or Sever and Remand Apportionment Complaint

Because the Court concludes that it would have "related to" bankruptcy jurisdiction over the Apportionment Complaint, and thus over the entire action, provided that the Apportionment Complaint is viable under Connecticut law, the Court examines the issue of striking or dismissing the Apportionment Complaint for failure to state a cognizable claim under Connecticut law.

 CRRA argues that the Apportionment Complaint must be stricken or dismissed, and thus it cannot serve as a

basis for federal jurisdiction, because it fails to meet Connecticut's statutory requirements in several ways. First, it seeks to recover purely economic or commercial damages, not the permissible damages "resulting from personal injury, wrongful death, or damage to property," as required by C.G.S. § 52–572h(c). Indeed CRRA points to lower court decisions holding that because damages caused by legal malpractice are purely economic, firms defending themselves against legal malpractice claims cannot use the apportionment mechanism. Second, under the statute, apportionment can only be made among negligent parties, not parties liable for intentional and fraudulent acts. CRRA emphasizes that it sues the three law firms for breach of contract and LeBoeuf for fraudulent misrepresentation and statutory unfair trade practices, but Hawkins, Delafield's Apportionment Complaint includes allegations of both intentional and fraudulent conduct and sues 44 of the 54 Defendants charged in CRRA's "global" complaint in H–03–1558, which also sounds *inter alia* in fraudulent misrepresentation and intentional torts. Under Connecticut law, damages for breach of contract and fraudulent misrepresentation of violations of CUTPA cannot be apportioned. *Allard v. Liberty Oil Equipment Co.*, 253 Conn. 787, 803, 756 A.2d 237, 246–47 (2000) (no apportionment between a negligent defendant and a defendant whose conduct was allegedly intentional, reckless, willful and wanton or subject to strict liability or violative of a statute). Third, CRRA has sued Hawkins, Delafield for breach of a fiduciary duty, which CRRA argues is heightened by the fact that its client, CRRA, is a government agency, and § 52–572h(k) expressly states that the statute does not cover breach of fiduciary duty claims. The Connecticut Supreme Court has noted that the "relationship between an attorney and his client is highly fiducia-

ry in its nature...." *Andrews v. Gorby*, 237 Conn. 12, 20, 675 A.2d 449, 453 (1996).

Federal and Connecticut rules of procedure are quite different. Under Connecticut law, "[t]he purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any complaint ... to state a claim upon which relief can be granted." *Peter–Michael, Inc. v. Sea Shell Associates*, 244 Conn. 269, 270–71, 709 A.2d 558, 559 (1998). Unlike under Fed.R.Civ.P. 12(b)(6), under Connecticut practice a party may only employ a motion to dismiss to question whether, on the face of the record, the court has jurisdiction over the suit. *Flanagan v. Commission on Human Rights and Opportunities*, 54 Conn.App. 89, 93–94 & n. 5 733 A.2d 881, 885 & n. 5 (1999), *cert. denied*, 250 Conn. 925, 738 A.2d 656 (Conn. 1999). The proper vehicle to challenge the legal sufficiency of a complaint under Connecticut law is a motion to strike. *Id.*, *citing* Practice Book § 10–39. A motion to strike admits all well-pleaded facts and implications therefrom as true, but does not admit legal conclusions or the truth or accuracy of opinions stated in the pleadings. *Emerick v. Kuhn*, 52 Conn.App. 724, 728–29, 739, 737 A.2d 456, 461, 467 (Conn. App.1999), *cert. denied*, 249 Conn. 929, 738 A.2d 653 (1999), *cert. denied*, 249 Conn. 929, 738 A.2d 653 (1999), *cert. denied*, 528 U.S. 1005, 120 S.Ct. 500, 145 L.Ed.2d 386 (1999); *Napoletano v. CIGNA Healthcare of Connecticut, Inc.*, 238 Conn. 216, 232–33, 680 A.2d 127, 137 (1996) ("The role of the trial court was to examine the complaints, construed in favor of the plaintiffs, to determine whether the plaintiffs have stated a legally sufficient cause of action."), *cert. denied*, 520 U.S. 1103, 117 S.Ct. 1106, 137 L.Ed.2d 308 (1997); *Doe v. Yale University*, 252 Conn. 641, 667, 748 A.2d 834, 851 (2000). The court may grant a motion to strike if it only asserts conclusions of

law that the facts alleged do not support. *Novametrix Medical Systems, Inc. v. The BOC Group, Inc.*, 224 Conn. 210, 215, 618 A.2d 25, 28 (1992); *Urda v. Glynos*, No. CV 950067734, 1996 WL 365013, *2 (Conn.Super. May 23, 1996). In essence CRRA argues that the Apportionment Complaint's allegations are legally insufficient to support a claim for apportionment.

In relevant part, C.G.S. § 52–102b (a) (emphasis added by the Court) states, "A defendant in any civil action **to which § 52–572h applies** may serve a writ, summons and complaint upon a person not a party to the action who is or may be liable pursuant to said section for a proportionate share of the plaintiff's damages in which the demand for relief shall seek an apportionment of liability...." Section 52–102b "is the **exclusive** means by which a defendant may **add a person** who is or may be liable pursuant to Section 52–572h for a proportionate share of the plaintiff's damages as a party to the action." C.G.S. § 52–102b(F); *Allard v. Liberty Oil Equipment Co.*, 253 Conn. at 792–93, 756 A.2d at 239–40, quoting § 52–102b(f)(emphasis added by the Court).

C.G.S. § 52–110h(a) in turn provides in relevant part,

A defendant in any civil action to which section 52–572h applies may serve a ... complaint upon a person not a party to the action who is or may be liable pursuant to said section for a proportionate share of the plaintiff's damages in which case the demand for relief shall seek an apportionment of liability.

 Thus an apportionment complaint may be filed when Connecticut's tort reform statute, G.S. 52–572h, the state's contributory and comparative negligence [21] statute, applies. C.G.S. § 52–572h, provides in relevant part,

(b) In causes of action based on negligence, contributory negligence shall not bar recovery in an action by any person or the person's legal representative to recover damages resulting from personal injury, wrongful death or damage to property if the negligence was not greater than the combined negligence of the person or persons against whom recovery is sought including settled or released persons under subsection (n) of this section. The economic or noneconomic damages allowed shall be diminished in the proportion of the percentage of negligence attributable to the person recovering which percentage shall be determined pursuant to subsection (f) of this section.

**(c) In a negligence action to recover damages resulting from personal injury, wrongful death or damage to property occurring on or after October 1, 1987, if the damages are determined to be proximately caused by the negligence of more than one party, each party against whom recovery is allowed shall be liable to the claimant only for such party's proportionate share of the recoverable economic damages and the recoverable noneconomic damages except as provided in subsection (g) of this section** [emphasis added by the Court]....

(h) (1) A right of contribution exists in parties who, pursuant to subsection (g) of this section, are required to pay more than their proportionate share of such judgment....

(k) **This section shall not apply to breaches of trust or other fiduciary obligation** [emphasis added by the Court].

(*o*) Except as provided in subsection (b) of this section, **there shall be no appor-**

---

**21.** Section 52–572h(b) is the contributory negligence provision, while § 52–52h(c) is the comparative negligence portion; they use virtually identical language.

tionment of liability or damages between **parties liable for negligence and parties liable on any basis other than negligence** including, but not limited to, intentional, wanton or reckless misconduct, strict liability or liability pursuant to any cause of action created by statute, except that liability may be apportioned among parties liable for negligence in any cause of action created by statute based on negligence including, but not limited to, an action for wrongful death pursuant to section 52–555 or an action for injuries caused by a motor vehicle owned by the state pursuant to section 52–556.

" '[A] civil action to which section 52–572h applies' within the meaning of § 52–102b, means a civil action based on negligence." *Allard,* 756 A.2d at 242. The clear language of § 52–572h(b) states that it applies only to negligence actions in which a party seeks damages for wrongful death, personal injury or damage to property. In the instant case, CRRA has not alleged that it suffered wrongful death and personal injury in its claims against the law firms.

The third category, "damages resulting from … damage to property," as used in § 52–102h(b), has been defined by the Connecticut Supreme Court as restricted to "damage to or the loss of use of tangible property" and thus does not apply to commercial losses, i.e., economic harm. *Williams Ford, Inc. v. Hartford Courant Co.,* 232 Conn. 559, 581–83, 657 A.2d 212, 223–224 (1995). After examining the language of the statute and its legislative history, the Connecticut Supreme Court concluded that "the legislature intended the phrase 'damage to property' to encompass only its usual and traditional meaning in the law of negligence actions, namely, damage to or the loss of use of tangible property, as opposed to damages from personal injury"; because the legislative his-

tory is silent about the intent behind the phrase "damage to property," it opined, "we simply cannot stretch the meaning of 'damage to property,' as used in § 52–572h(b), to include commercial losses unaccompanied by physical damage to or loss of use of tangible property." *Id.* In *Williams Ford,* the plaintiff's injury was monetary, i.e., savings that the plaintiff would have realized. *Id.,* 232 Conn. at 581, 657 A.2d at 222. In the wake of that decision, a number of lower courts have construed the high court's ruling to conclude that § 52–572h does not allow recovery of solely economic loss incurred as a result of legal malpractice. *Carpenter v. Law Offices of Dressler,* No. CV010804795S, 2002 WL 442304, *3 (Conn.Super. Feb. 22, 2002); *Gauthier v. Kearns,* 47 Conn.Supp. 166, 780 A.2d 1016 (2001); *Whitaker v. Erdos & Maddox,* No. CV000371896S, 2000 WL 1862127, *4 (Conn.Super. Nov. 14, 2000)(claim that lawyer's negligence caused plaintiff to suffer economic loss "is not a claim for personal injury [and] … [t]he Supreme Court has stated that monetary damage, or economic loss, does not fall within the purview of the phrase 'damage to property' as used in § 52–572h," *citing Williams Ford* ); *Thomas v. Smith,* No. 3:03CV1398, 2004 WL 1969401, *4 (D.Conn. Sept. 3, 2004) (The Connecticut Supreme Court held in *Williams Ford* that damages within the meaning of the statute do not " 'include purely commercial losses, unaccompanied by damages to or loss of the use of some tangible property.' ").

CRRA has not alleged that the three firms' negligent malpractice damaged tangible property of CRRA, to which damage the apportionment defendants might have contributed.

Nevertheless, in *Williams Ford* the Connecticut Supreme Court noted that its conclusion that Section 52–572h(b) does not apply "purely commercial losses," this

conclusion "does not end our inquiry." 232 Conn. at 585, 657 A.2d at 224. The *Williams* Court observed that the statute was passed to abrogate "the absolute bar of contributory negligence in favor of the doctrine of comparative negligence" to allow a comparative determination of "relative degrees of negligence of the plaintiff and the defendant," as "a means to diminish recovery of damages based upon the degree of the plaintiff's own negligence." *Id.*, 232 Conn. at 583, 657 A.2d at 225. Examining the language, legislative history, the circumstances surrounding the enactment, and the legislative policy behind § 52–572h(b), as well as the statute's relationship to "common law principles governing the same general subject matter, emphasized the rule of statutory construction that statutes in derogation of the common law should receive a strict construction and [not] be extended, modified, repealed or enlarged in its scope by the mechanics of construction." *Id.*, 232 Conn. at 581, 657 A.2d at 223. Not persuaded that the legislature "intended to create a different set of rules of negligence actions involving property losses and commercial losses," however, the high court "appl[ied] the statute, as a matter of common law, beyond its designated boundaries" and focused on the statute's underlying "policy for common law adjudication" because " 'there was a close relationship between the statutory and common law subject matters.' " *Id.*, 232 Conn. at 585, 657 A.2d at 225. The Supreme Court concluded,

> Where possible, courts should, as a matter of common law adjudication, 'assure that the body of the law—both common and statutory, remains coherent and consistent.' ... It would be consistent with that goal for the doctrine of comparative negligence, which by statute ap-

plies to actions based on negligence resulting in damage to person or property, also to apply to the tort of negligent misrepresentation resulting in commercial loss. Furthermore, it would undermine the legislative purpose of § 52–57h(b) if we were to require a plaintiff to be free from contributory negligence as a prerequisite to recovery under a theory of negligent misrepresentation merely because the damages sought were commercial losses rather than property damage. The doctrine of contributory negligence should not, therefore, consistent with our entire body of law, both statutory and common, act as an absolute bar to recovery for plaintiffs seeking recovery for negligent misrepresentation.

> We conclude, therefore, **as a matter of common law,** that the policy of the comparative negligence statute, § 52–572h, applies to negligence actions where only commercial losses are sustained.

*Id.*, 232 Conn. at 586, 657 A.2d at 225 (emphasis added by this Court).

In *Somma v. Gracey,* 15 Conn.App. 371, 544 A.2d 668 (Conn.App.Ct.1988), which is still good law, which is cited frequently, and which the federal District Court of Connecticut recently described as "the leading decision" on "[t]he scope of the Connecticut apportionment statute as it applies to claims of professional malpractice," the appellate court held that the comparative negligence defense doctrine applies to legal malpractice claims grounded in negligence and thus apportionment also applies. *Thomas v. Smith,* No. 3:03CV1398, 2004 WL 1969401, *3 (D.Conn. Sept. 3, 2004).[22] In *Somma,* a plaintiff sued his attorney for negligence in the sale of the plaintiff's business on the

---

**22.** In *Thomas v. Smith,* the federal district court dealt with architectural malpractice claims but found "no basis for distinguishing legal malpractice from architectural malpractice." *Id.*

grounds that the attorney failed to audit and inform the plaintiff of the financial status of the buyer and failed to advise the plaintiff not to accept a nonnegotiable promissory note from the buyer. The defendant attorney was permitted by the court to raise a comparative negligence defense that it was the plaintiff's responsibility to investigate the buyer's financial condition. In *Somma* the Connecticut appellate court pointed out that § 52–572h(b) states that in causes of action based on negligence, "[a]ny economic or noneconomic damages allowed shall be diminished in proportion of the percentage of negligence attributable to the person recovering ....," and concluded, "In situations where the claim of malpractice sounds in negligence ... the defense of comparative negligence should be made available.... We see no basis for distinguishing between actions for legal malpractice and other claims sounding in negligence." 15 Conn. App. at 378, 544 A.2d at 672. Thus under *Somma*, a plaintiff alleging a claim for legal malpractice grounded in negligence may seek to recover damages from his attorney for the plaintiff's monetary losses, and that attorney may reduce the damages by asserting in an apportionment complaint an affirmative defense that the plaintiff's negligence was also responsible for the plaintiff's loss.

There is a key distinction between the posture of the instant case and the circumstances in *Somma*, however, the makes *Somma* inapplicable to H–03–1580. Here the Apportionment Complaint does not assert an **affirmative defense of contributory or comparative negligence** to former client/Plaintiff CRRA's professional malpractice claim, but is an action filed against **newly added** third-party defendants who were not plaintiff's lawyers, but instead former Enron executive, directors, employees, accountants and auditors and entities such as the northeast utility companies with which CRRA dealt, e.g., CL & P, all of whom purportedly helped Enron conceal its true financial condition. In contrast in *Somma* the plaintiff was the former client of the defendant attorney being sued, and the court allowed the attorney to file a comparative negligence defense in response to the plaintiff/client's professional negligence claim, to show that the **plaintiff/client** had been negligent in his own right and that negligence had contributed to his own injury. Here Hawkins, Delafield sought to add **additional** parties as third-party defendants to new claims, in essence, alleged joint tortfeasors, for conduct distinct from the alleged malpractice of Hawkins, Delafield. Therefore *Somma* does not apply. Because Hawkins, Delafield is not asserting a defense of contributory or comparative negligence, Hawkins, Delafield must meet the requirements of the "exclusive" statutory method for adding and forcing others to share in payment of damages to CRRA for CRRA's monetary losses through the procedural device of a statutory apportionment complaint under §§ 52–102b and 52–572h, not the common law. Such an action must meet the "damage to [tangible] property" requirement, but does not here. Hawkins, Delafield is barred from seeking monetary damages for non-tangible injury. *See also Whitaker v. Maddox*, No. CV000371896S, 2000 WL 1862127, *3 (Conn.Super. Nov. 14, 2000)(distinguishing *Somma*, addressing a comparative negligence defense to a legal malpractice claim brought by a client/plaintiff against his **former** attorney, who in turn asserted an apportionment claim not against plaintiff but against the plaintiff's **successor** attorney; court held that such an apportionment claim was not only contrary to public policy, but that it was barred because (1) it was not "damage to property" as used in § 52–572h, (2) because plaintiff claimed only economic loss, and (2) because an apportionment complaint cannot be based on breach of a fiduciary duty).

Thus for *Somma* to apply, the affirmative comparative negligence defense comprising the apportionment complaint must arise out of and respond to the plaintiff's negligent malpractice claim, not assert new claims against new parties. *See, e.g., Davis v. Hume,* No. CV88 0096102S, 1990 WL 288692, *1 (Conn.Super. Apr. 18, 1990), in which the Plaintiff sued a defendant for legal malpractice in failing to diligently prosecute her slip and fall action against the City of Stamford. In *Davis* the attorney defendant filed two special defenses: (1) that the plaintiff's slip and fall was due to her own negligence and (2) that the plaintiff failed to obtain timely medical treatment to mitigate her injuries. The *Davis* court, distinguishing *Somma,* concluded that the defendant's defense that plaintiff was comparatively negligent did not relate to the plaintiff's malpractice claim and granted the motion to strike. *See also Thomas v. Smith,* 2004 WL 1969401 at *3; *Cusano v. Grudberg,* No. CV010276769, 2003 WL 21771987, *2 (Conn.Super. July 21, 2003)(Section 52–572h "provides that addition of parties pursuant to § 52–102b and § 52–572h is an exclusive mechanism"; thus "a failure to satisfy the requirements [must be based on negligence and seek damages for personal injury, wrongful death, or damage to tangible property] forecloses the addition of apportionment defendants."); *Center Capital Corp. v. Hall,* No. CV 92–0452084S, 1994 WL 75862, *4 (Conn.Super. Feb. 24, 1994); *Gauthier v. Kearns,* 47 Conn.Supp. 166, 171, 780 A.2d 1016, 1019 (Conn.Super.2001)(noting the statute in essence applies to joint tortfeasors, i.e., "two or more persons who are **liable to the same person for the same harm,**" but who need not "act in concert or in pursuance of a common design, nor is it necessary that they be joined as defendants"; "the question that must be addressed under § 52–572h(c) is whether the damages are determined to be proximately caused by the negligence of more than one party"). *Kearns,* 47 Conn.Supp. at 170–75, 780 A.2d 1016, 1018–21 (emphasis added by this Court). *See also Vona v. Lerner,* No. CV 94314224S, 1998 WL 437337, *2 (Conn.Super. July 16, 1998) (in case alleging that a law firm and lawyer breached their fiduciary duty and their contract with plaintiffs by disclosing plaintiffs' financial information to a bank without plaintiffs' consent, the court denied accounting firm's motion to strike law firm's third-party complaint for apportionment against an accounting firm for malpractice for providing that financial information to the bank).

Moreover, Conn. Legislative Service Public Act 99–69 (West), which expressly governs all cases pending or filed on or after August 11, 1998, amended § 52–572h by adding subsection (*o*), in order to overrule a prior decision by the Connecticut Supreme Court, *Bhinder v. Sun Co., Inc.,* 246 Conn. 223, 242, 717 A.2d 202, 208 (1998). In *Bhinder* the high court ignored the plain language of the statute and extended it by infusing it with common law principles to hold that liability may be apportioned between intentional and negligent tortfeasors. *Id.* (as a matter of common law the court should "extend the policy of apportionment to permit a defendant in a negligence case to bring in as an apportionment defendant a party whose conduct is alleged to be reckless, willful, and wanton.").[23] The subsection (*o*), added

---

**23.** In discussing *Bhinder* as overruled by P.A. 99–69 under Connecticut law, the Second Circuit wrote,

"Recklessness is a state of consciousness with reference to the consequences of one's acts." ... Recklessness is "more than negligence, more than gross negligence." ... Although "[t]he state of mind amounting to recklessness may be inferred from conduct," to infer the proper state of mind,

by the legislature to overrule *Bhinder*, precludes such apportionment:

> Except as provided in subsection (b) of this section, there shall be no apportionment of liability or damages between parties liable for negligence and parties liable on any basis other than negligence including, but not limited to, intentional, wanton or reckless misconduct, strict liability or liability pursuant to any cause of action created by statute, except that the liability may be apportioned among parties liable for negligence in any cause of action created by statute based on negligence including, but not limited to, an action for wrongful death pursuant to section 52–555 or an action for injuries caused by a motor vehicle owned by the state pursuant to section 52–556.

In sum, as stated by the Connecticut Supreme Court after examining the legislative history, "The general effect of P.A. 99–69, § 1(*o*), was to make clear that the apportionment principles of § 52–572h do not apply where the purported apportionment complaint rests 'on any basis other than negligence....'" *Allard*, 253 Conn.

at 800–04, 756 A.2d at 245–47 (concluding that § 52–572h(*o*) does not allow apportionment between a defendant liable in negligence and a defendant liable on a strict liability product liability theory or for intentional, wanton or reckless misconduct or pursuant to any cause of action created by statute). Thus the Court examines the Apportionment Complaint in H–03–1580 to determine whether its claims sound only in negligence.

CRRA contends that not only has it has sued the three law firms for breach of contract (legal service agreements) and negligence, but also Le Boeuf for fraudulent misrepresentation and statutory unfair trade practices.[24] CRRA maintains that Hawkins, Delafield's Apportionment Complaint includes allegations of both intentional and fraudulent conduct and sues 44 of the 54 Defendants charged in CRRA's "global" complaint in H–03–1558, which also sounds *inter alia* in fraudulent misrepresentation and intentional torts. *Allard v. Liberty Oil Equipment Co.*, 253 Conn. at 803, 756 A.2d at 246–47. Plaintiff insists that under Connecticut law, dam-

---

"there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them." ... In short, recklessness is "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent."

*Lee v. Coss*, 201 F.3d 431, 1999 WL 1314741, *3 (2d Cir.1999), quoting *Dubay v. Irish*, 207 Conn. 518, 542 A.2d 711, 718–19 (1988); *Bordonaro v. Senk*, 109 Conn. 428, 147 A. 136, 137 (1929).

24. CRRA's amended complaint (part of Ex. C to # 1) expressly states, in addition to negligence claims, distinct contract causes of action for breach of legal services agreements: Count One against Murtha Cullina; Count Four as to Hawkins Delafield. Against Leboeuf, Count Seven charges negligent misrepresentation, Count Eight, fraudulent misrepresentation, and Count Nine, violations of

CUTPA. The CUTPA claim is generally-alleged without any specific provision identified: "Leboeuf's conduct as aforesaid was unfair, deceptive, unethical, unscrupulous and contrary to the public interest in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen.Stat. § 42–110a *et seq.*" Thus it appears to be based on both the negligent misrepresentation and fraudulent misrepresentation charges. This Court notes that the Connecticut Supreme Court has held that a CUTPA claim can be based on negligence. *A–G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 215, 579 A.2d 69, 76 (1990) (relating to § 42–110b(a), "No person shall engage in unfair methods of compensation and unfair or deceptive acts or practices in the conduct of any trade or commerce."); *see also Poulin v. Yasner*, No. CV 940141928, 1997 WL 112778, *4 (Conn.Super. Feb. 26, 1997), *aff'd in part and rev'd in part*, 64 Conn.App. 730, 781 A.2d 422 (Conn.App.2001), *cert. denied*, 258 Conn. 911, 782 A.2d 1245 (Conn.2001).

ages for breach of contract and fraudulent misrepresentation of violations of CUTPA cannot be apportioned. The Court agrees.

As noted, in its Apportionment Complaint Hawkins, Delafield has sued 44 of the 54 defendants that were also sued in CRRA's global complaint in H–03–1558. The Apportionment Complaint (also part of Ex. C to # 1), in seeking apportionment of damages, references the amended complaint and the global complaint in H–03–1558 because they seek the same $220 million in damages relating to the Enron Transaction. While CRRA insists that its claims in the global complaint are not grounded in negligence, Hawkins, Delafield argues that over half of the twenty-five causes of action, including eight aiding and abetting claims asserting complicity in negligent misrepresentation, sound in negligence, according to CRRA's own pleadings.[25] Hawkins, Delafield maintains that it merely modeled its Apportionment Complaint on and incorporated CRRA's allegations of negligence into the Apportionment Complaint.[26]

■ The Court's review of the global complaint's claims, such as those against Enron directors and officers and Arthur Andersen employees, revealed that the factual allegations are substantially grounded in intentional fraud even though the causes of action are labeled as negligence by CRRA. Many of the Apportionment Complaint allegations are not properly negligence-based. As discussed *infra,* because aiding and abetting under Connecticut law requires that the aider and abettor to "be generally aware of [its] role as part of the overall illegal or tortious conduct" of the primary actor that aider and abettor is substantially assisting at the time it is assisting, aiding and abetting is by nature inconsistent with negligence's lack of such

---

**25.** The global complaint, attached to # 1 in H–03–1558, asserts twenty-five counts, including fourteen negligence-based causes of action in Count 2 (negligent misrepresentation against the Enron Defendants); Count 4 (aiding and abetting negligent misrepresentation against the Enron Defendants); Count 6 (negligent misrepresentation against the Arthur Andersen Defendants); Count 8 (aiding and abetting negligent misrepresentation against the Arthur Andersen Defendants); Count 9 (negligence against Arthur Andersen); Count 11 (aiding and abetting negligent misrepresentation against Vinson & Elkins); Count 13 (aiding and abetting negligent misrepresentation against Kirkland & Ellis); Count 15 (aiding and abetting negligent misrepresentation against J.P. Morgan Chase); Count 17 (aiding and abetting negligent misrepresentation against Citigroup, Inc.); Count 19 (aiding and abetting negligent misrepresentation against Merrill Lynch); Count 21 (aiding and abetting negligent misrepresentation against Barclays Capital, Inc.); Count 22 (negligent misrepresentation against Moody's Investors Services); Count 23 (negligent misrepresentation against Standard & Poor's Rating Services); and Count 24 (negligent misrepresentation against Fitch). *See* ¶¶ 6–7

of the Apportionment Complaint (attached to # 1 in H–03–1580) identifying the relationship of the Apportionment Complaint to claims in H–03–1558 and representing that the damages sought by CRRA in H–03–1580 are the same as those in H–03–1558.

**26.** Paragraph 7 of the Apportionment Complaint at 3 states (emphasis added by this Court),

Included within the 25 counts in [H–03–1558] are claims made against all defendants that each defendant, by reason of the Basic Facts and separately alleged conduct, has been **negligent** with respect to representations made to CRRA in connection with the Enron Transaction or has aided and abetted others with respect to their **negligent** conduct in regard to such transaction and has caused the loss allegedly sustained by CRRA. The Attorney General of the State of Connecticut, co-counsel for CRRA in [H–03–1558], specifically stated in his press release of October 29, 2002, announcing the filing of the case, that "[e]ach **of the defendants were either complicit or negligently incompetent,** enabling Enron to defraud CRRA."

awareness. See pages 70–73 and n. 39 of this memorandum and order. Moreover, the Apportionment Complaint seeks to apportion damages that might be imposed upon Hawkins, Delafield in the legal malpractice case-in-chief, but that action has asserted not only negligence, but also a breach of contract cause of action against Murtha Cullina and Hawkins, Delafield and both fraudulent misrepresentation and CUTPA violations against Leboeuf. An apportionment complaint cannot seek to apportion damages for claims that are not grounded in negligence.

Furthermore, CRRA has sued Hawkins, Delafield for breach of a fiduciary duty, a duty which CRRA argues is heightened by the fact that CRRA, its client, is a government agency. Section 52–572h(k)9 expressly states that it does not cover "breaches of trust or of other fiduciary obligations." As noted earlier, CRRA points out that the Connecticut Supreme Court has noted that the "relationship between an attorney and his client is highly fiduciary in its nature...." *Andrews v. Gorby*, 237 Conn. 12, 675 A.2d 449, 453 (1996); *Whitaker*, 2000 WL 1862127, *4. This Court concurs.

In *Whitaker v. Erdos & Maddox*, the court concluded that § 52–572h(k), which expressly states that "[t]his section shall not apply to breaches of trust or of other fiduciary obligations," required the court to strike a plaintiff's claim that his attorney breached his fiduciary duty to the plaintiff because apportionment under the statute was inapplicable. 2000 WL 1862127 at *4–5. *See also Andersen v. Bitondo*, No. CV 970081677S, 1998 WL 279810, *1 (Conn.Super.Ct. May 18, 1998). While CRRA has not expressly identified breach of fiduciary duty as one of its causes of action, in *Whitaker*, 2000 WL 1862127 at *4, the court noted,

The Supreme Court has stated that "the relationship between an attorney and client must involve personal integrity and responsibility on the part of the lawyer and an equal confidence and trust on the part of the client.... The relationship between an attorney and client is highly fiduciary in its nature and of a very delicate, exacting and confidential character, requiring a high degree of fidelity and good faith." *Andrews v. Gorby*, 237 Conn. 12, 20, 675 A.2d 449 (1996).

Because of the intrinsic nature of that fiduciary duty, the *Whitaker* court found "the apportionment concept to be inapplicable to the present case" for legal malpractice. 2000 WL 1862127 at *5.

In sum, for all these reasons, the Court agrees with CRRA that Hawkins, Delafield's Apportionment Complaint fails to meet the requirements of Connecticut law and that CRRA's motion to strike it should be granted. Moreover, because the Apportionment Complaint is the sole source of this Court's "related to" bankruptcy jurisdiction over the entire action, the Court therefore has no subject matter jurisdiction over the remaining portion of the suit and accordingly grants CRRA's motion to remand the remainder of the case to the appropriate Connecticut state court. The motions constituting instruments # 15 and 94 are therefore MOOT, while # 61 and 62 will remain pending for ruling by the Connecticut state court following remand.

### IV. MOTIONS IN H–03–1558

**A. CRRA's Motion to Remand and/or Abstain, or Alternatively to Strike, Dismiss or Sever the third-party complaint pursuant to Rule 14(a) of the Federal Rules of Civil Procedure and Remand the underlying action against the three law firm defendants (# 121)**

CRRA also moves to remand H–03–1558 under 28 U.S.C. § 1447(c) on the grounds

that there is no federal jurisdiction over its state-law claims [27] or, alternatively, for the court to abstain from exercising jurisdiction under 28 U.S.C. § 1334(c)(1) or (2). It maintains that the Defendants' potential claims for indemnification or contribution from Enron's bankruptcy estate, when Enron is not a party to this suit, are insufficient to sustain "related to" bankruptcy jurisdiction here under 28 U.S.C. §§ 1334(b) and 1452. Defendants argue that the Court has jurisdiction because the claims are related to the adversary proceeding between CRRA and Enron pending in the bankruptcy court.[28]

The Court has indicated in this memorandum and order, beginning on page 25, and in numerous other MDL 1446 cases its legal conclusions regarding "related to" bankruptcy jurisdiction based on contribution and indemnification claims and the unanimity rule as well as mandatory and permissive abstention with respect to the kind of claims asserted here and accordingly denies CRRA's motion.

**B. CRRA's Motion to Stay Adjudication of Any Motions to Transfer until motion for remand is resolved (# 119), joined by the Arthur Andersen Defendants (# 141), is MOOT in light of the Court's resolution of # 121.**

**C. CRRA's Petition, under 28 U.S.C. § 1292(b), for Certification of Interlocutory Appeal (# 224) of an order by the Honorable Warren W. Eginton, United States District Court for the District of Connecticut, denying CRRA's motion to remand and/or abstain, or Alternatively to Strike, Dismiss or Sever the Third–Party Complaint pursuant to Rule 14(a) of the Federal Rules of Civil Procedure and Remand the underlying action against the three law firm defendants.**

Section 1292(b) provides,

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order....

28 U.S.C. § 1292(b). "The decision to certify an interlocutory appeal pursuant to section 1292(b) is within the discretion of the trial court and unappealable." *In re Air Crash Disaster*, 821 F.2d 1147, 1167 (5th Cir.1987), *citing In re McClelland Engineers, Inc.*, 742 F.2d 837, 839 (5th Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 366 (1985).

CRRA contends that there are controlling questions of law and substantial

---

**27.** Here CRRA claims that Defendants violated CUTPA and Connecticut common law.

**28.** As noted earlier, CRRA instituted the adversary proceeding contending that "Enron induced CRRA to enter an illegal business deal: a $220 million loan from CRRA to Enron that Enron knew was *ultra vires* and beyond CRRA's statutory authority to make." # 122 at 5. In that adversary proceeding it sought imposition of a constructive trust over the amount of the loan so that it did not become part of the debtor's estate, but Judge Gonzalez rejected the theory.

grounds for difference of opinion regarding Judge Eginton's order. Specifically, it identifies as controlling legal issues (1) is this case "related to" a bankruptcy proceeding, thus creating federal jurisdiction under § 1334(b) and § 1452; (2) if there is "related to" bankruptcy jurisdiction, was the removal procedurally deficient because there was no unanimous consent; (3) if there is jurisdiction, should mandatory abstention under § 1334(c)(2) apply; and (4) if there is jurisdiction, should the court in its discretion permissively abstain from exercising it under § 1334(c)(1)?

It is apparent from this Court's memoranda and orders in MDL 1446 that it had independently come to the same conclusions as' Judge Eginton regarding these issues in the instant action. Moreover, while acknowledging that the scope of "related to" bankruptcy jurisdiction is unsettled, the Court is confident that its rulings are well founded and supported by substantial recent case law and that an exception from the rule against piecemeal appeals is not warranted here. With respect to the three conditions required for a petition for certification of interlocutory appeal, i.e., that the question be a controlling issue of law, that there is substantial ground for disagreement about the issue of law, and that an immediate appeal appears to advance the ultimate termination of the MDL 1446 litigation, the Court is persuaded by the last requirement and by its implications in the context of this huge MDL litigation, to deny the petition. The Court finds that not only would the appeal not materially advance the ultimate termination of the litigation, since the instant action is only tangentially related to the substantive claims of the *Newby* class action, but that such an appeal would ob-

struct the progress of this very complex action over which this Court has imposed an orderly and efficient discovery schedule. Furthermore, this issue relates to cases from a number of circuit courts of appeals with differing views. Indeed Judge Eginton's order was issued in the Second Circuit, but with the transfer here, would be reviewed by the Fifth Circuit. Because of the division among courts, this Court is convinced that ultimately a ruling by the Supreme Court or action by Congress, will be required to resolve the question, and such a process would be lengthy and most likely not final until after the resolution of this litigation.

Therefore the Court denies the petition for certification of an interlocutory appeal.

**D. Credit Agency Defendants' Motion for Leave to File Motions to Dismiss and for a Stay of Discovery (# 237)**, in other words for relief from this Court's scheduling order (# 1561 in *Newby* ) staying the filing of amended pleadings and/or responsive pleadings in coordinated cases until the Court resolves the class certification motions in *Newby* and *Tittle*.

Describing themselves as "the three leading providers of rating opinions about the credit worthiness of securities and securities issuers in the United States" published "to subscribers and the general public,"[29] Standard & Poor's, Moody's, and Fitch, while preserving their right to contest the court's personal jurisdiction over them, seek to file their motions to dismiss on an expedited basis[30] and for a limited stay of discovery against them because they are convinced that they should be dismissed based "on their well established

---

**29.** # 238 at 2.

**30.** Motions to dismiss have been filed by Standard & Poor's, Fitch, and Moody's

(# 256, 259, 262, respectively) and answered and are now ripe for review.

First Amendment rights as publishers" and wish to avoid extraordinary burdens of time and money that discovery would entail, as well as the "inhibit[ion of] the free flow of information on matters of public concern." # 237 at 2.

Obviously, any value in expedited consideration has been defeated at this point by the sheer size and volume of this litigation, which has severely taxed the Court's ability to address in a timely matter countless matters in the myriad MDL 1446 cases. Nevertheless, the Credit Rating Agencies represent that CRRA has consented to the relief they seek and to the extent that the parties have worked matters out by agreement, parts of the motion may no longer be in dispute, the matter is resolved. As indicated earlier, the Court grants the motion for leave to file the motions to dismiss and, since the Court resolves the motions to dismiss *infra*, finds the request for a stay of discovery to be MOOT.

### E. CRRA's Motion to Consolidate H–03–1558 with H–03–1579 (# 246 in H–03–1558) and Rebecca Mark–Jusbasche's Motion to Consolidate the same cases (# 41 in H–03–1579).

Apparently, while the case was pending in the United States District Court for the District of Connecticut, the docket sheet reflects entry of an order on 12/20/02 by Judge Eginton granting Rebecca Mark–Jusbasche's motion to consolidate these two actions, but there is no such instrument in the file.[31] Moreover, the parties have continued to file instruments in the separate cases with no recognition of consolidation. Thus to clarify this situation, the Court grants both motions to consolidate and henceforth the parties shall file all pleadings in the older, lead case, H–03–1558.

### F. Plaintiff's motion to file sur-reply (# 321) to Andrews & Kurth L.L.P.'s reply

The motion to file sur-reply, which was submitted as # 322, is unopposed. The Court therefore grants the motion and has considered the sur-reply in resolving the motion to dismiss.

### G. Defendant Andrews & Kurth L.L.P.'s Motion to Dismiss (# 254)

#### 1. Allegations in the Amended Complaint

The complaint identifies Andrews & Kurth as outside general counsel to Enron at all relevant times, i.e., between 1998 and December 2, 2001.

Three causes of action are asserted against Andrews & Kurth. With respect to the first two, Andrews & Kurth is charged with knowingly and intentionally aiding and abetting in fraudulent misrepresentations and aiding and abetting in negligent misrepresentations about Enron, including about its operations, performance, profitability, liquidity, debt structure, indebtedness, and debt and borrowing capacity, as issued in its financial statements and SEC filings, press releases, and publicly disseminated reports and disclosures, purportedly for the purpose of furthering Enron's illegitimate business interests and Ponzi scheme to deceive the business community and investing public, including CRRA, by inflating Enron's revenue and hiding billions of dollars of its debt. CRRA claims that it reasonably and justifiably relied on such numerous, false statements in making its decision to do business with Enron. In a third count against the law firm, the complaint asserts that An-

---

**31.** At that time H–03–1579 was numbered 3:02cv2095.

drews & Kurth and the other Defendants violated CUTPA, Conn. Gen.Stat. § 42–110a, *et seq.*

The First Amended Complaint at ¶ 280 asserts that the law firm represented Enron in twenty eight FAS 140 [32] Transactions, "one of Enron's favorite tools for improperly reporting inflated income while keeping crippling amounts of debt off its financial statements and public disclosures." [33] Plaintiff alleges that these transactions were

> structured by Enron to monetize an otherwise illiquid asset, remove the asset from its balance sheet in a purported sale but nonetheless retain control over the asset in order to time the final disposition or sale of the asset. Enron used these transactions to improperly report inflated income on its financial statements and public disclosures. Indeed, these transactions did not constitute "true sales," but rather were loans and the resulting proceeds should have been recorded and publicly reported as debt.

According to the complaint, even though Andrews & Kurth knew that the transactions would not be recorded as debt, but instead as gain, on Enron's balance sheet and that Enron would retain control over, and ultimate ownership of, the purportedly transferred asset(s), Andrews & Kurth issued "true sales" opinion letters representing that Enron was "legally isolated" from these assets, as required by FAS 140. Moreover, it alleges that Andrews & Kurth knew that these opinion letters were provided to Arthur Andersen L.L.P. to serve as a basis for its materially misleading accounting treatment in Enron's financial statements. Enron did prepay and unwind many of the transactions before their contemplated maturity date, sometimes (with particular examples cited in the complaint) while Andrews & Kurth was still working on the opinion letter relating to a transaction's original creation. First Amended Complaint at ¶¶ 284–90. While drafting the related "true sale" opinion letters, Andrews & Kurth also purportedly helped Enron in the unwinding of fifteen related transactions, the documents for which had express provisions for prepayment and continuing retention of control over and immediate reacquisition of "sold" assets by Enron. [34] The complaint also claims that Andrews & Kurth expressed concern to Enron about the propriety of allowing Enron to prepay at any time to retrieve the assets, but that in deals closing in December 1999 the law firm "was given very clear instructions that Enron had to be able to prepay and get the assets back at any time" and thus had included that express right in the documents. First Amended Complaint at ¶ 185. [35]

## 2. The Arguments and Court Comments

Andrews & Kurth moves to dismiss the complaint against it, which it claims "boils down to conclusory allegations that CRRA was fraudulently induced into a transaction

---

**32.** FAS 140 refers to Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Financial Accounting Standards No. 140 (Financial Accounting Standards Bd.2000). The term also refers to FAS 125 transactions. FAS 125 was amended and became known as FAS 140, effective April 1, 2001, so FAS refers to both FAS 140 and FAS 125.

**33.** # 310 at 6.

**34.** The complaint identifies four specific instances in which Andrews & Kurth simultaneously drafted the "true sales" letters and worked on unwinding the same transactions.

**35.** As evidenced by a letter dated March 19, 2000, Andrews & Kurth followed Enron's instructions to structure the deals so that Enron retained control to prepay and "reacquire" the assets at any time.

in which A & K had **no role** based upon false financial statements that A & K **neither generated nor audited.** A & K's only action was drafting opinion letters for its client in wholly unrelated transactions that are not alleged to have reached the Plaintiff nor to have been drafted for the benefit of the Plaintiff." # 254 at 1.

With respect to the CUTPA claim, Andrews & Kurth contends that it fails because (1) Connecticut law does not apply to a Texas law firm's actions in representing a Texas client, writing opinion letters addressed to Enron in Texas and provided to Arthur Andersen in Texas or Illinois, and (2) the Connecticut Supreme Court has held that for public policy reasons such a CUTPA cause of action does not exist for attorney/client services.

Andrews & Kurth maintains that for CUTPA to apply, "the violation 'must be tied to a form of trade or commerce *intimately associated* with Connecticut [citation omitted].' " *Titan Sports, Inc. v. Turner Broadcasting Sys., Inc.,* 981 F.Supp. 65, 71 (D.Conn.1997). Andrews & Kurth emphasizes that there is no nexus between Andrews & Kurth and Connecticut that implicates trade or commerce in Connecticut. The conclusory allegation that the law firm "derives substantial revenue from interstate international commerce, including from business within the State of Connecticut," is insufficient to trigger the statute. *Alexander Hamilton Life Ins. Co. v. James River Corp. of Va.,* No. 3:96cv1100(AHN), 1997 WL 13053, *7 (D.Conn. Jan. 14, 1997)(dismissing CUTPA claim where, as here, the plaintiff "failed to allege what trade or commerce occurred in Connecticut" that gave rise the "the alleged wrongdoing").

After researching the question, the Court finds that the geographical reach of CUTPA has not been definitively resolved. On the one hand the clear language of the statute seems to support applying the stat-

ute to conduct involving "trade and commerce" in Connecticut because in defining that phrase, § 42–110(4) restricts it to *specific acts* "in this state." Nevertheless, § 42–110g(b) provides that persons "entitled to bring an action under subsection (a) of this section may ... bring a class action on behalf of themselves and other persons similarly situated who are residents of this state **or injured in** this state to recover damages [emphasis added by the Court]," suggesting that even where the tortious acts occur out-of-state, where persons in Connecticut are injured, a claim may be brought under CUTPA. Although no appellate court has addressed the question, several lower courts have held that even where the violations have occurred completely out-of-state, CUTPA applies if "the injury, i.e., the economic impact, occurred in Connecticut." *See, e.g., Titan Sports, Inc. v. Turner Broadcasting Systems, Inc.,* 981 F.Supp. at 72 n. 5 (and cases cited therein); *Connecticut Pipe Trades Health Fund v. Philip Morris, Inc.,* 153 F.Supp.2d 101, 107 (D.Conn.2001) (*citing Titan Sports* for the holding "that CUTPA applies to out-of-state defendant whose allegedly deceptive acts occurred outside the state but were broadcast within Connecticut and injured plaintiff in Connecticut"); *Federici v. Gans,* No. CV 940317690S, 1999 WL 49779, *2 (Conn.Super.1999)(finding there was "sufficient showing that the economic impact of the unfair trade practice occurred in Connecticut" to sustain a CUTPA claim) (*citing Uniroyal Chemical Co., Inc. v. Drexel Chemical Co., Inc.,* 931 F.Supp. 132 (D.Conn.1996) for the proposition that "a CUTPA claim may also be maintained where there is sufficient showing that the economic impact of the unfair trade practice occurred in Connecticut"); *Valtec Int'l, Inc. v. Allied Signal Aerospace Co.,* No. 3:93CV01171(WWE), 1997 WL 288627, *7 (D.Conn. Mar. 7, 1997) ("in the context of a multistate transaction,

where choice-of-law principles dictate that the law of Connecticut should be applied, a cause of action may exist under CUTPA even though none of the acts complained of took place in Connecticut").

Nevertheless, one treatise maintains that the legislative history, which the authors concede is not reliable because it consists of statements made long after the enactment of the statute, demonstrates that the legislature did not intend to allow CUTPA to cover conduct "merely 'affecting' trade or commerce" in Connecticut and rejected language to that effect (i.e., "wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state"), choosing instead to restrict its reach to conduct occurring "in this state." Robert M. Langer, John T. Morgan, and David L. Belt, 12 Conn. Prac., Unfair Trade Practice § 3.7 ("Conduct Outside Connecticut") (West 2004). The same treatise, without demonstrating similarities in the aim or nature of either statute, notes the use of a similar phrase in section 5 (authorizing the Federal Trade Commission to proceed only against "unfair methods of competition in commerce"[36]) of the Federal Trade Commission Act, passed in 1924, 15 U.S.C. § 45, and in effect at the time that CUTPA was enacted in 1973, may be relevant to construing what the Connecticut legislature intended in enacting CUTPA. In *F.T.C. v. Bunte Bros.*, 312 U.S. 349, 350–51, 61 S.Ct. 580, 85 L.Ed. 881 (1941), the Supreme Court interpreted "commerce" as limited to interstate commerce and refused to read it expansively to mean "affecting commerce." In 1975, the FTC Act was amended to reach "unfair or deceptive acts or practices in *or affecting*" commerce; in contrast the Connecticut legislature never amended its statute and its silence and inaction suggest that it did not wish to expand CUTPA's geographical reach to conduct outside the state that affected commerce in Connecticut. Langer, *et al.*, 12 Conn. Prac. § 3.7. The Court finds that neither one of these somewhat attenuated arguments is persuasive.

Because there is judicial authority for allowing a CUTPA claim based on violations outside of state that affect trade and commerce in Connecticut and where injury occurs to Connecticut residents, the Court finds that the statute applies to that extent.

Even if the statute is applicable to Andrews & Kurth's conduct outside of Connecticut that allegedly injured CRRA in Connecticut, Andrews & Kurth argues that acts taken by an attorney in the "representation of the client in a legal capacity" are "excluded for public policy reasons"; thus actions such as Andrews & Kurth's opinion letters for Enron are not actionable under CUTPA. *Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705, 731, 627 A.2d 374, 386 (1993)(Berdon, J., concurring).[37] As the panel explained in *Jackson*, 225 Conn. at 727, 627 A.2d at 384,

"Determining when attorneys should be held liable to parties with whom they are not in privity is a question of public policy." ... Providing a private cause of action under CUTPA to a supposedly aggrieved party for the actions of his or her opponent's attorney would stand the attorney-client relationship on its head and would compromise an attorney's

---

**36.** The statute defines "commerce" as interstate commerce. 15 U.S.C. § 44 (2003).

**37.** This Court observes that *Jackson* held that CUTPA does not provide a plaintiff with a cause of action against an attorney who represented the plaintiff's adversary in an earlier litigation. The court explained, "Imposing liability under CUTPA on attorneys for their representation of a party opponent in litigation would not comport with a lawyer's duty of undivided loyalty to his or her client." 225 Conn. at 729, 627 A.2d at 385.

duty of undivided loyalty to his or her client and thwart the exercise of the attorney's independent professional judgment on his or her client's behalf. *Id.* (citations omitted).[38]

Next, Defendant argues that CRRA's claim for aiding and abetting negligent misrepresentation fails to identify any particular misrepresentations by Andrews & Kurth, no less to assert that CRRA relied on such. The only allegedly false statements that CRRA expressly claims to have relied upon were those in public filings, credit rating reports, and statements by Enron, in creation of which Andrews & Kurth had no role. Furthermore Andrews & Kurth contends that CRRA has not identified any duty Andrews & Kurth had to prevent, to police, or to stop the fraudulent accounting practices or the Enron Transaction in dispute, in which Andrews & Kurth maintains it had no role, for which the firm made no proposals, and regarding which the firm did not participate in the structuring or drafting. Andrews & Kurth cites this Court's decision in *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F.Supp.2d 549, 706 (S.D.Tex.2002)(dismissing claims against Kirkland & Ellis because there were no allegations against it of material misrepresentations or omissions to investors or the public generally, because the documents it drafted were for private transactions and were not included in or drafted for any public disclosure or shareholder solicitation, and because it was not Enron's counsel for securities or SEC filings).

As a threshold matter, the Court notes that the claims against Kirkland & Ellis were grounded in different law than the claims against Andrews & Kurth. Moreover, although Andrews & Kurth argues that this Court's decision granting Kirkland & Ellis' motion to dismiss supports a similar action here, the pleadings are distinguishable. The Court found the allegations against Kirkland and Ellis were conclusory and general, whereas here CRRA has identified twenty-eight separate and allegedly deceptive opinion letters drafted by Andrews & Kurth and unwindings by Andrews & Kurth of four of those transactions, contradicting the substance of those letters. In addition, and a key factor here, Andrews & Kurth did not prepare these documents to provide misleading information **to its client,** Enron, because Enron already knew that it was repurchasing assets that Andrews & Kurth was representing were beyond Enron's reach. Instead the nature of the purported information in the documents indicate that the information in the letters was intended, by both Enron and Andrews & Kurth, to deceive persons **outside the attorney-client relationship.** The complaint has alleged that Andrews & Kurth knew that its opinion letters were used by Arthur Andersen as a basis for its purportedly misleading financial statements, which it also knew were incorporated into the public SEC filings and which Andrews & Kurth had reason to expect would mislead the public and fraudulently induce entities like CRRA to enter into business with and lend money to a foundering corporation. Thus third parties like CRRA were the intended or foreseeable recipients of Andrews & Kurth's allegedly fraudulent legal services.

---

38. *See also Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 496, 656 A.2d 1009, 1019 (1995)(In *Jackson* "we declined to recognize the right of that client's opponent to sue the attorney under CUTPA on the basis of the professional services the attorney had rendered for the client."); *Suffield Development Associates Ltd. Partnership v. National Loan Investors, L.P.,* 260 Conn. 766, 783, 802 A.2d 44, 54 (2002)(emphasizing the chilling effect that liability under CUTPA would have "on lawyers' duty of robust representation," the Connecticut Supreme Court concluded that both negligent and intentional malpractice are exempted from liability under the statute.)

Moreover, argues Defendant, analogizing aiding and abetting to civil conspiracy,[39] an allegation that Andrews & Kurth **knowingly and intentionally** aided and abetted **negligent** misrepresentations of Enron's financial status is inherently contradictory and is not legally cognizable. *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F.Supp. 1424, 1439 (D.Ariz.1992)(rejecting claim and observing "other courts have found the concept of secondary liability for negligence to be inherently inconsistent"). To aid and abet, one must have "knowledge" of the primary actor's tortious conduct and "substantially assist" in effecting that conduct. *Morin v. Trupin*, 711 F.Supp. 97, 112 (S.D.N.Y.1989)(elements of aiding and abetting are (1) existence of a primary fraud, (2) aider and abettor must have knowledge of that fraud, and (3) the aider and abettor must provide substantial assistance to achieve the primary fraud). Be-

---

**39.** The Court observes the District of Columbia Circuit, noting that "courts and commentators have frequently blurred the distinction between the two theories of concerted liability," has concluded, "The prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in a wrongful activity. Aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join in the wrongful conduct." *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C.Cir.1983). *Halberstam* recognized that the Restatement (Second) of Torts § 876(a) corresponds to a theory of conspiracy, while § 876(b) is parallel to aiding and abetting. *Id.* at 477; *in accord Aetna Casualty and Surety Co. v. Leahey Construction Co., Inc.*, 219 F.3d 519, 534 (6th Cir.2000).

In contrast, the Eighth Circuit has decided that "liability for civil conspiracy is in substance the same thing as aiding and abetting liability." *K & S Partnership v. Continental Bank, N.A.*, 952 F.2d 971, 980 (8th Cir.1991), *cert. denied*, 505 U.S. 1205, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992). In both, however, a key factor is the defendant's knowledge. *Aetna*, 219 F.3d at 534.

A number of Connecticut courts have treated conspiracy and aiding and abetting as the same cause of action. *See, e.g., Macomber v. Travelers Property and Casualty Corp.*, 261 Conn. 620, 647, 804 A.2d 180, 197–98 (2002); *Pediatric Occupational Therapy Services, Inc. v. Town of Wilton*, No. X06CV020174833S, 2004 WL 886394, *13 (Conn.Super. April 7, 2004); *DePrimo v. Chiarelli*, No. CV010454691S, 2004 WL 423400, *5 (Conn.Super. Feb. 9, 2004)(cause of action for conspiracy to commit fraud exists in Connecticut); *Calore v. Town of Stratford*, No. CV980357147S, 2001 WL 58364, *4 (Conn.Super. Jan. 8, 2001) ("In Connecticut cases, the tort of aiding and abetting is often used interchangeably with the principles outlined in § 876 of 4 Restatement (Second), Torts."). In *Macomber* the Connecticut Supreme Court stated,

> In order to survive a motion to strike a civil conspiracy count, the plaintiffs must properly allege: "(1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff."

261 Conn. at 647, 804 A.2d at 198, *quoting Marshak v. Marshak*, 226 Conn. 652, 665, 628 A.2d 964 (1993), *overruled on other grounds, State v. Vakilzaden*, 251 Conn. 656, 666, 742 A.2d 767 (1999). To assert a cause of action for aiding and abetting against Andrews & Kurth here, CRRA must allege that "(1) the person [Enron] whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of [its] role as part of the overall illegal or tortious conduct at the time that [it] provides assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Calore*, 2001 WL 58364 at *3.

Regarding a claim under § 876(a), the Texas Supreme Court has held that "[b]ecause negligence by definition is not an intentional wrong, one cannot agree or conspire to be negligent." *Juhl v. Airington*, 936 S.W.2d 640, 643 (Tex.1996). However CRRA responds that it sues not for conspiracy to commit negligence, but for aiding and abetting negligent misrepresentation (as well as fraudulent misrepresentation) under § 876(b).

cause civil conspiracy requires specific intent, and because a person cannot agree to commit a wrong about which he has no knowledge, some courts have concluded that parties cannot commit conspiracy to be negligent. *Firestone Steel Products Co. v. Barajas,* 927 S.W.2d 608, 614 (Tex. 1996); *Triplex Communications Inc. v. Riley,* 900 S.W.2d 716, 719 (Tex. 1995)(same). *Cf. Texas Dept. of Transportation v. Able,* 35 S.W.3d 608, 613 (Tex. 2000)(Joint enterprise liability views each defendant as the agent of the other and holds each responsible for the negligent act of the other). *But see In re ZZZZ Best Sec. Litig.,* No. CV87–3574RSWL, 1990 WL 132715, *12 (C.D.Cal. July 23, 1990) ("Since aiding and abetting liability requires allegations of knowledge, it would not seem to be compatible with negligent misrepresentation which is based on the conduct of an actor that does not have to be done with knowledge. However, the aider and abettor is not the same party as the one who allegedly made the negligent misrepresentation. Thus the aider and abettor could knowingly further a misrepresentation that was negligently made by another party.").

In sum, Andrews & Kurth insists that "CRRA's attempt to manufacture secondary liability for alleged negligent misrepresentations by Enron and the Enron Defendants must fail." # 254 at 10.

■ Third, regarding the cause of action for aiding and abetting fraudulent misrepresentation, Plaintiff fails to satisfy the knowledge requirement, which Andrews & Kurth contends turns on whether the abettor owed a duty to the Plaintiff. Here, it insists, Plaintiff has failed to show that Andrews & Kurth owed a duty to CRRA to prevent, intercept or disclose the alleged fraud in a transaction in which

Andrews & Kurth maintains it played no role. Andrews & Kurth argues that for a claim of fraud by nondisclosure, there generally must be a duty to disclose arising from a fiduciary relationship or a previously incomplete and misleading representation, neither of which is pled here. *Lesikar v. Rappeport,* 33 S.W.3d 282, 319 (Tex. App.-Texarkana 2000, pet. den.); *Renovitch v. Kaufman,* 905 F.2d 1040, 1048 (7th Cir.1990). Because an attorney must protect the confidences of his client, a third party does not have a fraud claim against an attorney who fails to disclose information about a client, even a client perpetrating fraud. *Lesikar,* 33 S.W.3d at 319–20; *Renovitch,* 905 F.2d at 1047. Thus seven if Enron were defrauding CRRA, CRRA has no claim against Andrews & Kurth based on its silence or inaction.

Andrews & Kurth contends that where there is no fiduciary or contractual duty running from the alleged aider and abettor to the Plaintiff, as is the situation here, silence and inaction may satisfy the substantial assistance requirement only where the plaintiff shows that "the defendant ... possess[es] a 'high conscious intent' and a conscious and specific motivation to aid the fraud." *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir.1975).[40] *See also Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1126–27 (5th Cir.1988)("When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high 'conscious intent' variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter.... Silent acquiescence never indicates by itself that the abettor wants the fraudulent scheme to succeed; here we usually require proof of 'conscious intent.' "), *cert. denied sub nom. Abell v.*

---

**40.** The Fifth Circuit did observe that knowing assistance can be inferred from atypical business actions lacking business justification.

*Woodward,* 522 F.2d at 97; *In accord Woods,* 765 F.2d at 1010.

*Wright, Lindsey & Jennings,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989). Andrews & Kurth maintains that it owed no duty to CRRA and that CRRA has failed to allege a high conscious intent and specific motivation to aid in the fraud.[41]

In opposition, CRRA argues, and this Court agrees, that even if the "conscious intent" test does apply to common law aiding and abetting,[42] the Fifth Circuit jury charge for "conscious intent" requires only that the plaintiff show that the defendant knew of the existence of the securities violation and understood that its actions aided in promoting the success of the securities violation. *Akin v. Q–L Investments, Inc.,* 959 F.2d 521, 536 (5th Cir.1992)("Conscious assistance has two aspects. First the plaintiff must prove that the defendant had knowledge of the existence of the securities violation and generally understood how its actions aided in promoting the success of the securities violation. Second, the plaintiff must prove that the defendant intended to further the securities violation."). "The second element of scienter—commitment—would be met where evidence shows that the abettor acts from a desire to help the fraud succeed." *Id.* at 536 n. 14. CRRA insists that it has alleged these elements and shown that the law firm was aware of and associated itself with Enron's fraud; CRRA has cited evidence corroborating Andrews & Kurth's knowledge, including its admissions of instructions from Enron to violate FAS 140, its internal communications expressing its concerns, and its participation in unwinding transactions while simultaneously working on opinion letters to support them as "true sales."

Andrews & Kurth contends that CRRA's pleading also fails to demonstrate that the law firm "substantially assisted" in any fraudulent misrepresentation for aiding and abetting liability because it fails to allege that Andrews & Kurth drafted, reviewed or authorized any statement on which CRRA claims to have relied in connection with the Enron Transaction. *Morin,* 711 F.Supp. at 113 ("In the context of aiding and abetting, where the primary violations consist of either misrepresentations in, or omissions from, a document, the substantial assistance must relate to the preparation or dissemination of the document itself."). Reading "preparation" and "document" narrowly, the firm insists that Andrews & Kurth's opinion letters, even if they contained misrepresentations,

---

**41.** CRRA responds that the "conscious intent" test applies only to federal securities claims under § 10(b) and not to common law aiding and abetting, and that Andrews & Kurth has failed to cite any cases showing otherwise. This Court disagrees and observes that a number of "courts addressing aiding and abetting liability under section 10(b) apply the same analysis as those addressing common law aiding and abetting liability under Restatement (Second) of Torts § 876." *Smith v. First Union National Bank,* No. 00–4485–CIV, 2002 WL 31056104, *2 and n. 2 (S.D.Fla. Aug. 23, 2002) (and cases cited therein).

**42.** Aiding and abetting under § 10(b) was disallowed by the Supreme Court in *Central Bank of Denver v. First Interstate Bank,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Nevertheless, the analysis of aiding and abetting under that statute pre-*Central Bank* is the same as that for common law. *See In re Colonial Ltd. P'ship Litigation,* 854 F.Supp. 64, 102 (D.Conn.1994)("The pleading requirements for aiding and abetting common law fraud are substantially similar to the pleading requirements for aiding and abetting a violation of section 10(b)."). For aider and abettor liability there is "a single scienter requirement that varies on a sliding scale from 'recklessness' to 'conscious intent.... The plaintiff must show conscious intent unless there is some special duty of disclosure or evidence that the assistance to the violator was unusual in character or degree.'" *Abbott v. Equity Group, Inc.,* 2 F.3d 613, 621 (5th Cir.1993), *cert. denied sub nom. Turnbull v. Home Ins. Co.,* 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

do not constitute substantial assistance to the primary securities law violation, i.e., the misrepresentations relied upon by CRRA. Andrews & Kurth further argues CRRA never identified any misinformation that was prepared or transmitted by Andrews & Kurth to CRRA and on which CRRA relied, no less that Plaintiff also failed to allege that the law firm even made a misrepresentation on which the law firm **intended** CRRA to rely. *McCamish, Martin, Brown & Loeffler v.* *F.E. Appling Interests,* 991 S.W.2d 787, 791, 794 (Tex.1999) (A claim under the Restatement (Second) of Torts § 552[43] "is available only when information is transferred by an attorney to a known party for a known purpose"; liability is limited "to situations in which the attorney who provides the information is aware of the nonclient and intends that the nonclient rely on the information"); *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 524 (Tex.1998).[44] Instead

**43.** Section 552 of the Restatement (Second) of Torts (1976), titled "Information Negligently Supplied for the Guidance of Others," provides in relevant part,

(1) One who, in the course of his business profession or employment, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justiciable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Subsection (2) limits this provision to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Comment (h) relating to Subsection (2) states, The rule stated in this Section subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied. In this particular his liability is more narrowly restricted than that of the maker of a fraudulent representation (*see* § 531), which extends to any person whom the maker of the representation has reason to expect to act in reliance upon it.

... [I]t is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker intends to reach and influence either a particular person or persons, distinct from the much larger class who might reasonable be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. . . . It is not enough that the maker knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.

**44.** Because at issue here is whether Texas or Connecticut law applies to the claims against Andrews & Kurth, this Court points out that Connecticut courts have construed the "limited group" restriction of subsection (2)(a) of § 552 and comment (h) far more liberally that Texas courts. In Connecticut under § 552 "even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know or has a duty to know the truth." *Richard v. A. Waldman & Sons, Inc.,* 155 Conn. 343, 346, 232 A.2d 307, 309 (1967); *Citino v. Redevelopment Agency,* 51 Conn.App. 262, 273, 721 A.2d 1197, 1206 (1998).

In *Williams Ford Inc. v. The Hartford Courant Co.,* 232 Conn. 559, 657 A.2d 212, asserting causes of action of intention misrepresentation or fraud, negligent misrepresentation, and violations of CUTPA, in selling advertising space the defendant newspaper allegedly misrepresented to plaintiffs (seventy-two automobile dealership groups) that they could reduce advertising costs only by buying larger contracts and misinformed them that "consecutive contracts" with lower rates were not available or would not save them money. Applying § 552, the Connecticut Supreme Court

CRRA has expressly stated that it relied on credit reports improperly prepared by Credit Agencies derived from false representations by Enron, audited financial statements and SEC filings improperly prepared by Andersen and made by Enron, and public and private statements made by Enron representatives.

CRRA disagrees with Andrews & Kurth's contention that CRRA has failed to plead substantial assistance for aiding and abetting liability. CRRA maintains that substantial assistance requires only that the allegations be "sufficiently specific to inform the defendant of the precise nature of the charges against him." *Neilson v. Union Bank of California, N.A.*, 290 F.Supp.2d 1101, 1131 (C.D.Cal.2003) ("Where aiding and abetting is the gravamen of the claim, Rule 9(b) requires that the complaint ... inform [the defendant] ... what he did that constituted ... 'substantial assistance.'").[45] The motion to dismiss also emphasizes that aiding and abetting must be pled with particularity under Federal Rule of Civil Procedure 9(b), but argues the complaint fails to identify the misrepresentations made by Andrews & Kurth or to plead facts and circumstances demonstrating that the Andrews & Kurth's conduct and intent were fraudulent, indeed that the law firm was in any way involved in the Enron Transaction or that it made any profit from that Transaction. *Morin,* 711 F.Supp. at 113.

Specifically CRRA accuses Andrews & Kurth of providing essential assistance to Enron's fraudulent scheme to hide debt and build up revenue by its participation in twenty-eight FAS 140 transactions and in

did not recognize a duty to disclose owed to the universe of persons that might consider buying advertising; instead, the Supreme Court concluded that a duty of care was owed to all person who actually came forward and entered into transactions with the defendant. In *Dudrow v. Ernst & Young, LLP,* No. X01CV980144211, 1998 WL 800204, \*10, \*11 (Conn.Super. Nov. 4, 1998), in a cause of action for aiding and abetting, the court recognized that a duty of care was owed by an accounting firm to all residents, former residents or executors of former residents of a continuing care facility, who had invested their life savings in the facility, against the developer of that facility, after the accounting firm had allegedly misrepresented the facility's financial health in reports that it knew would be "used in a statutorily required disclosure." The court found that the "limited group" included all those who entered into continuing care contracts in reliance on the accounting firm's alleged misrepresentations in public documents.

In *Bennett Restructuring Fund, L.P. v. Hamburg,* No. X02CV010167682S, 2003 WL 178753, \*14–18 (Conn.Super. Jan. 2, 2003), the plaintiffs sued former officers and directors of a corporation for misrepresentations in SEC documents regarding the financial health of their company. In denying a motion to strike, the appellate court found that the plaintiffs satisfied the "limited group" restriction because they were "potential investors in RCI's Notes—for whose benefit and guidance the defendants prepared and filed the 10–Ks in which they made their alleged misrepresentations." *Id.* at \*16. By analogy, Connecticut courts might well recognize a cause of action under § 552 for the alleged substantial and knowing assistance of Andrews & Kurth to Arthur Andersen in misrepresenting Enron's financial health would have breached its duty of care to those who reasonably relied on those accountant reports, which Andrews and Kurth purportedly knew were incorporated into SEC documents, and who actually purchased debt securities issued by or lent money to Enron.

45. In *Neilson* the defendant was charged with aiding and abetting fraud, but not negligence. *See also In re Colonial,* 854 F.Supp. at 101–02 ("Although the plaintiffs' claims of fraud, negligent misrepresentation, and aiding and abetting arise under Connecticut law, these claims must nevertheless satisfy the pleading requirements of Rule 9(b). Thus with respect to common law fraud and misrepresentation, the plaintiffs must allege scienter on the part of the defendants, and specify with particularity the content, time, and place of the alleged misrepresentations.").

unwinding fifteen related transactions because these transactions fraudulently permitted Enron to retain control over the transferred assets and to "doctor" its books. At times working simultaneously on the opinion letters to support these transactions and on the unwinding of them, often at critical reporting times, Andrews & Kurth knew that these transactions lacked economic substance and were not "true sales." CRRA maintains that in deciding to do business with Enron it relied on financial statements that were generated as a result of Andrews & Kurth's aid and assistance to the scheme.

Noting that it has not alleged that Andrews & Kurth committed a primary violation, even though the law firm's arguments seem to charge that CRRA has, CRRA maintains that it has adequately satisfied both the knowledge and substantial assistance prongs for aiding and abetting fraudulent misrepresentation. Under the Restatement (Second) of Torts § 876(b) (1977), "for harm resulting to a third person" (CRRA) from the tortious conduct of another (Enron), CRRA need only allege (1) that Enron committed a wrongful act that caused injury, (2) that Andrews & Kurth knew that Enron's conduct constituted a breach of duty and (3) that Andrews & Kurth gave substantial assistance or encouragement to Enron in breaching that duty. *FDIC v. Romaniello*, No. CV 92–0294248, 1992 WL 369557 (Conn.Super. Dec. 3, 1992)(Although Connecticut has not recognized a cause of action for aiding and abetting a common law fraud, following *Halberstam v. Welch*, 705 F.2d 472 (D.C.Cir.1983), it recognizes the theories of conspiracy, or concerted action by agreement, and aiding and abetting, or concerted action by substantial assistance, as embodied in the Restatement (Second) of Torts § 876 (1979), "Persons Acting in Concert": "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him ... or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself...."). Indeed this Court observes that several lower courts in Connecticut have recognized the § 876(b) cause of action. *See also Brunette v. Bristol Savings Bank*, No. CV 92–0453957S, 1994 WL 468448, *2 (Conn.Super. Aug. 22, 1994) (following *Romaniello* and identifying as elements of aiding and abetting fraudulent actions of a co-defendant "(1) the party whom the defendant aids must perform a wrongful act that causes injury; (2) the defendant must be generally aware of [its] role as part of an overall illegal or tortious activity at the time [it] provides assistance; (2) the defendant must knowingly and substantially assist the principal violation."); *In re Colonial Ltd. P'ship Litig.*, 854 F.Supp. 64, 102 (D.Conn.1994)(same); *Shuster v. Lyons*, No. CV910036302S, 1994 WL 472419, *6 (Conn.Super. Aug. 7, 1997)(Connecticut accepted a doctrine analogous to civil conspiracy in the theory of liability under § 876 of the Restatement (Second) Torts in *Carney v. DeWees*, 136 Conn. 256, 262, 70 A.2d 142 (1949)); *Calore v. Town of Stratford*, No. CV980357147S, 2001 WL 58364, *4 (Conn.Super. Jan. 8, 2001). Moreover the state's Supreme Court has long recognized a common law claim for aiding and abetting a tort or statutory violation. *Carney v. DeWees*, 136 Conn. 256, 262, 70 A.2d 142, 146 (1949) (for asserting an aiding and abetting claim, as stated in the Restatement (Second) § 876 (1965), "a person is liable if he ... (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct itself. If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible

for the consequences of the other's act"); *Slicer v. Quigley*, 180 Conn. 252, 259, 429 A.2d 855, 859 (1980), *overruled on other grounds, Ely v. Murphy*, 207 Conn. 88, 540 A.2d 54 (1988); *Conn. National Bank v. Giacomi*, 242 Conn. 17, 63, 699 A.2d 101, 126 (1997). *See also Feen v. Benefit Plan Administrators, Inc.*, No. 406726, 2000 WL 1398898, *9 (Conn.Super. Sept. 7, 2000)("With respect to claims of aiding and abetting, Connecticut has adopted 4 Restatement (Second) Torts § 876(b)(1977)....").

Furthermore, § 876(b) applies to both intentional and negligent tortious acts. Comment d to § 876(b); *Dudrow v. Ernst & Young, LLP*, No. X01 CV 980144211, 1998 WL 800204, *12 (Conn.Super. Nov. 4, 1998)(aiding and abetting claims for intentional and negligent misrepresentations are cognizable under § 876). *See also Fortae v. Holland*, 334 Ill.App.3d 705, 720, 268 Ill.Dec. 173, 778 N.E.2d 159, 171 (2002)(in-concert liability under § 876(b) applies to knowing, substantial assistance of either intentional or negligent wrongdoing of other actors), *appeal denied*, 202 Ill.2d 669, 272 Ill.Dec. 357, 787 N.E.2d 172 (2003); *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 172–74 (Iowa 2002)(under § 876 "the plaintiff may base a claim of civil conspiracy on wrongful conduct that does not constitute an intentional tort").

Finally, challenging CRRA's standing to bring this suit against the law firm, Andrews & Kurth urges that CRRA is merely one of many creditors to whom Enron owed money and that its claim can only be brought by the Creditors' Committee in the Enron bankruptcy proceedings. Alternatively, Andrews & Kurth argues that like other Enron creditors, CRRA has no standing to sue on any claim against Andrews & Kurth outside of the Enron bankruptcy because any cognizable claim against a professional working for the debtor, Enron, belongs exclusively to the bankruptcy estate since the alleged generalized injury is to the Enron estate and would affect all other creditors. CRRA does not allege a specific misrepresentation made by Andrews & Kurth to CRRA, but only that the law firm knew that the transactions for which it had been retained by Enron contributed to the false financial statements upon which creditors generally would rely; thus the claim arises out of Andrews & Kurth's relationship with Enron, not with individual creditor CRRA. Andrews & Kurth reiterates that CRRA has failed to allege any duty running from the law firm to itself and no direct injury to CRRA arising from a breach of such a duty. Any duty Defendant breached was a duty to Enron, and thus any resulting injury was to Enron.

### 3. Court's Ruling

#### a. Personal Jurisdiction

As an initial matter, CRRA argues that Andrews & Kurth belatedly claimed that Connecticut courts lack personal jurisdiction over the law firm; CRRA insists that Andrews & Kurth has waived that defense because it failed to raise it in its motion to dismiss. Fed. R.Civ.P. 12(h)(1) ("A defense of lack of jurisdiction over the person ... is waived (A) if omitted from a motion in the circumstances described in subdivision (g), or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 14(a) to be made as a matter of course."). *Titan Sports, Inc. v. Hellwig*, No. 3:98–CV–467 (EBB), 1999 WL 301695, *7 (D.Conn. Apr. 26, 1999)("Under Federal Rule of Civil Procedure 12(h)(1), a party waives the defense of lack of personal jurisdiction when it is neither raised in the first pre-answer motion pursuant to Rule 12(b), nor included in a responsive pleading or an amendment to the pleading permitted as of right by Rule 51(a).... Thus

a litigant ordinarily must raise a personal jurisdiction defense 'at the time he makes his first significant defensive move— whether it be by way of a Rule 12 motion or a responsive pleading.' ")(quoting 5A Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1391 (1990)).

Andrews & Kurth contends that such waiver was impossible because it was never sued in Connecticut; instead CRRA added Andrews & Kurth as a defendant on December 23, 2003 by amended complaint, eight months after the case was transferred to this Court by the Judicial Panel on Multidistrict Litigation.

First, this Court observes that the Second Circuit prefers the term "forfeiture" rather than "waiver" of the personal jurisdiction defense in such circumstances. *Hamilton v. Atlas Turner, Inc.,* 197 F.3d 58, 61 (2d Cir.1999)("The term 'waiver' is best reserved for a litigant's intentional relinquishment of a known right. Where a litigant's action or inaction is deemed to incur the consequence of loss of a right, or, as here, a defense, the term 'forfeiture is more appropriate.' ") (and cases cited therein).

The multidistrict litigation statute authorizes federal courts to exercise nationwide jurisdiction. 28 U.S.C. § 1407 (providing for the transfer of actions pending in different districts "to any district for coordinated or consolidated pretrial proceedings"); *In re "Agent Orange" Product Liability Litigation MDL No. 381,* 818 F.2d 145, 163 (2d Cir.1987)(The Judicial Panel on Multidistrict Litigation "has rec-ognized, 'Transfers under Section 1407 are simply not encumbered by considerations of in personam jurisdiction and venue.... Following a transfer, the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer.' "), *cert. denied sub nom. Pinkney v. Dow Chemical Co.,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988). Thus this Court would have the same in personam jurisdiction as the transferor Connecticut federal court, and no more.

Furthermore, the MDL Panel has held that the phrase "pretrial proceedings" encompasses a motion to dismiss for lack of personal jurisdiction. *Hamilton v. Atlas Turner, Inc.,* 197 F.3d at 62, *citing the following cases: In re Gypsum Wallboard,* 302 F.Supp. 794, 794 (J.P.M.L.1969) (" '[m]otions to .... dismiss for lack of jurisdiction are being routinely considered by courts to which multidistrict litigation has previously been transferred and we see no good reason why [the defendant] cannot pursue its remedies following transfer' "); *In re Agent Orange Product Liability Litig.,* 996 F.2d 1425, 1435 (2d Cir. 1993), *cert. denied,* 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 434 (1994); *Stirling v. Chemical Bank,* 382 F.Supp. 1146, 1150 (S.D.N.Y.1974), *aff'd,* 516 F.2d 1396 (2d Cir.1975); and 15 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 3866 (2d ed. Supp.1999) (" 'Transferee courts have ruled on a wide range of preliminary and factual questions, such as ... motions to dismiss for lack of jurisdiction.' ").[46] An-

---

**46.** In *Hamilton,* one defendant failed to move to dismiss for lack of personal jurisdiction during three years that the case was pending in the transferee court, participated in discovery, and only moved for dismissal seven months after the case was returned to the court "despite several clear opportunities to do so during the four-year interval after filing its answer." 197 F.3d at 62. The Second Circuit found that the defendant "gambled that it could raise the personal jurisdiction issue on the eve of trial, in case a trial occurred," and concluded that the circumstances established forfeiture of the personal jurisdiction defense. *Id.*

drews & Kurth, added after that transfer, has not yet challenged personal jurisdiction under Connecticut's long arm statute and minimum contacts under the Fourteenth Amendment in the motion to dismiss that it has filed in this Court and an attempt to do so now might be deemed untimely.

Regardless, where there is "related to" bankruptcy jurisdiction, as here, the personal jurisdiction challenge based on minimum contacts with the forum state is irrelevant. 17 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Fed. Prac. & Procedure,* § 4106 (2004 Supp.)("Bankruptcy Rule 7004 provides for nationwide service of process in adversary proceedings arising in the bankruptcy courts. Therefore in determining whether the bankruptcy court has personal jurisdiction over the adversary defendants, the relevant question to be asked is not whether defendants have minimum contacts with the forum state, but whether the defendants have sufficient contacts with the United States for the exercise of personal jurisdiction to comport with traditional notions of fair play and substantial justice."); *In re Enron Corp.,* 316 B.R. 434, 444 (Bkrtcy.S.D.N.Y.2004) (Bankruptcy Rule 7004(f) "does not require that a state 'minimum contacts' analysis be undertaken to determine personal jurisdiction in a federal question case such as an adversary proceeding.... [O]nly a federal 'minimum contacts' test in required, whereby the Fifth Amendment's Due Process Clause limits a bankruptcy court's exercise of personal jurisdiction over a defendant."); *Cytomedix v. Little Rock Foot,* 287 B.R. 901, 903 (N.D.Ill.2002)(Minimum contacts analysis of *International Shoe Co. v. Washing-*

*ton,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), does not apply in bankruptcy context where the court has "related to" jurisdiction because the resolution of the action affects the bankrupt's estate). Here Andrews & Kurth clearly has contacts with the nation as a whole. Moreover the Court does not find that trying the case in New York or in Connecticut[47] would be fundamentally unfair under the Fifth Amendment Due Process Clause. The law firm has not shown that trial in these states would be so costly, burdensome, or inconvenient so as to deprive Andrews & Kurth of its day in court. Andrews & Kurth does business around the country and has represented national and international entities.

**b. Applicable State Law**

The second threshold issue here is which state's choice of law rule applies.

 In diversity jurisdiction cases, the choice of law rules of the state in which the court sits apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In federal question jurisdiction cases, where a court is exercising supplemental jurisdiction over state-law claims, a federal court also applies the choice of law rules of the forum state to the state law claims. *Id.; Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,* 96 F.3d 1151, 1164 (9th Cir.1996). In the instant case, however, which was transferred under § 1407, a different analysis applies. Generally if a case is transferred under 28 U.S.C. § 1406, the choice of law rules of the transferee court apply. *Nelson v. Int'l Paint Co.,* 716 F.2d 640, 643 (9th Cir.1983). But when a case has been

---

**47.** The Court would point out that this case was transferred here for consolidation with MDL 1446 solely for pretrial proceedings. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998)(holding that the federal transferee court conducting MDL pretrial proceedings has no authority to transfer the cases to itself under 28 U.S.C. § 1404(a) for trial but must remand them).

transferred pursuant to 28 U.S.C. § 1404(a), the choice of law rules of the transferor court are applied. *Ferens v. John Deere*, 494 U.S. 516, 525, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). This Court has previously found that a transfer under § 1407 in a case involving only state-law claims is more akin to the latter, where the venue was proper in the transferor federal district court, but the transfer by the Judicial Panel for Multidistrict Litigation was for convenience and efficiency. # 2143 at 15; *In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486, 1492 (9th Cir.1985) (and cases cited therein) ("we must apply the choice of law rules of Illinois because the claims were originally filed in the district court in Illinois before they were transferred to California by the Judicial Panel on Multidistrict Litigation"). Thus the choice of law rules of Connecticut apply here.

In tort cases, including causes of action for misrepresentation, Connecticut previously followed the traditional *lex loci delicti* doctrine, i.e., that the law of the place of injury governs. Under that doctrine, in this action the state suffering the economic impact of CRRA's $220 million loan to Enron would be Connecticut and its law would govern the substantive rights and obligations of the parties to the litigation. *O'Connor v. O'Connor*, 201 Conn. 632, 637, 519 A.2d 13, 15 (1986). Subsequently in 1986 Connecticut modified that approach in tort actions where "application of the doctrine of lex loci would produce an arbitrary, irrational result" to embrace the "most significant relationship" analysis of the Restatement (Second) of Conflict of Laws §§ 6 and 145(1) and (2) (1971) because that test "represent[ed] the most comprehensive and equitably balanced approach to the conflict of laws." *O'Connor v. O'Connor*, 201 Conn. at 648–50, 519 A.2d at 21–22; *Dugan v. Mobile Medical Testing Services, Inc.*, 265 Conn. 791, 800–01, 830 A.2d 752, 759 (2003). Thus only where application of lex loci will produce an irra-

tional result does the Court apply the Restatement's more flexible balancing test.

Since Andrews & Kurth contends that Texas choice of law principles should apply, the Court notes that in 1979 Texas also adopted the Restatement (Second) of Conflict of Laws' approach. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex.1979); *Hughes Wood Products, Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex.2000).

Section 145 of the Restatement, governing the choice of law decisions for tort issues generally, states,

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular case.

Section 6 principles "are used in evaluating the significance of a relationship, with respect to **the particular issue,** to the potentially interested states, the occurrence and the parties [emphasis added by the Court]." Comment b, § 145, Restatement (Second) of Conflict of Laws. Section 6(2) provides that where no state statute directs the parties,

factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

"[I]t is the significance, and not the number, of § 145(2) contacts that determines the outcome of the choice of law inquiry under the Restatement [Second] approach. As the concluding sentence of § 145(2) provides, [t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Dugan,* 265 Conn., at 803, 830 A.2d at 752. *See generally Chang v. Chang,* No. CV040198722S, 2004 WL 2095116, *2 (Conn.Super. Aug. 23, 2004). The comments also indicate that factors such as the protection of justified expectations of the parties and predictability and uniformity are of lesser importance in tort cases that in other areas of law, such as contracts, thus making the remaining factors more important for tort actions. Comment b to § 145. Moreover the purpose of state policies effected in the interested states' tort rules becomes significant. "If the primary purpose of the tort rule involved is to deter or punish misconduct, . . . the state where the conduct took place may be the state of dominant interest and thus of the most significant relationship. On the other hand, when the tort rule is designed primarily to compensate the victim for his injuries, the state where the injury oc-

curred, which is most often the state where the plaintiff resides, may have the greater interest in the matter." *Id.* Comment c to § 145. Nevertheless the comment recognized, "To some extent, at least, every tort rule is designed both to deter other wrongdoers and to compensate the injured person.". *Id.*

Section 148 of the Restatement (Second) of Conflict of Laws, focusing on the specific torts of fraud and misrepresentation where the injury is pecuniary, for the purpose of determining the state with the most significant relationship, provides,

(1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which the local law of the other state will be applied.

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

The Comment to § 148 states that it applies to fraudulent, negligent or innocent misrepresentations.

■ Because the aiding and abetting claims are secondary to and derivative of the underlying tort claims of fraudulent and negligent misrepresentation,[48] which allegedly caused the financial injury to CRRA in Connecticut, the Court examines the most significant relationship contacts with respect to § 148, as well as § 145 and § 6.

Andrews & Kurth contends that Texas, its place of business, where it performed the work for Enron,[49] i.e., where it generated the opinion letters and unwound the purportedly improper transactions, and where its relationship to Enron was centered, has the most significant relationship to the occurrence at issue and the parties in this action.

Generally the two most important factors in the most significant relationship test for tortious conduct are where the tortious conduct took place and where the injury occurred.

Because a civil action for aiding and abetting cannot exist independently but must be based upon a valid underlying cause of action, the Court considers both the place of the aiding and abetting and the place where the misrepresentations were made to CRRA as places where the tort took place. *Efthimiou,* 268 Conn. at 504–05, 846 A.2d at 226, *citing Marshak v. Marshak,* 226 Conn. 652, 668, 628 A.2d 964, 971 (1993)("civil action of aiding and abetting cannot stand alone and depends on the existence of a valid underlying cause of action"). This Court notes that "[v]icarious liability can of course be based on acts of assistance as well as words of encouragement." *Halberstam,* 705 F.2d at 482. Furthermore, such encouragement or deed need not be "at the scene of the tort"; "aiding-abetting action may also be more distant in time and still substantial enough to create liability." *Id., citing Russell v. Marboro Books,* 18 Misc.2d 166, 183 N.Y.S.2d 8 (N.Y.Sup.Ct.1959). *See also* Restatement (Second) of Conflict of Laws § 148 ("When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which the local law of the other state will be applied."). In the instant case, the allegations in the complaint indicate that the relevant tortious conduct took place in Texas and in Connecticut. According to

---

**48.** A civil action for aiding and abetting cannot exist alone but must be based upon a valid underlying cause of action. *Efthimiou v. Smith,* 268 Conn. 499, 504–05, 846 A.2d 222, 226 (2004); *Streeter v. Executive Jet Management, Inc.,* No. X01CV020179481S, 2004 WL 2039797, *2 (Conn.Super. June 29, 2004).

**49.** Enron was organized under the laws of Oregon, a state which otherwise has no interest here, and its principal place of business was in Houston, Texas.

the complaint, the misrepresentations issued in public financial statements that were required by federal law were based in part on Andrews & Kurth's deceptive opinion letters drafted in Texas and were foreseeably made by Enron and Arthur Andersen to CRRA in Connecticut, *inter alia.*

The reliance by CRRA on those alleged misrepresentations and the injury to CRRA occurred wholly in Connecticut.[50]

Moreover, the Court finds significant the fact that Plaintiff is a quasi-public agent of the State of Connecticut, therefore making its injury one that must be born by the taxpayers of Connecticut, a significant factor in the analysis of the states' relevant interests.

Furthermore, when a law firm works for a top Fortune 500 corporation with international dealings, like Enron, and that law firm prepares documents with information that it knows will be incorporated into required, key public financial statements that will be distributed nationwide, indeed worldwide, it is surely foreseeable that those who do business with that corporation may be injured by reasonable reliance on what are allegedly knowing and material misrepresentations in them that were provided by that law firm.

Under § 148, Connecticut law applies unless some other state has a more significant relationship to the substantive claim at issue and to the parties. Because in a tort action, factors such as protection of justified expectations of the parties and predictability and uniformity are of diminished importance, the Court's analysis under Sections 145 and 6 of the Restatement focuses on the purpose of the states' relevant local law rules to the issue in dispute to determine Connecticut's and Texas' interest in the determination of the case.

Regarding the states' relevant policies and interests, Andrews & Kurth argues that under Texas law, an attorney owes a duty of care only to his client and that only a client in privity can sue a lawyer for professional negligence. As for charges of fraudulent and negligent misrepresentation, Andrews & Kurth asserts that this Court has ruled that an attorney is only liable in Texas if it takes an affirmative step of speaking out to the public or if the attorney knew or had reason to expect that the defendant was in a limited group that might reasonably have been expected to have access to the information and to act in reliance on it. # 1194. It also emphasizes that Texas has refused to adopt § 876's concert of action theory of liability. *Juhl v. Airington,* 936 S.W.2d 640, 643–44 (Tex.1996).

Finding Andrews & Kurth's argument misleading, this Court observes while it is true that Texas has not adopted the Restatement (Second) of Torts § 876 for concert of action liability for substantially assisting negligent or fraudulent misrepresentation, Texas also has not rejected it; instead the Texas Supreme Court stated, "whether such a theory of liability is recognized in Texas is an open question."

**50.** Only in a footnote in its rejoinder to plaintiff's surreply does Andrews & Kurth conclusorily charge that CRRA's insistence that the misrepresentations were provided to it in Connecticut is a "baseless" claim that "can be found nowhere in CRRA's complaint." # 331 at 2 n. 5. Because CRRA is a Connecticut agency, because this is a motion to dismiss rather than one for summary judgment, and because Andrews & Kurth has failed to allege, no less prove, that CRRA received the misrepresentations elsewhere than in Connecticut, the Court finds this belated and almost concealed challenge insubstantial. Should Andrews & Kurth discover evidence demonstrating that CRRA received the misrepresentations outside of Connecticut, Andrews & Kurth may raise the issue on summary judgment.

*Juhl v. Airington,* 936 S.W.2d 640, 643–44 (Tex.1996). *See also Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d 573, 583 n. 7 (Tex.2001) ("... [W]e do not consider whether Texas law recognizes a cause of action for 'aiding and abetting' fraud separate and apart from a conspiracy claim."). Rather the high court in *Juhl* first focused on § 876(a), which imposes liability for agreement to act in a common design, in comparison to a cause of action for civil conspiracy, which Texas had long recognized, and found that the provision was illogical. It explained that negligence cannot be an intentional wrong since one cannot agree or conspire to be negligent. *Id.* at 643.[51] It compared a § 876(a) claim with a cause of action is under § 876(b), which is invoked in the instant suit and which imposes liability for substantially assisting and encouraging a tortfeasor in a tortious act. *Id.* at 644. With respect to that provision, the Texas Supreme Court found in *Juhl* that even if Texas adopted § 876, the claim failed because the summary judgment evidence in that suit proved that the defendants did not breach any duty, recognized or potential, to the plaintiff. *Id.*

The Court observes that Comment c to § 145 states, "A rule which exempts the actor from liability is entitled to the same consideration in the choice-of-law process as is a rule which imposes liability." There is no Texas law expressly and affirmatively providing immunity for professionals from allegations of aiding and abetting; rather, in Texas the Court finds inaction and recognition that the issue is "an open question." And while Texas may have a policy of protecting professionals from third-party liability when a Texas attorney injures Texas residents, its interest in injury to persons and entities outside Texas, i.e., in Connecticut, is limited.

Nevertheless, this Court does not find Texas' policy toward attorneys whose performance is below professional standards to be so different from, or antithetical to, that of Connecticut so as to deny application of Connecticut law here. Both states have a policy of holding accountable to third-parties attorneys whose conduct falls below acceptable professional standards. Andrews & Kurth oversimplifies this Court's ruling regarding attorney liability to third parties under Texas law; that memorandum and order speaks for itself. See # 1194 at 73–98. While the Court has concluded that Texas does permit third-parties to sue attorneys for professional negligence under the circumstances alleged here, the Court agrees that Texas has not expressly adopted § 867 and has not applied derivative common-law aiding and abetting to professional negligence claims.

In contrast, Connecticut has a strong, express policy of, and interest in, protecting its residents from tortious conduct, even where that conduct occurred outside of its boundaries, when the conduct injures Connecticut residents within the state's boundaries. That policy is evidenced in the reach of one of Connecticut's two long-arm statutes: it provides jurisdiction over foreign partnerships that commit torts with an impact in Connecticut as "consistent with the statute's remedial purpose of providing Connecticut residents with a convenient forum to seek redress for losses they suffer here as a result of a nonresident's tortious actions." *Cody v. Ward,*

---

**51.** The Texas Supreme Court in *Juhl* did perceive § 876 as limited to "antisocial or dangerous behavior," i.e., "highly dangerous, deviant or anti-social group activity which is likely to cause serious injury or death to a person or certain to harm a large number of people." *Id.* at 644–45. However, since the provision has never been adopted, there is little Texas case law addressing it. Had it been adopted, there is no certainty that Texas courts might not have expanded that interpretation.

954 F.Supp. 43, 46 (D.Conn.1997)(holding that transmission of fraudulent misrepresentations by a nonresident to a Connecticut resident by telephone and electronic mail to induce that Connecticut resident to buy and hold securities was sufficient to subject the nonresident to suit in Connecticut). Connecticut General Statutes Ann. § 52–59b(a), states in relevant part that a Connecticut court has personal jurisdiction over a foreign partnership that "commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent (A) regularly. does or solicits business, or engages in any other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce...." The allegations against Andrews & Kurth, if cognizable under Connecticut law and if proven, would satisfy this facial requirement of § 52–59b(a)(B) of the long-arm statute, authorizing jurisdiction.[52]

Furthermore, the Court finds that Connecticut has a strong interest in adjudicating this dispute involving CRRA, not only because it is a Connecticut entity, but because it is a quasi-public state agency. CRRA is entitled to a forum that can provide it with convenient and effective relief.

As noted earlier, Connecticut traditionally followed the law of the place of injury, the *lex loci delicti* doctrine, for tort cases; that doctrine still controls in Connecticut except where its application "would produce an arbitrary, irrational result," but even then remains a factor to be considered in the most significant relationship analysis. *Id.* at 46 & n. 7; *O'Connor v. O'Connor*, 201 Conn. at 649–50, 519 A.2d at 21–22. The Court finds no reason to conclude that imposing the *lex loci delicti* doctrine here would produce an arbitrary or irrational result and thus need not even reach the most significant relationship analysis. The result is the same under either test. According to allegations in the complaint, Enron intentionally targeted "business opportunities" in states outside of Texas to further its scam and to raise money from non-Texans to feed its Ponzi

---

**52.** Had Andrews & Kurth properly raised the challenge to personal jurisdiction in Connecticut state court, the next step would be to determine whether, under the particular facts of the case, the exercise of jurisdiction over the defendant partnership offends constitutional due process under the fourteenth amendment. *Xerox Corp. v. Axel Johnson Energy Dev., Inc.*, Nos. CV 92 0125804 and 92 0126094, 1993 WL 107824, *4 (Conn.Super. Apr. 2, 1993), *citing Frazer v. McGowan*, 198 Conn. 243, 246, 502 A.2d 905 (1986); *D'Amato v. Ocean One Mall*, No. 28 49 38, 1990 WL 272735, *2 (Conn.Super. Apr. 5, 1990). The two "touchstones" of a due process analysis based on minimum contacts with the forum state are fairness because the defendant purposefully availed itself of the privilege of conducting activities within Connecticut and thus is subject to jurisdiction in Connecticut and

the foreseeability of his being haled into court in Connecticut. *Id.* at *5, *citing United States Trust Co. v. Bohart*, 197 Conn. 34, 41, 495 A.2d 1034 (1985). As summarized by the federal district court of Connecticut in *Cody v. Ward*, 954 F.Supp. at 46, in a due process analysis,

> The "constitutional touchstone [is] whether the defendant purposefully established 'minimum contact' in the forum state." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75, 105 S.Ct. 2174, 85 L.Ed.2d 528 ... (1985)(quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 ... (1980)). Contacts that are merely "random, fortuitous or attenuated" do not provide an adequate basis for personal jurisdiction. *Burger King Corp.*, 471 U.S. at 475, 105 S.Ct. 2174....

scheme and conceal its financial condition. Moreover, Enron employed individuals and entities in other states that have also been sued for aiding and abetting the alleged misconduct leading to the company's financial collapse. It would be irrational, depending upon the law of the state in which each alleged aider and abettor had its principal place of business, to allow a party that knowingly and foreseeably injures residents in another state, by substantial assistance in creating and distributing to the public material misrepresentations of Enron's financial condition on which it knew businesses and investors would rely.

The Court concludes that Connecticut has the most significant relationship here and the law of Connecticut applies.

Thus the Court concludes that Connecticut law applies to this action.

## c. Standing

██ The burden of establishing standing rests on the party claiming that status. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995)("To have standing, '[a] plaintiff must [1] allege personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief.'").

CRRA claims that Andrews & Kurth aided and abetted Enron in concealing debt and inflating income on its financial statements and public disclosures based on those financial statements, that CRRA relied on those financial statements and public disclosures, the CRRA suffered a direct injury while Enron, and the debtor's estate, suffered none, and thus neither Enron nor its trustee (in Enron's case the court-appointed reorganization specialist Stephen Cooper) could bring these claims against Andrews & Kurth.

██ The Court agrees with CRRA that it has standing to pursue its claims. It is well established that pursuant to the Bankruptcy Code a trustee in bankruptcy "stands in the shoes of the corporation and has standing to bring any suit that the bankrupt corporation could have instituted had it not petitioned for bankruptcy." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991). Furthermore, "a bankruptcy trustee has no standing generally to sue third parties on behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Id.* Thus the bankruptcy trustee may not assert claims of the creditors against third parties, but only claims belonging to the debtor against third parties. *Id.* (and cases cited therein).

██ Moreover, where the debtor "has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Id.See also Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94, 100 (2d Cir.2003)("Where 'a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors.'") (*quoting Hirsch*, 72 F.3d at 1094). This rule applies to professional negligence claims. *Bennett Funding Group, Inc.*, 336 F.3d at 100; *Hirsch*, 72 F.3d at 1094. If a debtor corporation's officers and directors and a third party "collaborated in the fraudulent scheme, the trustee can sue only if it can establish that there has been damage to the corporation apart from the damage to the third-party creditors." *Bennett Funding Group, Inc.*, 336 F.3d at 100. A creditors' committee, acting on behalf of the corporate debtor, similarly lacks standing to assert causes of action against a third-party for aiding and abetting the debtor corporation. *Lippe v. Bairnco Corp.*, 218 B.R. 294, 301 (S.D.N.Y.1988)(when professionals are alleged to have aided and abet-

ted a company's managers in wrongdoing, "the claim 'belongs to creditors *qua* creditors,' and cannot be asserted by the company, its [bankruptcy] trustee, a committee of unsecured creditors, or anyone else standing in the shoes of the debtor corporation.").

■■■■ Furthermore state law determines whether a creditor of a bankrupt corporation or the bankruptcy trustee (or a debtor in a bankruptcy proceeding) may bring a claim outside the bankruptcy proceedings. *See, e.g., St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 700 (2d Cir.1989) ("We agree with those courts that have held that the determination of whether a claim may be brought by a creditor of a bankrupt corporation outside the bankruptcy proceedings depends on an analysis of state law"), *citing Morton v. National Bank (In re Morton),* 866 F.2d 561, 563 (2d Cir.1989) ("Whether the rights belong to the debtor or the individual creditors is a question of state law."); *Bennett Funding Group, Inc.,* 336 F.3d at 100; *Hirsch,* 72 F.3d at 1093. It is well established that Connecticut law gives a creditor like CRRA standing to assert causes of action for negligence and fraud if its injury is foreseeable, *inter alia. Hirsch,* 72 F.3d at 1093, *citing inter alia Tackling v. Shinerman,* 42 Conn.Supp. 517, 520, 630 A.2d 1381, 1384 & n. 2 (Conn.Super.1993) ("Connecticut law recognizes liability in negligence of attorneys and accountants to third parties whose reliance is foreseeable without regard to privity").[53] The Court concludes that similarly it would permit a creditor to sue a third-party for aiding and abetting fraud and negligence.

■■■■ A creditor must assert a direct injury to have standing to sue outside of the bankruptcy proceedings, unless the trustee abandons the claim. *St. Paul Fire and Marine Ins. Co,* 884 F.2d at 701. Where the claim against a third party is a general claim, with no particularized injury to a specific creditor, but instead a claim that could be brought by any creditor, the trustee is the proper plaintiff to bring suit because "[t]he claims, if proved, would have the effect of bringing the property of the third party into the debtor's estate, and thus would benefit all creditors." *St. Paul Fire and Marine Ins. Co,* 884 F.2d at 701 (and cases cited therein).

■■■■ Here CRRA's claims against Andrews & Kurth for aiding and abetting negligent and fraudulent misrepresentation on which CRRA claims to have relied, arose out of a default on a purported illegal loan from CRRA to Enron as part of the Enron Transaction, and are individual to and caused direct harm specific to CRRA, but not to the debtor, and any recovery from Andrews & Kurth would not become the property of the bankruptcy estate. Thus here the claim belongs to the creditor, CRRA, and not to the debtor in bankruptcy or a creditors' committee. Because the Court concludes that there is no damage to the debtor corporation from Andrews & Kurth's conduct separate from that suffered by the third-party creditor, neither the trustee nor the creditors' committee, both of which stand in the shoes of the debtor, has standing to assert the

---

**53.** The court in *Tackling,* 42 Conn.Supp. at 520, 630 A.2d at 1383, observed, " 'A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that the harm of the general nature of that suffered was likely to result from his act or failure to act.... The concept of privity is not relevant to an action based on negligence [citations omitted].' " In *Tackling,* the court examined whether it was reasonably foreseeable that the negligence of a residence appraiser, in determining under HUD/FHA guidelines whether lead paint was present, would result in harm from lead poisoning to plaintiffs.

claim. *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d at 118–20. Thus the Court finds that CRRA has standing to assert such claims.

### d. CUTPA

General Statutes § 42–110b(a) provides, "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In turn, "trade or commerce" "is broadly defined as the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42–110a(4). "The entire act is remedial in character ... and must be liberally construed in favor of those whom the legislature intended to benefit." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 492, 656 A.2d 1009 (1995).[54]

 There is no requirement of heightened pleading with particularity under CUTPA. *Macomber v. Travelers Property and Casualty Corp.*, 261 Conn. 620, 644, 804 A.2d 180, 196 (Conn.2002). Instead the Connecticut Supreme Court has

"adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1)[W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes,

the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons].... All three criteria do not need to be satisfied to support a finding of [a violation of CUTPA]."

*Id.*, quoting *Hartford Electric Supply Co. v. Allen–Bradley Co.*, 250 Conn. 334, 367–68, 736 A.2d 824 (1999). *See also Atlantic Richfield Co. v. Canaan Oil Co.*, 202 Conn. 234, 243, 520 A.2d 1008 (1987) ("a practice may be unfair because of the degree to which it meets one of the criteria [of the 'cigarette rule'] or because to a lesser extent it meets all three."). Here there is no serious argument that the Credit Rating Agencies' conduct was corrupt, immoral or unscrupulous. "[A] violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy.[55] ... Furthermore a party need not prove an intent to deceive to prevail under CUTPA." *Cheshire Mortgage Service, Inc. v. Montes*, 223 Conn. 80, 105–06, 612 A.2d 1130 (1992). Nor is there a requirement that a consumer relationship must exist between a plaintiff and a defendant being sued for a violation of CUTPA; indeed "'a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury.'" *Macomber*, 261 Conn. at 643, 804 A.2d at 195–96. *See*

---

**54.** General Statutes § 42–110b(d) provides that "it is the intention of the legislature that this chapter be remedial and be so construed."

**55.** As noted by Robert M. Langer, John T. Morgan, and David L. Belt, 12 Conn. Prac, Unfair Trade Practice § 4.2 ("CUTPA and Related Business Torts" "Misrepresentation and Failure to Disclose")(West 2004), although in

a number of opinions the Connecticut Supreme Court uses a disjunctive in saying that a CUTPA violation may be established by showing "either an actual deceptive practice ... or a practice amounting to a violation of public policy," suggesting two separate standards, it addresses only the legality of the deceptive conduct under the cigarette rule for determining unfairness.

*generally* Robert M. Langer, John T. Morgan and David L. Belt, 12 Conn. Prac. Unfair Trade Practice § 3.6 (Absence of Competitive or Transactional Relationship) (West 2005). An act or practice is deemed "deceptive" if it meets three conditions: (1) there is a representation, omission or other practice likely to mislead consumers; (2) consumers interpreted the message reasonably under the circumstances; and (3) the misleading representation or omission or practice is material, i.e., likely to affect consumer's decision or conduct. *Caldor, Inc. v. Heslin*, 215 Conn. 590, 597, 577 A.2d 1009 (1990), *cert. denied*, 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1053 (1991).

■ "[T]he liberal construction to which a remedial statute such as CUTPA is entitled, led the courts to construe its broad coverage to include unfair trade practices by attorneys." *Heslin v. Connecticut Law Clinic of Trantolo & Trantolo*, 190 Conn. 510, 520, 461 A.2d 938 (1983). Although CUTPA does apply to the conduct of attorneys because "the conduct of any trade or commerce" does not exclude such, the courts in Connecticut have held that the statute applies only to the entrepreneurial or commercial aspects of the practice of law, and not to the attorney's professional representation of a client. Thus a claim of malpractice, i.e., professional negligence, does not fall within the statute's reach. *Suffield Development Associates, Ltd. Partnership v. National Loan Investors, L.P.*, 260 Conn. 766, 781, 802 A.2d 44, 53 (2002); *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 79, 717 A.2d 724 (1998)("Our CUTPA cases illustrate that the most significant question in considering a CUTPA claim against an attorney is whether the allegedly improper conduct is part of the attorney's professional representation of a client or is part of the entrepreneurial aspect of practicing law.").

"[I]t is important to note that, although lawyers are subject to CUTPA, most of the practice of law is not. The 'entrepreneurial' exception is just that, a specific exception from CUTPA immunity for a well defined set of activities—advertising and bill collection for example." *See Haynes v. Yale–New Haven Hospital*, 243 Conn. 17, 34–38, 699 A.2d 964 (1997) (reasoning that practice of law and medicine may give rise to CUTPA claims only for entrepreneurial aspects, such as solicitation of business and billing, and not for claims involving issues of competence and strategy). It is not a catch-all provision intended to subject any arguably improper attorney conduct to CUTPA liability. Therefore, the mere fact that the actions of the attorney and the law firm might have deviated from the standards of their profession does not necessarily make the actions entrepreneurial in nature. *Suffield Development*, 260 Conn. at 782, 802 A.2d 44. The distinction between entrepreneurial and professional representation roles is not based on whether the attorney acted for profit, as such a result would largely undermine the general rule. *Suffield*, 260 Conn. at 782–83, 802 A.2d at 53–54. The exemption from CUTPA liability applies to intentional misconduct as well as negligent misconduct that falls below the professional standards. *Id.* at 54.[56] The Connecticut Supreme Court has

---

**56.** The Connecticut Supreme Court observed, It is of no consequence that the plaintiff in the present case is alleging intentional misconduct. By shielding attorneys from CUTPA liability for professional conduct, we do not intend to protect intentional malpractice, just as we never have intended to protect negligent malpractice. Rather, protecting professional conduct from CUTPA liability ensures that no attorney is discouraged from intentional and aggressive actions, believed to be in the interest of a client, by fear of being held liable under CUTPA in the event that the action is later

held that it is important not to interfere with the attorney's primary duty of robust representation of the interests of his or her client.... This public policy consideration requires us to hold that CUTPA covers only the entrepreneurial or commercial aspects of the profession of the law. The noncommercial aspects of lawyering—that is, the representation of the client in a legal capacity—should be excluded for public policy reasons. *Haynes,* 243 Conn. at 34–35, 699 A.2d 964.

 After reviewing the pleadings, this Court finds that allegations against Andrews & Kurth fall within the noncommercial, "strategy" area of professional representation and are therefore excluded from CUTPA liability for public policy reasons. Thus the Court finds that the motion to strike should be granted as to the CUTPA claim.

**e. Aiding and Abetting Negligent and/or Fraudulent Misrepresentation**

**(1.) General Challenges**

In arguing that logically there can be no cause of action for aiding and abetting negligent misrepresentation, Andrews & Kurth has selected cases from jurisdictions that agree with it, but fails to address those which do not and to cite any Connecticut cases.

 As a threshold matter, this Court concludes that Connecticut does recognize an independent common law claim for aider and abettor liability as defined by § 876(b) of the Restatement (Second) of Torts. *Connecticut Nat'l Bank v. Giacomi,* 233 Conn. 304, 329, 659 A.2d 1166,

1178 (1995) (affirming that there is no cause of action for aider and abettor liability under the provision of the Connecticut Uniform Securities Act modeled on § 10(b) of the Securities Exchange Act and pointing out alternatively that common law aider and abettor liability is available under the Restatement (Second) of Torts § 876 if the elements for such a cause of action are satisfied). It is clear that such a claim reaches aiding and abetting fraud or intentional torts, and a couple of state cases suggest that it would also encompass aiding and abetting negligent misrepresentation. *Carney v. DeWees,* 136 Conn. 256, 262, 70 A.2d 142, 145–46 (Conn.1949)(recognizing claim for common law aiding and abetting in a wrongful death claim); *Dudrow v. Ernst & Young LLC,* No. X01 CV98–0144211S, 1999 WL 786261, *10 (Conn.Super. Sept. 15, 1999). *See infra* at 803–04, *et seq.* Nevertheless, while the tortfeasor in the underlying tort may merely be negligent, under Restatement (Second) of Torts § 876(b) the aider and abettor is required have scienter and not merely to meet a "should have known" standard. *Dudrow,* No. X01 CV 98 0144211, 1998 WL 800204, at *6; Restatement (Second) of Torts § 876(b) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself...."). *See, e.g., Efthimiou,* 268 Conn. at 504–05, 846 A.2d at 225 (emphasizing aiding and abetting as a derivative claim, following *Halberstam's*[57] "generally aware of his role as part of an overall illegal or

---

deemed to have been an intentional deviation from the standards of professional conduct. "[W]e must ... take care not to adopt rules which have a chilling and inhibitory effect on would-be litigants of justiciable issues.... [We seek] to avoid any rule that would interfere with the attorney's

robust representation of the interests of his or her client. [citations omitted]."
*Suffield,* 260 Conn. at 784, 802 A.2d at 54.

**57.** *Halberstam v. Welch,* 705 F.2d 472 (D.C.Cir.1983).

tortious activity at the time he provides assistance" to the party performing "a wrongful act that causes an injury," and requiring that the aider and abettor must "knowingly and substantially assist the principal violation"); *Brunette,* 1994 WL 468448 at *2 (at least recklessness); *Romaniello,* 1992 WL 369557 at *1–2 (following *Halberstam* ).

 Indeed, a number of Connecticut cases addressing § 876(b) rely on *Halberstam,* 705 F.2d at 477, which distinguished between conspiracy and aiding and abetting,[58] but which did not distinguish between intentional and negligent torts for the conduct which the defendant allegedly aided and abetted, for liability under § 876(b). Although CRRA divides its claims into aiding and abetting negli-

gent misrepresentation and aiding and abetting fraudulent misrepresentation, because Connecticut recognizes such claims only under § 876(b), it would be more appropriate to plead a single claim. To state a claim under § 876(b), the plaintiff must show (1) that the aider and abettor knows that the party he is aiding is breaching a duty it owes to another and (2) that the aider and abettor gave substantial assistance to the primary tortfeasor. With respect to attorneys, "[u]nlike negligence claims, aiding and abetting liability does not require the existence of, nor does it create, a pre-existing duty of care to a third party nonclient.[59] Rather aiding and abetting liability is based on proof of scienter—the defendants must *know* that the conduct they are aiding and abetting is a tort." *Witzman v. Lehrman & Flom,* 601 N.W.2d 179, 186 (Minn.1999), *citing Restatement (Second) of Torts* § 876.[60]

**58.** See footnote 43 of this memorandum and order.

**59.** Contrary to Andrews' and Kurth's arguments, the aider and abettor need not owe a duty to the injured plaintiff, but it is the party who is aided and abetted (here the directors and officers of Enron) who must owe the duty to the other third-party, he re Plaintiff CRRA. As indicated, " 'A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that the harm of the general nature of that suffered was likely to result from his act or failure to act.' " *Tackling,* 42 Conn.Supp. at 520, 630 A.2d at 1383. Incorporating ¶¶ 1–472, detailing alleged misrepresentations by Enron upon which CRRA claims it relied to its detriment, the Amended Complaint at 161, ¶ 475, asserts, "It was reasonably foreseeable to the Enron Defendants that parties such as CRRA would rely upon and act upon the foregoing False Statements in making decisions to do business with Enron."

**60.** The Court has discussed public policy reasons why an attorney may not be held liable for its conduct in it robust representation of its client. A recognized exception to this general rule at common law is when the attorney acts fraudulently, maliciously or tortiously.

*See, e.g.,* J. Randolph Evans and Ida Patterson Dorvee, *Attorney Liability for Assisting Clients with Wrongful Conduct: Established and Emerging Bases of Liability,* 45 S.C.L.Rev. 803, 804–15 (Summer 1994).

In *Witzman* the Supreme Court of Minnesota discusses the imposition of liability on attorneys for aiding and abetting despite the general rule that attorneys do not owe a duty of care to nonclients. 601 N.W.2d at 186–87. It noted that "most courts addressing this specific issue have not excluded professionals from aiding and abetting liability. Indeed courts have recognized the legitimacy of aiding and abetting claims against attorneys and accountants.... Rather than refuse to recognize such claims, these courts have relied on strict interpretation of the elements of aiding and abetting to preclude meritless claims." *Id.* (and cases cited therein). *See also Schatz v. Rosenberg,* 943 F.2d 485 (4th Cir.1991)(analysis applicable to Restatement despite *Central Bank* ) (requiring "high conscious intent" and a "conscious and specific motivation" to aid and abet fraud), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992); *Chem–Age Industries, Inc. v. Glover,* 652 N.W.2d 756, 774 & n. 12 (S.D.2002); *Granewich v. Harding,* 329 Or. 47, 985 P.2d 788 (1999)(finding complaint state a claim for liability under § 876 against attorneys who knew of and participated in a

Moreover, the elements of substantial assistance and knowledge are examined "in tandem"; "where there is a minimal showing of substantial assistance, a greater showing of scienter is required." *Witzman*, 601 N.W.2d at 188, *citing In re TMJ Implants Products Liability Litigation*, 113 F.3d 1484, 1495 (8th Cir.1997), and *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir.1991).

Although Andrews & Kurth contends that Connecticut only recognizes a claim for aiding and abetting in the context of dangerous physical activities like drag racing, the Court finds this claim is erroneous. *See, e.g., Carney v. DeWees*, 136 Conn. 256, 70 A.2d 142 (recognizing common law claim for aiding and abetting a statutory violation or a tort)[61]; *Connecticut Nat'l Bank v. Giacomi*, 242 Conn. 17, 699 A.2d 101 (1997); *Connecticut Nat'l Bank v. Giacomi*, 233 Conn. 304, 329, 659 A.2d 1166, 1177 (Conn.1995) (affirming that there is no cause of action for aider and abettor liability under the provision of the Connecticut Uniform Securities Act modeled on § 10(b) of the Securities Exchange Act and pointing out alternatively the availability of common law aider and abettor liability under the Restatement (Second) of Torts § 876 if the elements for such a cause of action are satisfied); *Dudrow v. Ernst & Young, LLP*, No. X01CV980144211, 1998 WL 800204, *5–6 (Conn.Super. Nov. 4, 1998)(recognizing claim of aiding and abetting against developer of a continuing care facility in misrepresenting the facility's financial condition, but striking claim because plaintiff failed to plead scienter as required by Restatement (Second) of Torts § 876); *Dudrow v. Ernst & Young, LLP*, No. X01 CV98 0144211S, 1999 WL 786261 (Conn.Super. Sept. 15, 1999) (allowing to go forward a cause of action for aiding and abetting a continuing care residential facility in breaching its obligations to residents); *Facchini v. Miller*, No. CV 990587686S, 2000 WL 175580, *1 (Conn.Super. Jan. 31, 2000) (finding that plaintiff adequately alleged that an accountant aided and abetted the misrepresentation of the financial status of a company to deceive plaintiff in completing the sale of his stock in the company); *FDIC v. Romaniello*, No. CV 92–0294248, 1992 WL 369557 (Conn.Super. Dec. 3, 1992)(allowing common law aiding and abetting claim under § 876(b) where a company, aided and abetted by an accounting firm, fraudulently represented its worth to obtain a bank loan without putting up any collateral as security and later defaulted); *Brunette v. Bristol Savings Bank*, No. CV 92–0453 957S, 1994 WL 468448, *1–2 (Conn.Super. Aug. 22, 1994)(allowing aiding and abetting fraud claim under § 876(b) to proceed where accountant allegedly aided and abetted others by preparing misleading financial statements to induce plaintiffs to invest in financially unstable entities).

scheme of majority shareholders to "squeeze out" minority shareholders).

**61.** Connecticut first recognized a common law claim for aiding and abetting under § 876(b) in *Carney v. DeWees*, 136 Conn. 256, 70 A.2d 142, in the context of negligent driving. In that case, an action for wrongful death, one defendant in a car began racing along a highway with a truck, moved in front of the truck to keep the truck from passing, and sped through a red light onto a highway. In attempting to do the same to the car, the truck turned over and killed a passenger in the truck. Noting that the facts "established a sequence of improper conduct by the two drivers," the Connecticut Supreme Court found that the evidence would support a jury finding of civil liability under § 876(b) against the car's driver for inciting and encouraging the misconduct of the truck driver. *Id.*, 136 Conn. at 262, 70 A.2d at 145. *See also Palmieri v. Lee*, No. 405641, 1999 WL 1126317, *4 (Conn.Super.1999); *Facchini v. Miller*, No. CV 990587686S, 2000 WL 175580 (Conn.Super. Jan. 31, 2000).

In sum, according to *Halberstam,* to establish common law aiding and abetting liability under § 876(b) a plaintiff must allege and show three things: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam,* 705 F.2d at 472; *see also Calore,* No. CV980357147S, 2001 WL 58364, at *4. The "illegal or tortious activity" is elsewhere described as "the act encouraged ... known to be tortious," "wrongful conduct," or "tortious line of conduct," but never with an indication that the misconduct need be fraudulent or intentional. *Halberstam,* 705 F.2d at 478.[62]

### (2.) The Elements of a § 876(b) claim in Connecticut

#### (a.) Scienter

CRRA has pleaded that Andrews & Kurth knew that, under the direction of Enron which it initially questioned, its own acts in drafting opinion letters and unwinding improper transactions where Enron retained control over assets were deceptive and improper. Specifically, to fulfill the scienter requirement for aiding and abetting by Andrews & Kurth, CRRA has alleged in detail the times and contents of twenty-eight improper transactions over a three-year period and explained how they were fraudulent and intentionally designed to permit Enron to use these transactions to conceal improper financial manipulations. It has also claimed conclusorily, without specific facts

to support the allegations, that Andrews & Kurth's actions were part of a larger scheme and that Andrews & Kurth knew that the representations in its opinion letters were being used by Arthur Andersen and Enron to produce fraudulent accounting and deceptive public financial statements on which the public would rely.

 Under the Restatement (Second) of Torts § 876(b), the knowledge requirement is satisfied where the plaintiff pleads that the aider and abettor had a "general awareness that his role was a part of an overall activity that is improper." *Aetna Casualty and Surety Co. v. Leahey Construction Co.,* 219 F.3d 519, 533 (6th Cir. 2000), *citing Temporomandibular Joint (TMJ) Implant Recipients v. Dow Chem. Co.,* 113 F.3d 1484, 1495 (8th Cir.1997), and *Camp v. Dema,* 948 F.2d 455, 460 (8th Cir.1991). The degree of knowledge required for liability "remains flexible and must be decided on a case-by-case basis." *Aetna Casualty,* 219 F.3d at 535; *Camp v. Dema,* 948 F.2d at 459. According to the Fifth Circuit in *Woodward,* 522 F.2d at 95–96, to establish "general awareness," "the surrounding circumstances and expectations of the parties were critical, because knowledge of a violation must usually be inferred." Thus knowledge can be established by circumstantial evidence or by reckless conduct, but "the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." *Id.* at 96. In this action the alleged wrongdoing of Enron goes beyond the forty-eight transactions deceptively documented by Andrews & Kurth to the larger scheme to deceive the public, in particular potential investors, lenders, business partners and

---

**62.** With respect to conspiracy in contrast to aiding and abetting, however, the *Halberstam* court does require that the underlying tort be intentional: "... [I]t is difficult to conceive of how a conspiracy could establish vicarious liability where the primary wrong is negligence, but a secondary defendant could substantially aid negligence action." 705 F.2d at 478.

credit rating agencies, about the company's financial viability.

Andrews & Kurth relies on *Schatz v. Rosenberg*, 943 F.2d 485, 496 (4th Cir. 1991), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992),[63] and on *Woodward*, 522 F.2d at 97, to argue that for an aiding and abetting fraud claim there must either be a duty owed by the aider and abettor to the plaintiff, which is absent here, or a showing that the aider and abettor possessed a "high conscious intent" and a "conscious and specific motivation" to aid the fraud. See page 802 n. 60 of this memorandum and order.

 The Court finds that the claims against Andrews & Kurth in the instant action are not of mere silence or inaction; the complaint alleges that Andrews & Kurth, in a perversion of the legal purpose of an opinion letter, affirmatively, actively, knowingly, and repeatedly participated in Enron's alleged tortious conduct by drafting not one, but twenty-eight deceptive "true sales" letters over a three-year period with express provisions that improperly authorized Enron to prepay and to retain control over the purportedly transferred assets. Moreover, the complaint charges the firm personally participated in the unwindings at least four times while it was in the process of drafting the "true sales" letters for the very transactions being unwound. As noted, the nature of the letters demonstrates that they were written not for the law firm's client, which already knew what it was illicitly doing and wanted Andrews & Kurth to help hide it, but for deception of outside third parties. As for the law firm's state of mind, early in its representation Andrews & Kurth questioned Enron about the propriety of the substance of its opinion letters, but after directions from Enron, chose to continue the misrepresentations and unwindings and participated in the scheme: such conduct raises a strong inference that it, like Enron, intended the illicit scheme to succeed. Moreover, through such long-term, repetitive conduct the complaint adequately pleads "high conscious intent."

Thus the Court finds that CRRA has adequately pleaded scienter for its aiding and abetting claim against Andrews & Kurth.

**(b.) Substantial Assistance**

The second essential element for an aiding and abetting claim is substantial assistance by the aider and abettor. In those jurisdictions recognizing claims under § 876(b) there is wide variation in what is

---

**63.** The Fourth Circuit Court of Appeals in *Schatz* addressed aiding and abetting claims under § 10(b), pursuant to which there is no violation if the defendant remains silent absent a duty to disclose. *Id.* at 49, 717 A.2d 724, *citing Chiarella v. U.S.*, 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). *Schatz* has since been overruled by *Central Bank*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119, which disallowed aiding and abetting claims under § 10(b) based on the language and legislative history of the statute, but is inapplicable to state statutory and common law claims. Moreover, in *Schatz*, the panel emphasized that the aider and abettor allegedly failed to act, failed to disclose the alleged misrepresentations, and merely functioned as a "scrivener." *Id.* at 497, 717 A.2d 724. Nevertheless its analysis is recognized as applicable to claims under § 876. *Chem–Age Industries*, 652 N.W.2d at 774 n. 12.

Moreover recognizing the relevance of the applicable state law, *Schatz* also held that Maryland common law does not impose a duty to disclose to third parties unless they are intended beneficiaries of the attorney client relationship, which was not the situation in that case. *Id.* at 49, 717 A.2d 724. This Court would point out that in Connecticut, a violation of the Code of Professional Responsibility does not give rise to a civil cause of action, but is solely for the guidance of lawyers and a means for regulating conduct through disciplinary agencies. *Mozzochi v. Beck*, 204 Conn. 490, 501 n. 8, 529 A.2d 171, 176 n. 8 (1987)

required to satisfy the elements of substantial assistance and scienter, while the few Connecticut cases dealing with such claims are too vague to be helpful. In New York, for instance, for "substantial assistance" courts require a plaintiff to allege that "the actions of the aider/abettor proximately caused the harm on which the primary liability" is based; "but for" causation is not adequate because aider and abettor liability mandates that "the injury be a direct or reasonably foreseeable result of the conduct." *See, e.g., Cromer Finance Ltd. v. Berger,* 137 F.Supp.2d 452, 470 (S.D.N.Y.2001). *In accord Metge v. Baehler,* 762 F.2d 621, 624 (8th Cir.1985)(plaintiffs must prove that defendants proximately caused securities violation), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). While proximate cause is a demanding standard, rather than limiting aiding and abetting to preparation or dissemination of a document, New York courts recognize that

> [s]ubstantial assistance can take many forms. Helping to "mak[e] it possible for ACM to claim that the [performance] reports were based on objective valuations" is one. [*Primavera Familienstiftung v. Askin,* 173 F.R.D. 115, 127 (S.D.N.Y.1997) ]; *see CPC Int'l, Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 285–86, 519 N.Y.S.2d 804, 514 N.E.2d 116 (N.Y.1987)(broker aided and abetted primary fraud by providing false information used to present "enhanced financial picture to others"). Executing transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where

there is extraordinary economic motivation to aid in the fraud....

*Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 511 (S.D.N.Y.2001).

The Fifth and Eleventh Circuits have concluded that "[s]ubstantiality is based upon all the circumstances surrounding the transaction in question." *Woodward,* 522 F.2d at 97; *Woods,* 765 F.2d at 1012. The Fifth Circuit's approach to determining substantiality from the totality of circumstances easily embraces the six-factor approach for measuring substantiality enumerated in comment d to the Restatement (Second) of Torts § 876:(1) the nature of the act encouraged; (2) the amount and kind of assistance given by the defendant[64]; (3) the aider and abettor's presence or absence at the time of the tort; (4) his relation to the primary tortfeasor, and (5) his state of mind; and (6) the foreseeability to the abettor of resulting injury. *Halberstam,* 705 F.2d at 483–84, *citing* comment d. In reviewing these factors, the District of Columbia Circuit has added a sixth factor, the length of time the assistance was provided. *Halberstam,* 705 F.2d at 484. These factors are not exhaustive, but serve as guidelines.

Connecticut courts are vague about the definition of "substantial assistance." In *Carney v. DeWees,* 136 Conn. 256, 70 A.2d 142, it appears to mean "mutual participation" in the misconduct, while sufficient "encouragement" "to harm the plaintiffs or engage in ... tortious conduct" satisfies the requirement in *Norman v. Distasio,* No. CV960389982S, 2001 WL 761135, *4 (Conn.Super. June 15, 2001). Because

---

**64.** The panel suggested that for this criterion, the court might also apply a proportionality test to particularly bad or opprobrious acts, *i.e.,* a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences.... The particularly offensive nature of an underlying offense might also factor in the fifth criterion, the "state of mind" of the defendant.

*Halberstam,* 705 F.2d at 484 n. 13. The seriousness of Enron's alleged fraudulent scheme to deceive the public cannot be overstated, as evidenced by the debacle that has followed.

Connecticut courts have embraced § 876(b) and *Halberstam*, this Court follows the guidelines in these two sources. Moreover, as with the scienter requirement, under the facts alleged here the Court finds· that there are some close questions but that the pleading is sufficient at this state of the litigation to allow the aiding and abetting claim to go forward.

■■■ The Court finds that Andrews & Kurth's assistance to Enron, as detailed in the complaint, was adequate to state a claim against the firm for aiding and abetting Enron's purportedly fraudulent scheme that resulted in reasonably foreseeable injury to CRRA. The complaint makes clear the alleged deception which Andrews & Kurth's letters and unwindings not merely encouraged but made possible; moreover the opinion letters served as a basis for Arthur Andersen's allegedly crucial accounting fraud aimed at deceiving the public by inflating Enron's revenues and hiding its debt. As for the amount of assistance, the complaint presents Andrews & Kurth's aid as a significant factor, although by itself not necessarily an essential part of the fraudulent scheme nor a proximate cause of CRRA's injury[65]:(1) the law firm issued twenty-eight "true sales" opinion letters over a three-year period, at times simultaneously unwinding the relevant sham transactions; (2) the financial impact of just four of the twenty-eight FAS 140 transactions was the understatement of nearly $700 million of debt and the overstatement of income by more than $100 million; (3) Andrews & Kurth also not only gave its time, talents, and respected name to Enron's wrongdoing, but provided legal authority for Arthur Andersen's accounting manipulations, which were subsequently incorporated into the financial statements upon which CRRA claims it relied. Although the law firm was not present at the Enron Transaction, its participation in the fraudulent scheme, which allegedly caused the foreseeable injury to those who did business with Enron and who relied on the misrepresentations regarding Enron's financial condition, was direct. As noted the evident purpose of the letters, as well as the accounting reports in which they were incorporated by Arthur Andersen, was to deceive outside third-parties about Enron's true financial condition. Moreover Andrews & Kurth's activity was not an accidental, random or a one-time event, but ongoing over three-years and involved twenty-eight different opinion letters and a number of unwindings that revealed the deliberate deception of the letters. Thus the Court finds that CRRA has specifically pled conduct by Andrews & Kurth that substantially contributed to the false and misleading financial statements on which CRRA relied in deciding to do business with Enron.

The Court does have some questions.

First, relating to foreseeable injury to parties like CRRA, to what extent did Andrews & Kurth know about the larger scheme to which it contributed, i.e., that the letters were a part of Enron's plot

---

**65.** This Court rejects Andrews & Kurth's attempts here to construe very narrowly the published misstatement at issue to encompass only Arthur Andersen's financial statements and the SEC filings, and to ignore the allegation that Andrews & Kurth's allegedly deceptive opinion letters substantially contributed to the content of those misleading financial statements and SEC filings on which CRRA claims to have relied. As noted, lower courts in the Second Circuit, which includes Connecticut, have liberally construed the ways substantial assistance can be effected. *Primavera Familienstifung v. Askin,* 130 F.Supp.2d at 511. Thus the Court considers the fact that CRRA never saw the opinion letters nor met with Andrews & Kurth lawyers face to face nor knew of the firm's involvement in the letters, just as Andrews & Kurth did not know specifically of CRRA, as a factor in evaluating the degree of scienter, substantial assistance, and proximate cause.

through the aid of many other parties and through accounting manipulations to inflate revenue and hide debt in false and misleading financial statements, press releases and reports, all of which constitute the wrongdoing that Andrews & Kurth allegedly aided and abetted, in order to defraud those with whom it did business. It may be a "leap" or too attenuated a connection to argue that Andrews & Kurth could reasonably foresee that the contents of these letters, incorporated without identification of their source, along with deceptive representations of numerous other parties, by Arthur Andersen in its public accounting statements and SEC filings that would in turn reasonably deceive and cause financial injury to third parties who did business with Enron in reliance upon the them, including CRRA. The actual letters were not distributed to nor seen by CRRA, but Andrews & Kurth allegedly not only knew but intended the substance of the letters to target potential investors and lenders for Enron. Because this litigation is only at the motion to dismiss stage and because there are adequate facts pled to demonstrate such a recipient was targeted, the Court will not dismiss the claim on this basis.

A second question also remains. Because comment d and the illustrations accompanying it are the main guidelines the Court has for the aiding and abetting claim, it observes the comment's warning, "The assistance or participation of the defendant may be so slight that he is not liable for the act of the other." Among the illustrations to the comment are two that appear relevant here:

(5) A, a policeman, advises other policemen to use illegal methods of coercion

upon B. A is subject to liability to B for batteries committed in accordance with the advice.

. . . .

(9) A is employed by B to carry messages to B's workmen. B directs A to tell B's workmen to tear down a fence that B believes to be on his own land but that in fact, as A knows, is on the land of C. A delivers the message and the workmen tear down the fence. Since A was a servant used merely as a means of communication, his assistance is so slight that he is not liable to C.

It is not clear from the complaint whether Andrews & Kurth was performing the attorney's traditional role of advisor and counseling its client, with confidentiality protected by the attorney/client privilege for public policy reasons, or whether it was merely carrying out the directions of its client in a reversal of the usual professional relationship and communicating its work product to Enron's employees and prospective business contacts, or both. These matters will need to be fleshed out as the litigation proceeds. For the time being, the Court denies the motion to dismiss the aiding and abetting claim.

**H. Defendant Credit Rating Agency S & P's Motion to Dismiss (# 256); Defendant Credit Rating Agency Fitch Inc.'s Motion to Dismiss First Amended Complaint (# 259); and Defendant Credit Rating Agency Moody's Corporation's Motion to Dismiss First Amended Complaint (# 262)**

The Amended Complaint alleges that each of the Credit Rating Agency Defendants,[66] sued under two causes of action, i.e., negligent misrepresentation and violations of CUTPA, "failed to exercise rea-

---

66. Standard and Poor's represents that the Rating Agencies are widely understood to provide independent, objective, and credible analysis. Unlike an equity analyst, who recommends to investors to "buy," "sell" or "hold" a particular security, they do not provide investment advice, but instead gather information about securities and their issuers, analyze the information, and form opinions about the creditworthiness of the securities and the issuers. They transform the opinions into letter ratings, ranging from "AAA" for strong creditworthiness to "D" for default,

sonable care or competence in obtaining and communicating accurate information concerning the creditworthiness of Enron to the business community and the investing public, including CRRA." Amended Complaint at ¶ 232.

The Amended Complaint asserts that "the Agencies negligently published false and misleading credit information concerning Enron when they had information available to them, and when they could have and should have requested information directly from Enron, that would have shown that Enron's financial situation was precarious and not what Enron was representing it to be. As the Agencies reasonably should have expected, CRRA relied on these misrepresentations in making its decision to enter the Enron Transaction, suffering harm as a result." Amended Complaint at ¶ 400. The complaint charges generally that the Rating Agencies accepted Enron's false representations about its financial health and failed to perform a reasonable and continuous investi-

gation and to evaluate Enron's business, liquidity risk, corporate governance, accounting practices and conflicts of interest.[67]

The CUTPA claims against the Rating Agencies assert that their conduct constituted deceptive, unscrupulous, immoral, unethical, and unfair acts and/or practices in violation of the statute. Amended Complaint ¶ 424.

While each agency has filed its own motion to dismiss, the issues raised are largely common to all three and thus the Court addresses them together.

## 1. Negligent Misrepresentation

### a. Rating Agencies' Arguments

First, characterizing themselves as members of the "financial press," the Rating Agencies maintain that their published credit ratings are protected from this tort action by the First Amendment because they "perform traditional journalistic functions" [68]: "they gather information about

and publish those opinions globally. # 257 at 5.

**67.** CRRA claims that it retained Standard & Poor's and Moody's to evaluate bonds issued by Enron in the fall of 2000 and that they gave favorable ratings. Standard & Poor's asserts that it is not alleged to have rated the Enron Transaction, but that during the period leading up to CRRA's execution of the Enron Transaction, it did rate Enron a "BBB+," the lowest category of investment grade ratings. # 257, Ex. C at 132. Moody's corporate rating of Enron was "Baa1" on March 23, 2000. Moody's explains that "[t]he 'Baa' rating is the lowest Moody's rating a bond can have and still be considered 'investment grade.'" # 262 at 5–6. Fitch emphasizes that it did not rate Enron's creditworthiness in connection with CRRA's disguised loan transaction and that the complaint does not allege that Fitch even knew of the loan's existence. CRRA claims that all three Rating Agencies gave Enron investment grade credit ratings that were undeserved and more favorable than the credit rating of CL & P. For exam-

ple, as of October, 2000, Enron had a credit rating from S & P of BBB+ with "unsecured outlook stable"; from Moody's, of unsecured BAA1 with "no watch"; and from Fitch, Long term BBB- and commercial paper (short term) F2.

**68.** For example, Standard & Poor's cites a couple of cases describing the journalistic nature of its work: *In re Scott Paper Co.*, 145 F.R.D. 366, 370 (E.D.Pa.1992)("S & P publishes periodicals with a regular circulation to a general population. . . . S & P makes its own analysis, designed not merely for the personal use of the rating companies, but for the benefit of all who might read its publications. S & P maintains complete editorial control over the form and content of its publications, and the issuers who pay to be rated have no voice in the decision of which ratings to publish. Furthermore, unlike stockbrokers or personal investment advisors, S & P does not advise specific clients on their purchases or sales and has no personal interest in whether it subscribers actually purchase the securities which it rates."); *Pan Am Corp. v. Delta Air*

issuers and securities, analyze that information, formulate opinions about those issuers and securities and broadly disseminate those opinions, which are of concern to the public." # 238 at 9–10. *See, e.g., Jefferson County School Dist. No. R–1 v. Moody's Investor's Services, Inc.,* 175 F.3d 848, 856 (10th Cir.1999) (dismissing claims for tortious interference, injurious falsehood, and anti-trust violations because Moody's credit ratings are "protected expressions of opinion"); *County of Orange v. McGraw Hill Cos.,* 245 B.R. 151, 157 (C.D.Cal.1999)("The First Amendment protects S & P's preparation and publication of its ratings."). First Amendment protections reach publications related to business or economic issues. *See, e.g., Loewe v. SEC,* 472 U.S. 181, 210 & n. 58, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) (finding that publications with factual information and commentary on market conditions, financial matters, and trends are protected by the First Amendment; "because we have squarely held that the expression of opinion about a commercial product such as a loudspeaker is protected by the First Amendment, it is difficult to see why the expression of an opinion about a marketable security should not also be protected."); *In re Petroleum Products Antitrust Litigation,* 680 F.2d 5 (2d Cir.)(holding that confidential sources of prices published in a financial newsletter were entitled to First Amendment protection from compelled disclosure), *cert. denied sub nom. Arizona v. McGraw–Hill, Inc.,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *R & W Technical*

*Services Ltd. v. Commodity Futures Trading Commission,* 205 F.3d 165, 175 (5th Cir.2000) ("[T]he publication of impersonal advice about specific investments is fully protected speech under the First Amendment."), *cert. denied,* 531 U.S. 817, 121 S.Ct. 54, 148 L.Ed.2d 22 (2000).[69]

Second, argue the Rating Agencies, even if their ratings were not entitled to protection as statements of opinion, to impose liability on a publisher for statements about matters of public concern, a plaintiff must show that a statement is made with "actual malice," i.e., "with knowledge that the statement was false or with reckless disregard for whether or not it was true." *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 45, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971)(applicability of "actual malice" test depends on whether the publication is of "public or general interest"). Because " erroneous statement is inevitable in free debate … it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need to survive.' " *New York Times v. Sullivan,* 376 U.S. at 271–72, 84 S.Ct. 710, *quoting N.A.A.C.P. v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The Rating Agencies maintain that courts have regularly concluded that ratings and analysis of the creditworthiness of securities issuers are "matters of public concern" protected by the First Amendment from

---

*Lines, Inc. (In re Pan Am Corp.),* 161 B.R. 577, 581–82 (S.D.N.Y.1993)("The record allows no other conclusion but that S & p functions as a journalist when gathering information in connection with its rating process and specifically that it was functioning as a journalist, *viz.,* with the intent to use the material to disseminate information to the public....").

**69.** Fitch points out that "Article I, Sections 4 and 5 of the Connecticut Constitution confer even greater protection for speech, expression, and publication than the First Amendment, and necessarily limit the reach of claims arising under Connecticut common law and statutory provisions." # 260 at 29, *citing Leydon v. Town of Greenwich,* 257 Conn. 318, 348 n. 34, 777 A.2d 552, 573–74 n. 34 (Conn.2001).

tort liability for false statements. *See, e.g., Jefferson County,* 175 F.3d at 856 n. 3 ("Given the importance of financial information to investors and the economy as a whole," the opinions of ratings agents regarding creditworthiness of issuers are "matters of public concern."); *County of Orange v. McGraw Hill Cos.,* 245 B.R. 151 (C.D.Cal.1999) (finding Standard & Poor's ratings of Orange County's municipal debt constitutionally protected by the actual malice standard). The standard of "actual malice", i.e., "with knowledge that the statement was false or with reckless disregard for whether or not it was true," protects publishers from liability for "either innocent or negligent misstatement" so as not to chill the press' exercise of constitutional guarantees. *Time, Inc. v. Hill,* 385 U.S. 374, 389, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

The Supreme Court has declared that "recklessness" for purposes of "actual malice" "is not measured by whether a reasonably prudent man would have published or would have investigated before publishing." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). A plaintiff must demonstrate recklessness with "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* ("necessity for showing that a false publication was made with a 'high degree of awareness of probable falsity' "); *see also Church of Scientology Int'l v. Behar,* 238 F.3d 168, 174 (2d Cir.2001), *cert. denied,* 534 U.S. 814, 122 S.Ct. 40, 151 L.Ed.2d 13 (2001); *Scalamandre & Sons v. Kaufman,* 113 F.3d 556, 560–61 (5th Cir.1997); *First Equity Corp. v. Standard & Poor's Corp.,* 690 F.Supp. 256, 258–59 (S.D.N.Y.1988)(granting summary judgment because The Restatement's negligent misrepresentation standard did not apply to newspaper publisher Standard & Poor's and because plaintiffs failed to submit "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publications" regarding a description of bonds), *aff'd on other grounds,* 869 F.2d 175 (2d Cir.1989)(characterizing Standard & Poor's as something between a publisher of a general newspaper and a publisher of an advisory newsletter with specific recommendations). "[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte–Hanks Communications v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

First Amendment protections and the actual malice standard, discussed in more detail *infra,* have been expanded to reach beyond the their traditional application to the law of defamation, slander and libel to reach other causes of action, e.g., breach of contract, misrepresentation, and tortious interference with contract or business. *See, e.g., Bose v. Consumers Union,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (product disparagement); *County of Orange v. McGraw–Hill Companies, Inc.,* 245 B.R. 138 (C.D.Cal.1997)(professional negligence); *Compuware Corp. v. Moody's Investors Services, Inc.,* 222 F.R.D. 124, 127 (E.D.Mich.2004)(finding expansion of traditional scope persuasive and applying actual malice standard to alleged breach of contract dealing solely with publication of financial information and rating of defendant), *reconsideration denied in part,* 324 F.Supp.2d 860 (E.D.Mich.2004)(holding that credit rating service qualified for protection as a journalist under New York's reporter's privilege statute because plaintiff never alleged that Moody's stepped outside its role as an information gatherer nor played a significant role in structuring the transaction it rated).

CRRA's Amended Complaint has not alleged facts demonstrating that the ratings opinions were knowingly false or that the agencies had serious doubts about their validity, but only that "the Agencies negligently published false and misleading credit information concerning Enron when they had information available to them, and when they could have and should have requested information directly from Enron, that would have shown that Enron's financial situation was precarious and not what Enron was representing it to be."[70] Indeed the Rating Agencies emphasize that CRRA has asserted that the Rating Agencies were also victims of Enron's fraud.

■ Finally, the Ratings Agencies point out that, as reflected in CRRA's causes of action against its own attorneys, CRRA concedes that it acted beyond its statutory authority, *ultra vires*, in making the sham loan to Enron. They contend that CRRA's claims are therefore barred under the *in pari delicto* doctrine.[71]

Furthermore, point out the Rating Agencies, Connecticut law requires the existence of a duty of care to sustain a claim of negligence. *Gomes v. Commercial Union Ins. Co.*, 258 Conn. 603, 783 A.2d 462, 469 (2001). The Rating Agencies argue that "foreseeability is not commensurate with duty" under Connecticut law because

---

**70.** Amended complaint at ¶ 400.

**71.** The affirmative defense of *in pari delicto* "is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Pinter v. Dahl*, 486 U.S. 622, 632, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (the phrase "in pari delicto" "literally means 'in equal fault' "). Traditionally the doctrine was restricted to apply where "the plaintiff bore at least substantially equal responsibility for his injury," but has been expanded recently to cover situations "more closely analogous to those encompassed by the 'unclean hands' doctrine. . . ." *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 80 F.Supp.2d 129, 137–38 (S.D.N.Y.1999), *aff'd but criticized*, 322 F.3d 147 (2d Cir.2003); *Pinter*, 486 U.S. at 632, 108 S.Ct. 2063. When applicable, the doctrine bars recovery by a plaintiff who is "an active, voluntary participant in the unlawful activity that is the subject of the suit. Plaintiffs who are truly *in pari delicto* are those who themselves have violated the law in cooperation with the defendant." *Granite Partners, L.P. v. Bear Stearns & Co., Inc.*, 17 F.Supp.2d 275, 308 (S.D.N.Y.1998)(*quoting Pinter*, 486 U.S. at 635–36, 108 S.Ct. 2063). The common law doctrine is based on two principles: " 'courts should not mediate disputes between wrongdoers, and denying judicial relief to a wrongdoer deters illegal conduct.' " *Granite Partners*, 17 F.Supp.2d at 308, *quoting In re Granite Partners, L.P.*, 194 B.R. 318, 328 (Bankr.S.D.N.Y.1996). The plaintiff's fault need not be intentional or willful

for the doctrine to apply. *Pinter*, 486 U.S. at 633, 108 S.Ct. 2063. Nevertheless, the defense is available only where the fault of the plaintiff is equal to that of the defendant; "where one [of the parties], although participating in the wrong, is less guilty than the other, the party more at fault cannot employ the doctrine of pari delicto to shield his deliberate invasion of the rights of the former." *Furman v. Furman*, 178 Misc. 582, 586, 34 N.Y.S.2d 699, 704 (N.Y.Sup.Ct.), *aff'd*, 262 A.D. 512, 30 N.Y.S.2d 516 (N.Y.A.D.1941), *aff'd*, 287 N.Y. 772, 40 N.E.2d 643 (1942), cited *for the same proposition in Burda Media, Inc. v. Blumenberg*, No. 97 Civ. 7167(RWS), 1999 WL 413469, *11 (S.D.N.Y. June 21, 1999), *on reargument in part*, 1999 WL 1021104 (S.D.N.Y. Nov. 8, 1999). Moreover, sometimes the court can determine from the factual allegations in the complaint whether the doctrine applies as a matter of law. *Granite Partners*, 17 F.Supp.2d at 309.

While the rating agencies argue for application of the doctrine here on the grounds that CRRA has conceded that its loans were *ultra vires* and contrary to its statutory mandate, in its suits CRRA has alleged that its lawyers were the wrongdoers. Thus, even if it were to assume that the fault of CRRA and the Credit Rating Agencies were equal, based on the allegations in the complaint the Court does not find the doctrine applicable to preclude CRRA's claims. Moreover, whether the fault allegedly was equal would need to be determined.

it would lead to unlimited liability. *Mendillo v. Board of Educ.*, 246 Conn. 456, 484–85, 717 A.2d 1177, 1190–91 (1998). To determine whether a duty is owed, the court must ask (1) "whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result" and (2) "on the basis of a public policy analysis, . . . whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. The first part of the test invokes the question of foreseeability, and the second part invokes the question of policy." *Id.* at 1190. *See also Gazo v. City of Stamford,* 255 Conn. 245, 249, 765 A.2d 505, 508–09 (Conn.2001)("[T]he test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for the negligent conduct should extend to the particular consequences or particular plaintiff in the case. . . . The first part of the test invokes the question of foreseeability, and the second part invokes the question of policy.").

Furthermore, as an essential element of any claim of negligence, including negligent misrepresentation, there must be a duty of care, which is a question of law for the court to determine. *Gomes v. Commercial Union Ins. Co.*, 258 Conn. 603, 614, 783 A.2d 462, 469–70 (2001). The

Connecticut Supreme Court's test for the existence of a duty involves "(1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in this case.'" *Id.*, 258 Conn. at 616, 783 A.2d at 470.

The Rating Agencies cite *Perodeau v. City of Hartford,* 259 Conn. 729, 756–57, 792 A.2d 752, 768 (2002) for four factors to consider in determining "the extent of a legal duty as a matter of policy": "(1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging continued vigorous participation in the activity, while protecting the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *See also Jaworski v. Kiernan,* 241 Conn. 399, 407, 696 A.2d 332, 337 (1997) (same). They maintain that even if the harm to CRRA were foreseeable, analysis under the *Perodeau* factors demonstrates that no duty of care should exist here as a matter of public policy and thus CRRA fails to state a claim for negligent misrepresentation against them. They further insist that persons considering a bond rating in making an investment do not normally expect the rater to be a guarantor of the investment; instead potential investors normally expect the ratings opinion to provide one assessment of the risk of an investment, but not to eliminate that risk.[72]

72. They argue that CRRA's attorney admitted in his investigative report on the transaction at issue that CRRA could not expect Enron's ratings to be guarantees and that CRRA assumed unnecessary risk in making the loan to Enron. Interim Report of the Attorney General of the State of Connecticut Regarding The Connecticut Resources Recovery Authority–Enron Corporation–Connecticut Light & Power Company Restructuring Transaction, Feb. 2002, at 13 ("AG Report"), available at http://www.cslib.org/attygnl/press/2002/other/crra.pdf.

Regarding the first *Perodeau* factor, the expectations of the participants, the Rating Agencies emphasize that their publications were consistently issued with explicit statements advising that the materials are matters of opinion, not fact,[73] and that the Rating Agencies do not warrant the accuracy of the information they publish, which is frequently received from issuers, other obligors, underwriters, their experts, and other sources. Thus CRRA was on notice and should reasonably have expected that published ratings were merely opinions, not warranties by the Rating Agencies, which disclaimed liability for any loss resulting from reliance on their opinions and which explicitly stated they were not guarantors of Enron's rated long-term debt.

CRRA discounts taking such disclaimers at face value and points to court cases holding that boilerplate disclaimers and characterizing statements as opinions do not preclude liability. *Milkovich v. Lorain Journal Co.*, 497 U.S. at 18–19, 110 S.Ct. 2695 (characterizing information as an opinion does not immunize a statement from liability); *Jefferson County*, 175 F.3d at 856 ("[T]he fact that Moody's article describes its evaluation as an opinion is not sufficient, standing alone, to establish that Moody's statements are protected.... If such an opinion were shown to have materially false components, the issuer would not be shielded from liability by raising the word 'opinion' as a shibboleth."); *Omega Engineering, Inc. v. Eastman Kodak Co.*, 908 F.Supp. 1084, 1097–98 (D.Conn. 1995)(court rejected Kodak's insistence that its publication consisted of statements of opinion, not fact, when it reviewed the statements in the context of surrounding circumstances); *County of Orange v. McGraw–Hill Cos.*, No. CV96765, 1997 U.S. Dist. LEXIS, at *12–13 (C.D. Cal. June 2, 1997) (Noting that Standard & Poor's is "an expert in the municipal bond arena" which issues ratings on the "likely creditworthiness of certain debt issues," the court found that "the professional opinion cases imply the general tenor of opinions such as S & P's ratings is to support, not negate, the impression the rating is an assertion of fact, or at least substantially based on facts assessed by S & P.").

The Rating Agencies urge that the second and third factors also support a find-

---

**73.** *See, e.g.*, Global Credit Research Rating Action, Mar. 23, 2000 (the "Rating Report"), "Moody's Upgrades All Enron Corp. Long Term Debt Rating," Ex. A to # 262. This Rating Report, identified in the complaint, was the last issued by Moody's prior to consummation of the deal with Enron, and provides,

> All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind and MOODY'S, in particular, makes no representation or warranty, express or implied, as to the accuracy, timeliness, merchantability or fitness for any particular purpose of any such information.
>
> Under no circumstances shall Moody's have any liability to any person or entity for (a) loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) ... in connection with the procurement, collection, compilation analysis, interpretation, publication or delivery of any such information....
>
> The credit ratings, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities.... Each rating or other opinion must be made by or on behalf of any opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such person must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling.

ing of no duty of care because imposing liability would open the floodgates of litigation against the Rating Agencies by disappointed investors and creditors and chill the agencies from "vigorous participation" in the rating process, while causing an increase in economic and social costs. To vigorously participate in the credit rating industry, which provides useful information for investors, Rating Agencies must be allowed to maintain independence and objectivity and not be swayed by risk of unlimited liability for errors to either issuers or investors; instead the market should be the appropriate means for ensuring the reliability of credit opinions and of rating agencies. The agencies note that courts have focused on the lack of sufficient privity between rating agencies and the readers of the Rating Agencies' publications and of individualized advice to support unrestricted liability, the nearly unlimited exposure if any disappointed investor were allowed to sue them, and the potential chilling effect on the free flow of information should liability be imposed.

As for the fourth factor under *Perodeau,* decisions from other jurisdictions, of which there are few in this instance, the Rating Agencies insist that other jurisdictions have consistently held that the rating agencies and other financial publishers do not have a duty of care to the general public and cite a few cases from courts outside Connecticut that have found that the Rating Agencies have no duty of care to those that read its publications. *See, e.g., First Equity Corp. v. Standard & Poor's Corp.,* 670 F.Supp. 115, 117–18 (S.D.N.Y.1987), *aff'd,* 869 F.2d 175 (2d Cir. 1989); *Quinn v. McGraw–Hill Cos.,* 168 F.3d 331, 336 (7th Cir.1999); *Jefferson County,* 175 F.3d at 856.

In addition, note the Rating Agencies, mere opinions are not actionable as negligent misrepresentation under Connecticut law; only false statements of material fact are. *Daley v. Aetna Life and Casualty Co.,* 249 Conn. 766, 792–93, 734 A.2d 112, 128 (1999); *Yurevich v. Sikorsky Aircraft Division,* 51 F.Supp.2d 144, 152 (D.Conn. 1999); *Omega Engineering, Inc. v. Eastman Kodak Co.,* 908 F.Supp. at 1097.

The Rating Agencies argue that if Connecticut were to adopt Section 552(2) of the Restatement (Second) of Torts (1977) for a claim of negligent misrepresentation, as the majority of states have done, CRRA would have to allege, but cannot credibly do so, that it is a member of a limited group for whose intended benefit the Rating Agencies issued their opinions. The Rating Agencies maintain that the ratings are published for the investing public at large, too numerous to calculate. *See, e.g., Chanoff v. U.S. Surgical Corp.,* 857 F.Supp. 1011, 1022 (D.Conn.1994) ("[T]o recognize plaintiffs' claim and the potential liability 'in an indeterminate amount for an indeterminate time to an indeterminate class' would be contrary to the language and intent of Section 552."), *aff'd,* 31 F.3d 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1058, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994); *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1093 (S.D.N.Y.1996)(rating agency will not owe duty based on a representation "designed to target ... 'the public at large.' ").[74] Moreover, Comment a to the Restatement observes that limiting the group "promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests."

**b. Court's Ruling on Negligent Misrepresentation Claim**

After reviewing the case law regarding

**74.** Fitch adds that because CRRA was not a purchaser of a rated security, it cannot assert that it was an intended beneficiary of the Fitch rating.

credit rating agencies [75] and a number of reports and law review articles, this Court finds that generally the courts have not held credit rating agencies accountable for alleged professional negligence or fraud and that plaintiffs have not prevailed in litigation against them.[76] Moreover, there

**75.** Gregory Husisian, in a Note, *What Standard of Care Should Govern the World's Shortest Editorials?: An Analysis of Bond Rating Agency Liability*, 75 Cornell L.Rev. 411, 415–22 (January 1990) (footnotes omitted), explained the importance publications of credit rating agencies in sustaining efficient capital markets:

> Rating agencies facilitate the flow of information by processing public information and distilling it into a useful form at a far lower cost than the individual investor would incur. Thus, investor decisions are based on better information which in turn helps the market route capital to the best investments. .... The issuing company on the other had, wishes to raise capital for its projects at the lowest possible cost. A system with high information costs forces the corporation to pay a large premium to encourage investors to invest in its bonds.... Bond rating agencies help minimize high information costs. By specializing in information analysis, building confidential relationships with issuing companies, and cultivating reputations for accuracy, bond rating agencies increase the capital markets' efficiency. The investor who wishes to evaluate the riskiness of potential investments can consult specialists who can perform the evaluation at a drastically lower cost than she can. At the same time, society avoids the potentially wasteful resources that duplicative risk analysis by individual investors causes. Finally, by divulging the information to the rating agency, the issuing corporation can communicate nonpublic information to the market without alerting competitors. The rating agency can consider the information when formulating its rating.
>
> This centralization of research saves resources. Bond rating agencies, which have gained expertise through specialization, analyze issues less expensively than individual investors, help to avoid costly, duplicative research, and benefit from economies of scale. Furthermore, bond rating agencies disseminate information to the market very quickly and thereby facilitate rapid market adjustments.

**76.** Fifteen years ago Gregory Husisian observed that in recent years "the accounting profession has experienced a rapid expansion in its potential liability to relying parties" and argued against such a trend for credit analysts, which he conceded were, and the Court notes still are, "largely unregulated." 75 Cornell L.Rev. at 414, 424, 428–29. Husisian wrote,

> Bond rating agencies operate with surprisingly little government regulation. The tort system and the market serve as the only checks on bond rating agencies. Additionally, instead of being held to a negligence standard, as is the norm in other areas of law, bond rating agencies receive full first amendment protections as a member of the media, and are not held liable unless found to be reckless.

*Id.* at 413–14. He insisted that their significant economic role justifies protection under the higher recklessness standard and barring expansion of their potential liability. The higher actual malice standard still applies to tort claims against them.

Also arguing that credit rating agencies should not be subject to additional regulation is Steven L. Schwarcz, *Private Ordering of Public Markets: The Rating Agency Paradox*, 2002 U. Ill. L.Rev. 1, 2 (2002)("rating agencies should remain largely unregulated because they are motivated to provide accurate and efficient ratings because their profitability is directly tied to reputation").

For a negative evaluation of the effectiveness of the "reputational capital view" of credit agency restraints and an argument for increasing potential liability for negligence and misrepresentation, *see Frank* Partnoy, *The Siskel and Ebert of Financial Markets?: Two Thumbs Down for the Credit Rating Agencies*, 77 Wash. U.L.Q. 619, 711 (Fall 1999): "[C]redit rating agencies should not have their cake and eat it too. Such agencies should not simultaneously benefit from ratings-dependent regulation and be insulated from lawsuits alleging negligence or misrepresentation. If the agencies truly are private entities surviving based on their reputations, they should be susceptible to the same sorts of lawsuits any similarly-situated private entity would be." Partnoy reported that in the few suits charging credit rating agencies with fraud or professional negligence for misrepresentations or omission of material facts in

is even a statutory exemption under the Securities Act of 1933 for Section 11 claims against credit rating agencies like the three Defendants here that have been designated "nationally recognized statistical rating agencies" or "NRSROs." [77]

The Court observes that in its report, *Financial Oversight of Enron: The SEC and Private–Sector Watchdogs*, the Staff to the Senate Committee on Governmental Affairs was highly critical of the role in the Enron debacle of the three Credit Rating Agencies being sued here:

"... [I]n Enron's case, the credit rating agencies *did not perform as expected*. Based on a number of interviews conducted by the Committee staff with officials from Moody's, S & P, and Fitch, Committee staff concluded the agencies did not perform a thorough analysis of Enron's public filings; did not pay appropriate attention to allegations of financial fraud; and repeatedly took company officials at their word, without asking probing, specific questions—de-

spite indications that the company had misled the rating agencies in the past." *Id.* at 108. The report details the failings of these Defendants, and the Committee staff concluded that "the credit rating agencies' approach to Enron fell short of what the public had a right to expect, having placed its trust in these firms to assess corporate creditworthiness for the purposes of federal and state standards. It is difficult not to wonder whether lack of accountability—the agencies' practical immunity to lawsuits and nonexistent regulatory oversight—is a major problem." *Id.* at 116. Thus it, too, impliedly recognized the absence of authority to impose liability.

### (1.) First Amendment Protection

For the reasons discussed below, this Court concludes that while there is no automatic, blanket, absolute First Amendment protection for reports from the credit rating agencies based on their status as credit rating agencies, the courts generally have shielded them from liability for allegedly negligent ratings for various reasons.

their ratings, the "record of plaintiffs is not good." 77 Wash. U.L.Q. at 709. Less aggressive but arguing that in the wake of the "impetus for regulatory reform" created by the collapse of Enron, "we should take the opportunity to make a workable system better," is Claire A. Hill, *Regulating the Rating Agencies*, 82 Wash. U.L.Q. 43 (Spring 2004). *Id.* at 45.

**77.** Although rating agencies are private companies, in 1975 in an effort to insure that credit ratings were reliable the SEC developed an informal procedure for designating certain rating agencies as NRSROs, which had the effect in essence of limiting competition in the debt rating arena to the current favored four so designated agencies because of high bars to new applicants. *See, e.g.*, Steven L. Schwarcz, 2002 Ill. L.Rev. at 21–23; Claire A. Hill, 82 Wash. U.L.Q. at 53–557. Currently the designated NRSROs are Moody's, Standard & Poor's, Fitch and, only recently, Dominion Bond Rating Service Limited. Moody's and Standard & Poor's dominate the market, in effect creating "a two-

rating norm." Claire, 82 Wash. U.L.Q. at 59–60. The NRSRO designation has come under increasing criticism of those attempting to improve performance of credit rating agencies by additional competition to test the accuracy of the current NRSROs' ratings.

The NRSROs' credit ratings are most likely to be used in a registration statement. Rule 436(g)(1) of the Securities Act of 1933, 17 C.F.R. § 230.436(g)(1) provides for exemption of liability for them: "[T]he security rating assigned to a class of debt securities, a class of convertible debt securities, or a class of preferred stock by a nationally recognized statistical rating organization ... shall not be considered a part of the registration statement prepared or certified by a person within the meaning of sections 7 and 11 of the Act." The NRSROs are also shielded from liability under the securities laws for all conduct except fraud. *Financial Oversight of Enron: The SEC and Private Sector Watchdogs*, Report of the Staff to the Senate Committee on Governmental Affairs, at 105, Oct. 8, 2002.

The United States Supreme Court has opined, "The liberty of the press is not confined to newspapers and periodicals.... The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and periodicals." *Lovell v. City of Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938). As noted by the Rating Agencies, they have been accorded special protections by a few courts when they are characterized as publishers or journalists. *See, e.g., In re Pan Am Corp.,* 161 B.R. at 581–83 (quashing subpoena seeking information from publisher of creditworthiness ratings obtained as part of its news-gathering process because "S & P functions as a journalist when gathering information in connection with the ratings process ... with the intent to use the material to disseminate information to the public....").

Nevertheless, the United States Supreme Court has held that publishers are not entitled to automatic protection under the First Amendment from liability for violating laws generally. *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 802, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). *See also County of Orange,* 245 B.R. at 154 ("S & P's status as a financial publisher does not necessarily entitle it to heightened protection under the First Amendment"; " '[t]he question is not whether the defendant is a publisher but whether the cause of action impacts expression' "), *citing and quoting Cohen v. Cowles Media Co.,* 501 U.S. 663, 670, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) (holding that "[t]he First Amendment does not grant the press limitless protection" and that the " 'publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.' "). Thus such a privilege is qualified.

Others have questioned in particular the extension of the "journalist's privilege" recognized by some courts to extend to credit rating agencies. *See, e.g., American Savings Bank, FSB v. UBS Painewebber, Inc.,* No. M8–85, 2002 WL 31833223, *2–3 (S.D.N.Y. Dec. 16, 2002) (and cases discussed therein) (holding that "[t]he journalist privilege is a qualified one. Fitch is not primarily engaged in newsgathering generally, nor was it doing so when procuring the information sought by the subpoenas. The Court finds that Fitch is not entitled to the protections offered by the journalist privilege."). *See also Oberman v. Dun & Bradstreet, Inc.,* 460 F.2d 1381, 1384 (7th Cir.1972) (reversing summary judgment in favor of newsgatherer credit reporting service representative in libel case based in part on a fact issue, i.e., whether the credit service made a proper investigation before publishing its report; in dicta, "We are not persuaded that the credit rating of Oberman's business was entitled to the same treatment that the Supreme Court has afforded newspapers and magazines...."). In *Oberman,* the Seventh Circuit reflected that under Illinois law the credit rating agency's "qualified or conditional privilege" might have been abused if the agency "did not believe in the truth of [its rating] ... or had no reasonable grounds for believing [its material] to be true, ... a fact which may be inferred from '[a]ll the circumstances surrounding the transaction ... including the failure to make proper investigation.' " *Id.*

The Staff to the Senate Committee on Governmental Affairs in its negative report about the role of the credit rating agencies in the Enron debacles, commented,

... [T]he fact that the market seems to value the agencies' ratings mostly as a certification (investment grade v. non-investment grade) or as a benchmark (the ratings triggers in agreements) and not as information, and the fact that the law, in hundreds of statutes and regula-

tions, also uses their work that way, seems to indicate that their ratings are not the equivalent of editorials in *The New York Times*. The fact that the rating agencies have received First Amendment protection for their work should not preclude greater accountability.

*Financial Oversight of Enron: The SEC and Private Sector Watchdogs,* Report of the Staff to the Senate Committee on Governmental Affairs, at 124, Oct. 8, 2002.

Accordingly, in view of the division of opinion, this Court will not assume blanket protection for the Credit Agency ratings, but will consider any First Amendment protection for credit rating reports as qualified and will scrutinize the facts alleged according to standards and heightened pleading requirements developed by courts to determine whether CRRA has stated a claim that is not precluded by First Amendment protection.

 As a starting point, it appears to the Court that nationally published credit agency ratings reports regarding Enron, a top Fortune 500 company, in 2 000 are matters of public concern. The sheer size of the MDL 1446 litigation, not to mention the numerous related criminal actions, attests to the public import of Enron and its sudden collapse in 2001.

 In *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), rejecting "an artificial dichotomy between 'opinion' and 'fact,' " the United States Supreme Court limited the scope of defamation laws in concluding that "at least in situations . . . where a media defendant is involved, a statement on matters of public concern must be provable as false before there can be liability under state defamation law." Therefore "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional pro-

tection." *Id.* at 20, 110 S.Ct. 2695. In other words, if a statement "cannot reasonably [be] interpreted as stating actual facts," it is shielded by the First Amendment. *Id.* As factors to consider in the determination of whether a statement can reasonably be interpreted as one of fact, the court may examine the language employed, e.g., whether it is "loose, figurative, or hyperbolic language which would negate the impression" that it was a statement of fact, as well as the context of the statement and the "general tenor of the article." *Id.* at 21, 110 S.Ct. 2695.

Moreover an examination of the specific facts and circumstances of a credit rating agency's report is necessary to determine the extent, if any, of First Amendment protection it should receive. In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), in a libel action brought by a private plaintiff against a credit reporting agency based on false statements that the agency made on an individual's credit report that he had filed for bankruptcy and that damaged his business reputation, the United States Supreme Court emphasized that " '[w]hether . . . speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record.' " *Id.,quoting Connick v. Myers,* 461 U.S. 138, 147–49, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In *Greenmoss Builders,* the Supreme Court found that the credit report of a private construction contractor was not entitled to First Amendment protection because it concerned "no public issue, . . . [but] was speech solely in the interest of the speaker and its specific business audience," since it concerned solely a private plaintiff and was sent to only five subscribers who were under agreement to keep the information confidential; therefore the report did not involve any "strong

interest in the free flow of commercial information" that would "ensure that 'debate on public issues [will] be uninhibited, robust, and wide-open.'" *Id.* 472 U.S. at 762, 105 S.Ct. 2939 (citations omitted). Furthermore, observing the long established reduced protection for commercial speech, the high court observed that the speech at issue

> is solely motivated by the desire for profit, which, we have noted, is a force less likely to be deterred [by regulation] than others.... Arguably the reporting here was also more objectively verifiable than speech deserving of greater protection.... In any case, the market provides a powerful incentive to a credit reporting agency to be accurate, since false credit reporting is of no use to creditors. Thus any incremental "chilling" effect of libel suits would be of decreased significance.

*Id.* at 762–63, 105 S.Ct. 2939.

The credit rating reports regarding Enron by national credit rating agencies were not private or confidential, but distributed "to the world" and were related to the creditworthiness of a powerful public corporation that operated internationally. *See Oberman,* 460 F.2d at 1387 (Hastings, J., dissenting) ("The financial data circulated by Dun & Bradstreet, Inc. are part of national commercial communication. There is no doubt that an adverse credit rating can injure a subject."). While not making a *per se* rule about the level of First Amendment protection that should be accorded to such speech, in dicta in *Lowe v. S.E.C.,* the Supreme Court noted that it had previously "held that expression of opinion about a commercial product

such as a loudspeaker is protected by the First Amendment" and stated, "[I]t is difficult to see why the expression of opinion about a marketable security should not also be protected." *Lowe v. S.E.C.,* 472 U.S. 181, 210 n. 58, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985). As noted, credit rating agencies do not profit from the sale of the bonds of any company that they rate for creditworthiness and they perform an essential service for economy and efficiency of the capital markets.

Relying on *Milkovich,* the Tenth Circuit has concluded that for a reasonable factfinder to find that a credit agency's published article implies a false assertion of fact about a corporation's financial condition, the statement must be sufficiently specific to show that the credit agency's statement evaluating that corporation's creditworthiness is provably false. *Jefferson County School District No. R–1 v. Moody's Investors Services, Inc.,* 175 F.3d 848, 855 (10th Cir.1999). Where vague phrases like "negative outlook" or "ongoing financial pressures" are used by the credit agency and could be based on an unidentified "myriad of factors, many of them not provably true or false," the Tenth Circuit has determined that they are "too indefinite to imply a false statement of fact" and thus the evaluation is a "protected expression of opinion." *Id.* at 855–56. It also concluded that standing alone, a credit agency's characterization of its evaluation as an "opinion" is insufficient to establish First Amendment protection where a plaintiff demonstrates that the opinion has specifically identified "materially false components." *Id.* at 856.[78] *See also Moldea v.*

---

**78.** Fitch insists that CRRA's complaint does not identify any specific false statement reasonably implied from its ratings of Enron's creditworthiness. Instead, accompanied by its express disclaimer of responsibility for the accuracy of any documents provided by the issuer, accountants or lawyers on which Fitch

relied and disclosure that it made no independent investigation, its letter-grade ratings are not objectively provable as true or false because they are "inherently subjective statements of opinion," protected by the First Amendment. # 260 at 31.

New York Times Co., 22 F.3d 310, 313 (D.C.Cir.1994)(concluding in a suit brought by the author of a book against a newspaper publisher for alleged libel in a book review, "[T]here is no wholesale exemption from liability in defamation actions for statements of 'opinion.' Instead statements of opinion can be actionable if they imply a provably false fact, or rely on stated facts that are provably false."), cert. denied, 513 U.S. 875, 115 S.Ct. 202, 130 L.Ed.2d 133 (1994).

In *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180 (4th Cir.1998), the Fourth Circuit Court of Appeals examined a statement in a stock tip column regularly published by Forbes magazine that stated that Biospherics stock was overvalued. *Id.* at 182. The article, titled "Sweet–Talkin' Guys," focused on Biospherics' development of a non-fattening sweetener called D-tagatose or "Sugaree." Representing that the stock was high because of "hype and hope" for such a product, which Biospherics bragged would even delay aging, the article stated, *"Investors will sour on Biospherics when they realize that Sugaree isn't up to the company's claims,"* that its cost would be five times that of sugar, and that other cheaper sweeteners from competitors would soon be available. *Id.* Finally the article stated, *"Biospherics shares are easy to borrow; the few independent analysts who follow the company think its stock is worth $2 on current business." Id.*

The Fourth Circuit observed that "the context and 'general tenor of the article' . . . indicate that the piece contains constitutionally protected subjective views and not factual statements." *Id.* at 184. The article made no claim to "first-hand knowledge of facts and certainly no accusations of perjury. It has a breezy rather than solemn tone, appearing in a magazine column denominated 'Streetwalker.'" *Id.* The panel found that it "reflects the writer's

subjective and speculative supposition." *Id.* at 184. The court maintained that it was not "propos[ing] a 'doctrinal exemption' for stock tip articles." *Id.* Moreover it described the first challenged statement, "Hype and hope for a natural, noncaloric sugar substitute—called Sugaree—that the company's been 'developing' for 15 years," as containing "irreverent and indefinite language ('hype and hope') that permeates the story, all 'negating the impression that the writer is stating fact.'" *Id.* at 184–85, *quoting Milkovich*, 497 U.S. at 21, 110 S.Ct. 2695, and *Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 129 (1st Cir.1997) ("'The vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be actionable.'"). The appellate court found that the quotation remarks around "developing" "may suggest that the product is not worth years of development, or that its development has been slow," but rejected Biospherics' argument that they "imply the company lied about its claims that it developed Sugaree." *Id.* at 185. The panel pointed to the play on words in the statement, "Investors will sour on Biospherics when they realize Sugaree isn't up to the company's claims" as demonstrating that it is not a statement of fact but "the tipster's own interpretation." *Id.* Finally, the court examined the sentences, "Even if the FDA okays [Biospherics] to produce Sugaree—a big if—its cost to consumers could be at best five times the price of sugar. Meanwhile, Johnson & Johnson and Hoechst are working on their own, cheaper, sweeteners. Monsanto is perfecting its Nutra-Sweet sugar substitute." *Id.* According to the panel, these lines "state the factual basis for the entire article and Biospherics does not challenge their accuracy." *Id.* The tipster's interpretation or opinion is based on these fully disclosed facts, which the reader is permitted to interpret in his own way, and thus is not actionable as

defamation. *Id.* Generally the "imprecise and casual language in this statement-the shares are 'easy to borrow'—as well as its tenor and context-a breezy stock tip—" would be construed by any reasonable person reading "Sweet Talkin' Guys" as a nonactionable, " 'subjective view, an interpretation, a theory, conjecture or surmise, rather than [a] claim[ ] to be in possession of objectively verifiable [false] facts.' " *Id.* at 186.

■ The United States Supreme Court has also held that to preserve the "breathing space" essential for freedom of expression, a publisher will not be liable for a false statement about matters of public concern unless it made that statement with "actual malice," i.e., "with knowledge that the statement was false or with reckless disregard for whether or not it was true." *Hustler Magazine v. Falwell,* 485 U.S. 46, 52, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *New York Times v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 348–49, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) [79]; *see also In re County of Orange v. McGraw–Hill Companies, Inc.,* 245 B.R. 138, 144, 150 (C.D.Cal.1997)(holding that the actual malice standard is applicable to a publisher's false statements about public figures and about matters of public concern, and concluding that Standard & Poor's bond rating was protected from county's claim for professional negligence unless actual malice is shown).[80] Thus a

publisher may be liable for a statement of opinion if that statement reasonably implies false facts or relies on stated facts that are provably false. *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695.

Regarding H–03–1558, this Court observes that while a credit rating agency's latitude for expressing opinion is not without limits, it must be given "constitutional 'breathing space' appropriate to the genre." *Moldea,* 22 F.3d at 315, *citing New York Times v. Sullivan,* 376 U.S. at 272, 84 S.Ct. 710. This Court further finds as significant here that rating creditworthiness is far from an exact science (as the disclaimers explicitly warn), that the rating agencies rely on information provided by the issuer of the debt securities, and that an evaluation necessarily involves interpretive skills that may produce unverifiable statements of the rater's opinion. Moreover, there is as yet no clearly established obligation defining the extent to which that they should investigate or should pressure a debt-issuing entity for further information or verify information. As noted by the Washington D.C. Circuit Court of Appeals in *Moldea,* one must consider context and the type of evaluation readers expect in that context in determining whether an evaluation is actionable. 22 F.3d at 314–15.

Nevertheless, in *Commercial Financial Services, Inc. v. Arthur Andersen LLP,* 94 P.3d 106 (Okla.Civ.App.2004), the court

---

**79.** The Court also noted that "mere proof of failure to investigate, without more, cannot establish reckless disregard for truth." *Gertz,* 418 U.S. at 332, 94 S.Ct. 2997.

**80.** *But see* that in *LaSalle Nat. Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1097 (S.D.N.Y.1996), the court stated that "the Supreme Court has held that the *Times v. Sullivan* 'actual malice' standard inapplicable to a credit reporting agency," *citing Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 762, 105 S.Ct. 2939, 86 L.Ed.2d

593 (1985). This Court would point out that the *LaSalle* court failed to note the important and distinguishing factual basis for the decision (the report's "content, form, and context . . . as revealed by the whole record"), i.e., that the report was of only limited interest to a private plaintiff, the credit rating agency and the five subscribers who received it and who were required to keep it confidential, and therefore the speech did not relate to matters of public concern. 472 U.S. at 761–62, 105 S.Ct. 2939.

held that the First Amendment does not protect rating agencies from liability for alleged inaccuracies where they were asked to rate investment certificates by a debt collecting company, rated the bonds based on information furnished by that company, were paid a fee by that company, were therefore in privity with that company,[81] and thus owed a duty of care to that company to provide accurate ratings. The court noted a "crucial distinction" between the suit before it and that in *Jefferson County*:

> In *Jefferson County*, Moody's published its opinion for the benefit of subscribers and new services. "[I]t had not been asked to rate the bonds [by the school district issuing them]." ... By contrast, in the instant case the Rating Agencies *had* been asked to rate the bonds, at CFS' request and CFS' expense.... While the Rating Agencies gave "opinions," they did so as professionals being paid to provide their opinions to a client. If a journalist wrote an article for a newspaper about the bonds, the First Amendment would presumably apply.

But if CFS hired that journalist to write a company report about the bonds, a different standard would apply. Similarly, CFS and the Rating Agencies can be said to be in privity through an agreement that both sides are entitled to enforce.... We believe the relationship between these parties goes beyond a relationship between a journalist and subject, and is more analogous to that of a client and the client's certified public accountant.... We do not believe the First Amendment shields the agencies from potential liability.

*Commercial Financial*, 94 P.3d at 110.

Moreover the court observed,

> It is true that in supplying a rating, agencies also serve the public interests. As explained in a law review article on the subject, "The bond rating services are popular with investors because they can rate securities' riskiness far less expensively than can an individual investor. The information the services provide improves the market's efficiency by equalizing prices at the margin so that

---

81. In *County of Orange*, in finding that Moody's rating of the school district's bond was protected by the First Amendment, the Court pointed out that Moody's was paid no fee by the company it rated nor any current information by it. 173 B.R. at 850.

This Court observes that there is a potential conflict of interest created by compensation of credit rating agencies. As stated by Ronald M. Loeb and David J. Richter in *Rating Agencies: Recent Reform Initiatives*, 953 PLI/Corp. 301, 306 (Aug.1996),

> A rating agency's credibility rests upon its status as an independent evaluator of the credit quality of an issuer's security. Nonetheless, rating agencies are compensated not by the investors who rely upon their ratings but rather by the issuers whose securities are being rated. Moreover, rather than viewing investors as their sole clients, most of the rating agencies, to varying degrees, view everyone involved—investors, issuers and investment bankers—as their clients.

See also Schwarcz, *Private Ordering*, 2002 U. Ill. L.Rev. at 15 ("Rating agencies are virtually always paid their fee by the issuer of securities applying for the rating. This raises the possibility that the issuer will use, or the rating agency will perceive, monetary pressure to improve the rating."). Frank Partnoy, 77 Wash. U.L.Q. 619, argues that the limited number of rating agencies and lack of competition, secrecy regarding the rating process, and payment of compensation by issuers of the bonds they are rating, among other historical and economic factors, have resulted in declining informational value of their ratings and created incentives to provide inaccurate ratings. Other commentators like Gregory Husisian, 75 Cornell L.Rev. 411, and Claire Hill discount this argument, insisting that the rating agencies' reputation for independence and honesty is too important to compromise and generally functions effectively as a bar to any pressure from issuers who pay for their ratings, as does competition with other credit-rating agencies.

securities more accurately affect the market's collective preference for the risk." Gregory Husisian, *What Standard of Care Should Govern the World's Shortest Editorials? An Analysis of Bond Rating Agency Liability*, 75 Cornell L.Rev. 411, 413 (1990) (footnotes omitted).[82] The article goes on to cite a number of decisions for the proposition that bond rating services receive the same full First Amendment protection afforded other media such as newspapers for negligent non-defamatory misstatements of fact. *Id.* at n. 16; *see, for example, First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 869 F.2d 175, 180 (2d Cir.1989).

*Id.* at 111. The court in *Commercial Services* again distinguished the case before it and *First Equity Corp.*, which involved a suit by subscribers to Standard & Poor's newsletter, based on the special relationship of privity between the parties in *Commercial Services* that created a duty of care not owed to a general reader or a subscriber. 94 P.3d at 111–12. *See also American Savings Bank, FSB v. UBS Painewebber*, No. M8–85, 2002 WL 31833223, at *1–2 (S.D.N.Y. Dec. 16, 2002)(because unlike Standard & Poor's, Fitch, in addition to functioning as a newsgatherer, "does not operate publications with complete circulation to the general public[,] ... performs ratings based on a

private contractual agreement[, and] ... rates transactions at the request of issuers or investment bankers for a fee," and thus Fitch "is not entitled to the protections afforded by the journalistic privilege").

Even where one lower court allowed a negligent and fraudulent misrepresentation action to go forward under Illinois law (both causes of action requiring reasonable reliance on the statements at issue) against a credit rating agency,[83] the Seventh Circuit held that a purchaser's reliance on an "A" credit rating of bonds by Standard & Poor's was not reasonable because he had received a letter from the issuer informing him of substantial risks in that type of investment and that the Standard & Poor's rating was not a recommendation, because the Private Placement Memorandum warned that the bonds were not insured or guaranteed, because he was an experienced banker, and because he was informed that over one million dollars of mortgage loans in the offering were delinquent. *Quinn v. McGraw–Hill Companies, Inc.*, 168 F.3d 331, 336 (7th Cir.1999).

In contrast to the situation in *Jefferson County*, where the credit rating agency had not been asked to rate the bonds at issue, here CRRA claims that it specifically retained Standard & Poor's and Moody's to rate the bonds that Enron issued in the fall of 2000, and that they gave the bonds a positive rating. Thus

---

**82.** This law review article was also cited in *Jefferson County*, which proclaimed,

> Courts cannot constitutionally allow recovery on any showing less than recklessness because of the potential chilling effect that imposing a negligence standard would have on rating publications. Given the importance of financial information to investors and the economy as a whole, bond rating constitutes a matter of "public concern." Applying the traditional first amendment law, the state's interest in compensating relying investors must give way to the first amendment's concern for the free flow of commercial information. Society must rely

on the market and competition to keep rating agencies operating at their negligence threshold, not on courts and juries.

175 F.3d at 848, n. 3, *quoted by Commercial Financial Services*, 94 P.3d at 111.

**83.** The appellate court noted that Illinois recognizes that "the tort of negligent misrepresentation extends to third parties who lack privity with the defendant where the 'defendant knew the information would be used and relied upon' and 'the potential liability was restricted to a comparatively small group.'" 168 F.3d at 335 (citations omitted).

there is a question whether the relationship of privity or conflict of interest as to those two agencies precludes or limits First Amendment protection of the ratings. *Commercial Financial,* 94 P.3d at 110.

CRRA has alleged professional negligence claims against the Rating Agencies: specifically that the Rating Agencies accepted Enron's false representations about its financial health, failed to perform a reasonable and continuous investigation and to evaluate Enron's business, liquidity risk, corporate governance, accounting practices and conflicts of interest, negligently published false and misleading credit information concerning Enron, despite the fact that they had contradictory information available to them and could have and should have requested information directly from Enron, which would have shown that Enron's financial situation was precarious and not what Enron was representing it to be. Amended Complaint at ¶ 400. The Court finds that the challenged ratings reports are a combination of subjective, nonactionable evaluation and verifiable facts. The Court concludes that the *actual malice standard* should apply here because the nationally published credit ratings focus upon matters of public concern, a top Fortune 500 company's creditworthiness. Thus CRRA must also demonstrate that the ratings were made with "actual malice," i.e., "with knowledge that the statement was false or with reckless disregard for whether or not it was true." *Hustler Magazine v. Falwell,* 485 U.S. at 56, 108 S.Ct. 876; *New York Times v. Sullivan,* 376 U.S. at 280, 84 S.Ct. 710.

This Court has previously indicated that there is no blanket First Amendment protection for published credit ratings; one must examine any underlying facts, the circumstances under which the statements were made (context), the nature of the content, and the language of the statements to determine whether they are protected by the First Amendment. Since the First Amendment protection for credit rating agencies as members of the "financial press" performing "traditional journalistic functions" is not universally acknowledged, the Court addresses more specific standards applied by the courts to determine if the creditworthiness reports are protected.

Given what appears to be a policy of heightened protection for credit reports under the First Amendment, which are matters of public concern and opinion even if negligently prepared, in light of the conclusory allegations regarding the Credit Rating Agencies in CRRA's amended complaint the Court finds that CRRA has failed to satisfy any of the specific, enhanced pleading requirements established by courts to overcome First Amendment protection for alleged negligent misrepresentation against any of the Defendant Credit Rating Agencies. CRRA's complaint does not detail the circumstances or the language of any of the agencies' reports, it has not identified factual statements that are provably false, and it has not alleged facts showing that the Rating Agencies were at fault because they knew or had significant suspicions that their statements were false and thus acted with actual malice. While the complaint claims that the Rating Agencies "could have and should have known" of the misrepresentations or omissions of their creditworthiness reports regarding Enron, the phrase "could have and should have known" does not reach the standard of *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), i.e., that "the defendant in fact entertained serious doubts as to the truth of his publication." As noted, the Agencies are not held to a reasonable person standard that might require investigation: "[F]ailure to investigate before publishing, even when a reasonably prudent person would have done

so, is not sufficient to establish reckless disregard." *Harte–Hanks Communications v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Thus CRRA has not met its pleading burden to state a claim in light of Defendants' First Amendment defense. While this Court would normally grant leave to amend to allow a Plaintiff an opportunity to cure its failure to meet enhanced pleading standards, because, as explained below, the Court concludes that as a matter of law CRRA cannot state a claim for negligent misrepresentation against the Credit Rating Agencies under the facts of this case, amendment would be futile.

### (2.) Duty of Care

■ Even if CRRA's Amended Complaint had adequately pleaded that the challenged credit reports were not entitled to constitutional protection by showing that they contained specific provably false factual connotations made with actual malice in response to the Credit Rating Agencies' First Amendment defenses,[84] a crucial prerequisite for stating a negligent misrepresentation claim is a court determination that under the facts and circumstances alleged, there exists a duty of care owed to the plaintiff by the defendant. *Gomes v. Commercial Union Insurance Co.,* 258 Conn. 603, 614, 783 A.2d 462, 469 (2001). "The existence of a duty is a question of law, and only if such a duty is found to exist does the trier of fact then determine whether the defendant [breached] that duty in the particular situation at hand." *Id.,* 258 Conn. at 614, 783 A.2d at 470 (citations omitted).

The Connecticut Supreme Court has explained, under Connecticut law,

"Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of

that duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual.... Although it has been said that no universal test for [duty] ever has been formulated ... our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may result if it is not exercised.... By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result? ..."

"A simple conclusion that the harm to the plaintiff was foreseeable, however, cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed.... A further inquiry must be made, for we recognize that duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.... While it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world.... The problem for the law is to limit the legal consequences of wrongs to a controllable degree."

*Id.,* 258 Conn. at 615, 783 A.2d at 470, *quoting Lombard v. Edward J. Peters, Jr., P.C.,* 252 Conn. 623, 632–33, 749 A.2d 630 (2000). Thus this Court must make "(1) a

---

**84.** *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695.

determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public police analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in this case.'" *Id.*, 258 Conn. at 616, 783 A.2d at 470.

It could be argued, and CRRA has done so, that the nature of the harm suffered by CRRA was a foreseeable result of the allegedly misleading ratings reports about Enron's creditworthiness. Focusing on the second prong, the Court finds that the critical issue here is whether the relationship between the Credit Rating Agencies' alleged negligent misrepresentation and the injury to CRRA is too removed as a matter of public policy to impose a duty.

In Connecticut there is no statute or articulated policy reason for holding the Credit Rating Agencies liable for their alleged failure to perform adequate investigations or to challenge the information given to them by Enron. "In the absence of a controlling statute or overriding public policy consideration," the Court measures the "attenuation between [the third party tortfeasor's] conduct, on the one hand, and the consequences and identity of the plaintiff on the other hand." *Gomes*, 258 Conn. at 616, 783 A.2d at 470–71. Here, the Court finds that relationship between the alleged negligent misrepresentation by the Credit Rating Agencies and the harm to CRRA too remote, as a matter of public policy, to impose a duty. The credit reports were distributed to the world at large. At most, the Credit Rating Agencies were rating Enron's creditworthiness for repayment of specific bonds issued during 2000. CRRA did not purchase these bonds. Instead, it made a loan to Enron that was independent of the bonds.

Circumstances of lesser import support the finding of no duty. While insufficient by themselves to preclude liability, the credit reports had clear, unambiguous disclaimers that they were opinions and not guarantees. Moreover CRRA was an experienced business entity with substantial business acumen. Furthermore there is a fact issue as to whether CRRA knew that it was acting *ultra vires* and improperly in making an allegedly disguised, unsecured loan to Enron, a matter that cannot be determined at this stage. This Court has previously discussed the significant rule played by the Credit Rating Agencies in the efficient operation of capital markets, which would be chilled by unlimited potential liability for creditworthiness ratings, while public policy clearly encourages "continued vigorous participation in the activity." *Jaworski v. Kiernan*, 241 Conn. 399, 407, 696 A.2d 332, 337 (1997). While new regulation of the agencies may well be in order to "protect[ ] the safety of the participants," *id.*, allowing anyone to sue credit rating agencies who had read the credit rating reports and claimed to have relied upon them and lost money in any endeavor that person undertook would be far more deleterious than beneficial to society as a whole.

In conclusion, because CRRA has failed to meet the requirements of heightened pleading to pierce First Amendment protection and because the Court concludes as a matter of law and public policy that there was no duty of care owed by the Credit Rating Agencies to CRRA regarding its loan to Enron, the Court grants the Rating Agencies' motion to dismiss the negligent misrepresentation claim.

### 2. CUTPA Claims

#### a. Rating Agencies' Arguments

As for the claims against them under CUTPA, in addition to denying that they

owed any duty of care to CRRA to support a malpractice claim, the Rating Agencies insist that the allegations against them "are indistinguishable from other forms of professional negligence excluded by Connecticut courts" (# 238 at 26) under CUTPA, like those the Court discussed against Andrews & Kurth. The Rating Agencies urge that the professional negligence exclusion has been applied by Connecticut courts outside of the areas of medicine, law and psychology and should be applied to them, too. *Anderson v. Yale University,* No. CV 970399373, 1998 WL 405117, at \*4 (Conn.Super. July 1, 1998)(striking CUTPA claim against publishers of a campus periodical, who the court found were not engaged in trade or commerce in writing the article, but instead "in the dissemination of information through the medium of the written word"; court applied the rule of *Haynes v. Yale–New Haven Hosp.* and concluded that "just as the doctor or lawyer cannot be held liable for a CUTPA violation based on malpractice, which does not implicate billing or solicitation, so too must the reasoning extend to journalists"); *Ferrigno v. Pep Boys–Manny, Joe and Jack, Inc.,* 47 Conn.Supp. 580, 582, 818 A.2d 903, 904 (Conn.Super.2003)(striking CUTPA claim asserted against automobile servicing business based upon purported improper tire installation because "professional negligence or malpractice" is not cognizable under the statute). The complaint does not allege that the Rating Agencies engaged in the solicitation of business or other commercial conduct or that they profited from negligently rating Enron's creditworthiness.

Nor does the complaint assert that the Rating Agencies engaged in any deceptive or unfair acts, under the cigarette rule standard, which must be pled with particularity under CUTPA. With respect to the first factor under the cigarette rule, the complaint fails to allege that the Rating Agencies' conduct violated public policy.

For the second factor, it fails to assert and cannot assert that the Rating Agencies engaged in immoral, unethical, oppressive or unscrupulous actions in publishing the ratings of Enron, especially because CRRA has pled that the Rating Agencies were purposely misled by Enron, which provided them with falsely inflated financial information.

Furthermore the Credit Rating Agencies contend that, as a matter of law, CRRA has not alleged that the Rating Agencies' acts caused CRRA substantial damage. To constitute a "substantial injury" under Connecticut law, the injury must be substantial, not outweighed by any countervailing benefits to consumers or competition, and not one that consumers could reasonably have avoided. *Web Press Services Corp. v. New London Motors, Inc.,* 205 Conn. 479, 484, 533 A.2d 1211, 1214 (1987). While CRRA has alleged that it lost a substantial sum of money in the Enron Transaction, it has failed to plead the remaining two prongs adequately. Defendants contend that CRRA has conceded that it should not have entered into the disguised loan, which was unsecured and *ultra vires,* exceeding its statutory authority. and could reasonably have avoided its injury. Moreover, CUTPA does not apply when a claim is grounded solely in negligence and the plaintiff was contributorily negligent. *Williams Ford,* 657 A.2d at 227. Therefore CRRA is therefore barred from recovering from the Rating Agencies.

In addition the Rating Agencies insist that the CUTPA claim fails because CRRA's claimed damages were not directly caused by their conduct. Conn. Gen. Stat. § 42–110g(a) (plaintiff may assert a CUTPA claim if he "suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b."). Connecticut

courts construe this statutory language to require a plaintiff to plead and demonstrate that his injuries were directly caused by the wrongful acts of the defendant. *Vacco v. Microsoft Corp.*, 260 Conn. 59, 86–91, 793 A.2d 1048, 1064–67 (2002)(holding that CUTPA does not apply where the defendant suffers remote or derivative effects from alleged wrongful acts); *Collins v. Gulf Oil Corp.*, 605 F.Supp. 1519, 1523 (D.Conn.1985) ("To sustain a CUTPA claim, plaintiff must show that he was a direct victim of defendants' unfair practices."); *Connecticut State Medical Society v. Oxford Health Plans, Inc.*, No. X01CV010165664S, 2002 WL 31501871, at *3 (Conn.Super. Oct. 25, 2002)(rejecting argument that any loss having its origin in a CUTPA violation in a "but for" sense is actionable under the statute), *aff'd*, 272 Conn. 469, 863 A.2d 645 (2005). The Rating Agencies insist that CRRA's losses arose from the acts of the parties involved in the Enron Transaction, and only indirectly, if at all, from the Rating Agencies' publication of Enron's credit rating.

Fitch adds that because securities ratings are a form of speech protected by the First Amendment, and because CRRA has failed to allege that it acted with actual malice, CRRA has failed to assert a CUTPA claim. *Jones v. New Haven Register, Inc.*, No. 393657, 2000 WL 157704, at *9 (Conn.Super.Ct. Jan. 31, 2000)

■ Fitch, a Delaware Corporation with its principal place of business in New York, also challenges the Connecticut court's personal jurisdiction over it. Noting that the Connecticut long-arm statute covering foreign corporations, Connecticut General Statutes § 33–929(e) & (f),[85] does not extend as far as permitted by the federal Constitution because it does not authorize personal jurisdiction over a foreign corporation on the grounds that it was systematically and continuously doing business in Connecticut, but only where the foreign corporation commits tortious conduct within Connecticut or where the claim arises out of business transacted by the defendant in Connecticut.[86] The complaint's jurisdictional allegation against each of the Rating Agencies is that each

---

**85.** Section 33–929(e) & (f) provides in relevant part,

(e) Every foreign corporation which transacts business in this state in violation of section 33–920 shall be subject to suit in this state upon any cause of action arising out of such business.

(f) Every foreign corporation shall be subject to suit in this state by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state ... or (4) out of tortious conduct in this state....

Section 33–602(14) defines a "foreign corporation," as used in § 33–929, as "a corporation incorporated under a law other than the law of [Connecticut]."

The long-arm statute applying to foreign corporations is thus far more restrictive than the one applying to non-resident individuals and foreign partnerships, § 52–59b(a), that the Court applied to Andrews & Kurth and that allows jurisdiction based on torts committed outside the state but causing injury inside the state. *See, e.g., Bross Utils. Serv. Corp. v. Aboubshait*, 489 F.Supp. 1366, 1373 & n. 35 (D.Conn.1980), *aff'd*, 646 F.2d 559 (2d Cir.1980) (Table).

**86.** In determining whether personal jurisdiction exists based on a cause of action arising out of business transacted by the defendant within Connecticut, this Court must exclude from consideration evidence of other business activities in which the defendant has participated if the plaintiff's claims do not arise out of those activities. *Lombard Bros., Inc. v. Gen. Asset Mgmt. Co.*, 190 Conn. 245, 251, 460 A.2d 481, 484–85 (Conn.1983), *citing Electric Regulator Corp. v. Sterling Extruder Corp.*, 280 F.Supp. 550, 554 (D.Conn.1968).

"regularly transacts business in the State of Connecticut and derives substantial revenue from business within the State of Connecticut," but not that CRRA's claim arises out of such business. Amended Complaint at ¶¶ 98–100. Furthermore, although CRRA asserts that it specifically discussed the transaction at issue with Standard & Poor's and Moody's, it does not claim that it did so with Fitch. Nor does the complaint state that Fitch made any misrepresentation to CRRA in Connecticut or that CRRA read of a rating of some Fitch publication in Connecticut. Thus there is no transaction of business that gave rise to the claim. Nor is there any tortious conduct by Fitch in Connecticut alleged to give rise to personal jurisdiction: the complaint does not allege that Fitch made any misrepresentation to CRRA within Connecticut or that CRRA read of a rating in a Fitch publication in Connecticut. Instead the complaint charges that the Rating Agencies published their ratings of Enron's creditworthiness to the investing public at-large on a global basis. Fitch submits an affidavit demonstrating that Fitch did no rating

analysis or research, whose adequacy is challenged in this suit, in Connecticut.

CRRA's response in opposition in essence argues that the Rating Agencies knew or should have know of Enron's dire financial situation because they had access to information that would have revealed the numerous parts of the fraudulent scheme involving off the balance sheet special purpose entities participating in deceptive and risky transactions, hedges, swaps, prepays, loans disguised as business deals, aggressive accounting practices to hide Enron's debt and inflate its revenue, conflicts of interest, etc.

### b. Court's Ruling on CUTPA claim

### (1.) Professional Negligence Exemption

■■■ The Credit Rating Agencies contend that the CUTPA claims against them "are indistinguishable from other forms of professional negligence excluded by Connecticut courts" (# 238 at 26) under the statute. The Connecticut Supreme Court's exception from CUTPA liability for professional negligence of lawyers[87] and doctors and healthcare providers,[88] ex-

---

**87.** *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin,* 247 Conn. 48, 79, 717 A.2d 724, 740 (1998); *Krawczyk v. Stingle,* 208 Conn. 239, 246, 543 A.2d 733, 736 (1988); *Jackson v. R.G. Whipple, Inc.,* 225 Conn. 705, 730–31,627 A.2d 374, 386 (1993)(Berdon, J., concurring)("it is important not to interfere with the attorney's primary duty of robust representation of his or her client"); *Suffield Development Associates, Ltd. Partnership v. National Loan Investors, L.P.,* 260 Conn. 766, 782–83, 802 A.2d 44, 53–54 (2002)(entrepreneurial exception is "a well-defined set of activities-advertising and bill collection for example" and is not based on whether the attorney profited from the activity).

**88.** *Haynes v. Yale–New Haven,* 243 Conn. 17, 34–35, 699 A.2d 964, 972–73 (medical malpractice claim against doctors and healthcare providers). Concluding that "professional negligence—that is, malpractice—does not

fall under CUTPA," the Connecticut Supreme Court wrote,

> We conclude that the touchstone for a legally sufficient CUTPA claim against a healthcare provider is an allegation that an entrepreneurial or business aspect of the provision of services aside from medical competence is implicated, or aside from medical malpractice based upon the adequacy of staffing, training, equipment, or support personnel. Medical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation. To hold otherwise would transform every claim for malpractice into a CUTPA claim.

*Id.,* 243 Conn. at 38, 699 A.2d at 974. The high court concluded that all physicians and health care providers represent to the public that "they are licensed and impliedly that they will meet the applicable standards of care. If they fail to me et that standard of care and harm results, the remedy is not one based

cept for the purely entrepreneurial or commercial aspects of their work, for public policy reasons has been extended by some lower Connecticut courts to architects, accountants, and engineers.[89]

■ As a remedial statute CUTPA should be broadly construed and exceptions narrowly construed. This Court finds that the rationale of some cases establishing or extending the professional negligence exemption do not fit the Credit Rating Agencies. Unlike the relationships between clients or patients and their lawyers, doctors, accountants, architects and/or engineers, there is no direct or personal relationship here, but only an attenuated link, between the Credit Rating Agencies and vast audience who read and may rely on their creditworthiness reports. Those to whom the credit report is distributed are merely potential investors whom the Credit Rating Agencies do not know, cannot specifically identify, and are not even subscribers to their newsletters or publications. Indeed CRRA was not even

---

upon CUTPA, but upon malpractice." *Id.*, 243 Conn. at 39, 699 A.2d at 974–75. *See also Rumbin v. Baez*, 52 Conn.App. 487, 490, 727 A.2d 744 (1999)(licensed clinical psychologist).

The court in *Hendriks Associates, L.L.C. v. Old Lyme Marina, Inc.*, No. 546496, 2001 WL 496883, *6, (Conn.Super. Apr. 26, 2001)(extending the CUTPA professional negligence exemption to engineers), emphasized, "The purpose of CUTPA is not to provide an alternate, statutory basis for bringing a malpractice action. The Supreme Court's distinction between the entrepreneurial and other aspects of professional practice should therefore apply with equal force to professions other than law and medicine."

89. *Routh v. Preusch*, No. CV030197042, 2004 WL 2165906, *3 (Conn.Super. Sept. 1, 2004)("There is no discernible reason why a professional architect should be treated differently than doctors and lawyers" for purposes of liability under CUTPA.).

In *The Advest Group, Inc. v. Arthur Andersen, L.L.P.*, No. CV 97 0571417, 1998 WL 457697, *7–8 (Conn.Super. July 28, 1998)(extending CUTPA professional negligence exemption to accountants), the court wrote,

It is logical to extend the reasoning in *Haynes* to accounting malpractice claims. Accounting, like law and medicine, is a learned profession that is not interchangeable with other commercial endeavors. Deviations from the standard of care applicable to accountants are not the type of actions the consumer protection provisions of CUTPA were designed to prevent. Case law concerning accounting malpractice, the regulations of the State Board of Accountancy, and the rules of the American Institute of Certified Public Accountants more appropriately address such deviations.

Like attorneys and health care providers, accountants are extensively regulated by a state agency other than the Department of Consumer Protection. See Connecticut General Statutes §§ 20–279b, et seq. The State Board of Accountancy (the "Board") regulates the conduct of public accountants in this state pursuant to the authority granted to it by § 20–280 of the Connecticut General Statutes. Specifically, the Board has the authority to conduct investigations into complaints about the conduct of accountants, § 20–280c, and to impose sanctions on accountants, including fines; revocation or suspensions of licenses, censures; or imposition of probation; for committing dishonesty, fraud or negligence in the practice of public accountancy and for other enumerated misconduct. § 20–281a.

In accord *Vanczak v. Romani*, No. 990080053, 2002 WL 31466438, *1–2 (Conn.Super. Oct. 18, 2002).

The exemption was also extended to engineers by several courts: *Hendriks Associates, L.L.C. v. Old Lyme Marina, Inc.*, No. 546496, 2001 WL 496883, *5 and *6 (Conn.Super. Apr. 26, 2001)(noting, "There is a split among Superior Court judges" on the issue of whether the "CUTPA exclusion for professional negligence, as established by the Supreme Court, ... extend[s] to other professions than law and medicine"); *Stamford IHOP, Inc. v. Torello*, No. CV990425893, 2001 WL 103766, *1 (Conn.Super., Jan. 24, 2001); *Shoreline Care Ltd. P'ship v. Jansen & Rogan Consulting Engineers, P.C.*, No. X06CV940155982S(CLD), 2002 WL 173155, *4 (Conn.Super. Jan. 9, 2002).

a potential investor in Enron debt securities, but merely a participant in an illegal loan. Thus there is no confidential professional/client relationship here that public policy seeks to protect.

CUTPA's purpose is not to provide an alternative statutory basis for malpractice. *Advest Group,* 1998 WL 457697, at *7; *Willow Springs Condominium Ass'n, Inc. v. 7th BRT Development Corp.,* 245 Conn. 1, 42–43, 717 A.2d 77, 99–100 (1998) ("CUTPA reflects a public policy that favors remedying wrongs that may not be actionable under other bodies of law."); *Hendriks Associates, Llc v. Old Lyme Marina, Inc.,* No. 546496, 2001 WL 496883, *6 (Conn.Super. Apr. 26, 2001). As discussed, some courts expanding the application of the CUTPA exemption have done so with the result of barring CUTPA claims against professionals for malpractice. The gravamen of the complaint against the Credit Rating Agencies here is professional negligence. In *Haynes v. Yale–New Haven Hospital,* the plaintiff asserted that the defendant hospital represented to the public that it was a "major trauma center," but did not meet the standards of such an entity. 243 Conn. at 38, 699 A.2d 964. The Supreme Court found that such a claim was in essence a claim for professional malpractice. By analogy, the Credit Rating Agencies, holding themselves out as the most prominent and respected rating agencies, designated as NRSROs by the SEC, imply they are meeting the high standards of their field in their ratings of Enron's creditworthiness. Thus, under the reasoning of some of the cases, the remedy for the alleged failure to satisfy those standards should not be grounded in CUTPA, but in negligence, a failure to meet a duty of care if Plaintiff can establish that one exists between the Rating Agencies and CRRA.

Nevertheless, in contrast to the situation in *The Advest Group,* where the court reasoned that extensive regulation of accountants provided alternative and more appropriate remedies, as discussed earlier there is minimal if any regulation of the Credit Rating Agencies by the state or federal government, and thus no other source of restraint of misconduct. Thus the "implication of this argument ... that their professional conduct should be judged by the carefully articulated standards of their own profession, as would be done in a malpractice action, not by other, potentially inconsistent standards that might otherwise be applied by an untutored factfinder in a CUTPA claim," flounders under the circumstances here. *Morin v. Tracy, Driscoll & Co.,* No. CV030823241S, 2004 WL 1395945, *6 (Conn.Super. May 26, 2004). This Court is also aware that the statute "by its own terms applies to a broad spectrum of commercial activity." *Willow Springs,* 245 Conn. at 42, 717 A.2d at 99. "Trade or commerce, in turn, is broadly defined as the advertising, sale or rent or lease, the offering for sale or rent or lease, of **the distribution of any services and any property, tangible or intangible, personal or mixed, and any other article, commodity, or thing of value in this state.** [emphasis added]" *Id.,* citing General Statutes § 42–110b(d). Furthermore "CUTPA reflects a public policy that favors remedying wrongs that may not be actionable under other bodies of law.... It is, therefore, not necessary to find [the defendant] liable for some underlying actionable wrong in order to support a CUTPA claim." *Willow Springs,* 245 Conn. at 43, 717 A.2d at 100.

Because the Connecticut courts have not addressed the question of extending the CUTPA exemption to credit rating agencies and because as a remedial statute the reach of CUTPA should be liberally construed, this Court is unwilling to conclude that the professional negligence exemption

should apply to the Credit Rating Agencies.

## (2.) Unfair Practice that Violates CUTPA: The Cigarette Rule

Therefore the Court examines the criteria of the cigarette rule of the federal trade commission to determine whether the alleged conduct is unfair and violates CUTPA: (1) whether the alleged practice offends public policy as established by statute, common law or some "other established concept of unfairness," (2) whether it is immoral, unethical, oppressive, or unscrupulous, and (3) whether it causes substantial injury to consumers, competitors or business persons. *Willow Springs,* 245 Conn. at 43, 717 A.2d at 99–100.

There does not appear to be any common law or statute or other legal authority in Connecticut establishing a public policy against the distribution of credit ratings that are negligently misleading by the Credit Rating Agencies.[90]

 " 'Although a failure to disclose can constitute a CUTPA violation, it will do so only if, in light of all the circumstances, there is a duty to disclose.' " *Willow Springs,* 245 Conn. at 43–44, 717 A.2d 77, *quoted in Gladue v. Cummins,* No. 547927, 1999 WL 793783 (Conn.Super.Sept.27, 1999); *see also Normand Josef Enterprises, Inc. v. Conn. Nat'l Bank,* 230 Conn. 486, 523, 646 A.2d 1289, 1307 (1994) ("A failure to disclose can be deceptive only if, in the light of all the circumstances, there is a duty to disclose."). "A duty to disclose will be imposed ... on a party insofar as he voluntarily makes disclosure. A party who assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak." *Macomber,* 261 Conn. at 636, 804 A.2d at 191–92; *Catucci v. Ouellette,* 25 Conn.App. 56, 59, 592 A.2d 962, 963–64 (1991)(same; adding that the party "must avoid deliberate nondisclosures."). The allegations here are that the Credit Rating Agencies could have or should have known of Enron's risky financial state, not that they did know. One cannot be held liable for failing to disclose something one did not know. Therefore CRRA has not established a duty to disclose based on the

---

**90.** Rather, public policy favoring First Amendment protection for the role of free speech and the free flow of information on matters of public concern favors protection of even purportedly negligent inaccuracies. Protection of freedom of expression is based on the supposition that " 'right conclusions are more likely to be gathered out of a multitude of tongues.' " *New York Times,* 376 U.S. at 269, 84 S.Ct. 710, quoting Judge Learned Hand, *U.S v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943). "Freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 503–04, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). As proclaimed by Justice Holmes in his dissent in *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919)("[T]he best test of truth is the power of the thought to get itself accepted in the competition of the market...." Although "false statements of fact are particularly valueless [because] they interfere with the truth-seeking function of the marketplace of ideas ... and ... cause damage to an individual's reputation that cannot be easily repaired," nevertheless "a rule that would impose strict liability for false factual assertions would have an undoubted 'chilling effect on speech relating to public figures that does have constitutional value.' ") *Hustler Magazine,* 485 U.S. at 51–52, 108 S.Ct. 876. Thus "breathing space is provided by a constitutional rule that allows public figures to recover for libel or defamation only when they can prove *both* that the statement was false and that the statement was made with the requisite level of culpability." *Id.* at 52, 108 S.Ct. 876. As noted, a pragmatic reason for the protection of creditworthiness ratings, the essential role of the Rating Agencies in effecting economical and efficient capital markets, has long been recognized and protected.

Rating Agencies' having voluntarily made deceptive ratings.

 The factual allegations in the complaint supporting a negligent misrepresentation cause of action clearly do not amount to immoral, unethical, oppressive or unscrupulous conduct. *Thames River Recycling v. Gallo,* 50 Conn.App. 767, 784, 720 A.2d 242, 254 (1998) ("proof that a *party acted negligently is not sufficient* to establish[ ] that the party's conduct was immoral, unethical, or unscrupulous" and is not adequate to show a CUTPA violation "unless the party claiming the act was violated also proved by a preponderance of the evidence that the third factor [caused substantial injury to consumers, competitors or other business people] ... was violated.").

Regarding this third factor, the Court finds that CRRA is a business person that suffered substantial monetary loss when Enron filed for bankruptcy and defaulted on CRRA's loan. For conduct to cause substantial, unjustified injury, the injury must not only be substantial but it must "not be outweighed by any countervailing benefits to consumers or by competition that the practice produces" and must be "an injury that the consumer, competitor, or other business person could not reasonably have avoided." *Thames River Recycling v. Gallo,* 50 Conn.App. 767, 785–86, 720 A.2d 242, 255 (1998). Here the Court has discussed at length the strong policies protecting credit rating agencies because the benefits to the capital markets generally are deemed to outweigh the injuries to consumers, in particular where there are warnings that the reports are opinions and not guarantees.

The Connecticut Supreme Court has held that a plaintiff who is contributorily negligent fails to establish the third element. *Williams Ford,* 232 Conn. at 592–93, 657 A.2d at 228 ("because the jury found that the dealerships were 10 percent contributorily negligent, the dealerships have not proved that they 'could not reasonably have avoided any injury.' "). The Court has already observed that in this action CRRA charges its lawyers with that negligence, not itself. The issue of contributory or comparative negligence cannot be determined at this stage of the litigation.

Moreover, CUTPA provides a private cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b...." General Statutes § 42–110g(a); *Abrahams v. Young and Rubicam, Inc.,* 240 Conn. 300, 306, 692 A.2d 709, 712 (Conn.1997), *citing Fink v. Golenbock,* 238 Conn. 183, 212–13, 680 A.2d 1243 (1996). The Connecticut Supreme Court construes the phrase, "as a result of," as requiring that the plaintiff show that the prohibited act proximately caused the harm to the plaintiff. *Abrahams,* 240 Conn. at 306, 692 A.2d at 712. Proximate cause is " '[a]n actual cause that is a substantial factor in the resulting harm.' " *Id., quoting Stewart v. Federated Dept. Stores, Inc.,* 234 Conn. 597, 606, 662 A.2d 753 (1995). In other words "proximate cause" requires a determination " 'whether the harm which occurred was of the same general nature as the foreseeable risk' created by the defendant's act." *Id., quoting Doe v. Manheimer,* 212 Conn. 748, 758, 563 A.2d 699 (1989). Proximate cause is more limited than cause in fact: " 'Philosophically cause in fact is limitless; but for the creation of this world, no crime or injury would ever have occurred.... Lines must be drawn determining how far down the causal continuum individuals will be held liable for the consequences of their actions.' " [91] *Id., citing*

---

91. The cause in fact test is also knows as the "but for" test. The proximate cause test is in essence "a legal tool for limiting a wrong-

*Stewart*, 234 Conn. at 605–06, 662 A.2d 753. The question of causation is generally one for the trier of fact unless the mind of a fair and reasonable person can reach only one conclusion. *Id.*

The pleadings allege that the credit ratings were a substantial factor in CRRA's decision to do business with Enron by allegedly providing an unsecured loan to Enron. The questions of substantial injury, proximate cause and even foreseeability of that harm being of the same general nature as the foreseeable risk created by Defendants' alleged negligence, require considerations similar to the factors for imposing a duty to disclose as a matter of public policy on the allegedly negligent Credit Rating Agency Defendants for a negligent misrepresentation claim, discussed *supra*. For the reasons cited by the Court under that analysis, it finds that CRRA has failed to plead proximate cause under CUTPA because the mind of a fair and reasonable person could reach only one conclusion on the causation issue, i.e., that CRRA's decision to make the purported loan was far too attenuated from the alleged negligent creditworthiness reports to impose liability under CUTPA.

## V. Summary of Rulings

Accordingly, for reasons stated above, the Court

ORDERS the following:

### A. H–03–1580

(1) Plaintiff CRRA's motion to strike the Apportionment Complaint is GRANTED with prejudice and the remaining legal malpractice case-in-chief is REMANDED to the Superior Court for the Judicial District of Waterbury, Connecticut, where it was previously designated (X06) CV 02 0174569 S(# 72).

---

doer's liability only to those types of harms that have a reasonable connection to his action." *Ganim v. Smith & Wesson Corp.*, 258 Conn. 313, 350–51, 780 A.2d 98, 121 (2001).

(2) Pending motions # 15 and 94 are MOOT, while # 61 and 62 will remain pending for a ruling after remand to state court.

### B. H–03–1558

(1) CRRA's motion to stay adjudication of any motions to transfer until motion for remand is resolved (# 119), joined by the Arthur Andersen Defendants (# 141), is MOOT;

(2) CRRA's motion to remand and/or abstain, or alternatively to strike, dismiss or sever the third-party complaint pursuant to Rule 14(a) of the Federal Rules of Civil Procedure and remand the underlying action against the three law firm defendants (# 121) is DENIED;

(3) CRRA's motion to consolidate H–03–1558 with H–03–1579 (# 246 in H–03–1558) and Rebecca Mark–Jusbasche's motion to consolidate the same two cases (# 41 in H–03–1579) are GRANTED; henceforth the parties shall file all pleadings in the lead case, H–03–1558;

(4) CRRA's petition for certification of interlocutory appeal (# 224) of an order by the Judge Eginton, denying CRRA's motion to remand, is DENIED;

(5) The Credit Agency Defendants' motion for leave to file motions to dismiss is GRANTED, but their request for a stay of discovery (# 237) is MOOT;

(6) Plaintiff's motion to file sur-reply (# 321) to Andrews & Kurth L.L.P.'s reply is GRANTED.

(7) Defendant Andrews & Kurth L.L.P.'s motion to dismiss (# 254) is GRANTED as to CRRA's CUTPA claim and DENIED as to the claim for aiding and abetting under § 876(b);

---

*See generally* Robert M. Langer, John T. Morgan, and David L. Belt, 12 Conn. Prac, Unfair Trade Practice § 6.5 ("Private Enforcement"; "Proximate Cause")(West 2004).

(8) Defendants S & P, Fitch, and Moody's motions to dismiss (# 256, 259, and 262) are GRANTED.

Responses to the following motions shall be filed within thirty days of entry of this memorandum and order: (1) Defendant Joseph W. Sutton's motion to dismiss (# 125) for lack of personal jurisdiction; (2) Defendant Mark–Jusbasche's motion to dismiss (# 158) for lack of personal jurisdiction.

**C. H–03–1579**

CRRA's motion to stay adjudication of any motions to transfer (instrument # 36 in H–03–1579; # 119 in H–03–1558) is MOOT.